UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**COMPLAINT**

DAVID PAKTER,

ECF CASE 08 CV 7673
(DAB)/(KNF)
Plaintiff demands a
jury trial

                  Plaintiff,

   -against

NEW YORK CITY DEPARTMENT OF EDUCATION
f/k/a BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK;  and  JOEL I.
KLEIN, as Chancellor of the CITY SCHOOL DISTRICT
OF THE CITY OF NEW YORK;,

                  Defendants.

Plaintiff David Pakter, by his attorney, Joy Hochstadt complaining of the defendants, alleges as follows:

### NATURE OF THE CASE

1.    This action is brought pursuant to Title VI of the Civil Rights Act of 1964,  ("Title VI") [ race  discrimination in federally funded Title I programs], codified as 42 U.S.C. §2000(d)-(d)(4); Title VII of the Civil Rights Act of 1964, ("Title VII") as amended [retaliation for opposition to protected activities under the Act and under ADEA], codified as 42 USC §2000-e *et seq.;* the National Labor Relations Act ("NLRA") [retaliation for communications in a union forum] codified as 29 U.S.C. §151 *et seq.;* the Fair Labor Standards Act ("FLSA") [retaliation for opposing prohibited conduct], codified as 29 U.S.C. §215 (a)(3); the Federal False Claims Act ("FCA") [false certification of non-discrimination in federally funded Title I programs], codified as 31 U.S.C. §3730(h);  Federal Age Discrimination in Employment Act as amended ("ADEA"), codified as 29 U.S.C. §621 *et seq.;* Amendment I of the United States Constitution [retaliation by state actors for speech on an important

public matter (intentional race discrimination against students of the NYC School System)]; and Section 1. Amendment XIV of the United States Constitution [denial of equal protection and due process by state actors in the manner of removal of plaintiff from the NYC payroll), both reached by means of 42 USC§ 1983; comprise plaintiff's major federal claims. Plaintiff's major New York State claims include the New York State Human Rights Law ("State Human Rights Law") regarding age discrimination in employment and retaliation for opposing race discrimination in educational programs, codified as New York Executive Law §290 *et seq.*; State "Whistle Blowers" Laws codified as New York Civil Service Law § 75-b and as New York Labor Law §§ 740, 741 and the New York City Human Rights Law ("City Human Rights Law"), codified as Section 8-101 *et seq.* of the New York City Administrative Code.

2.      In this action, the plaintiff, a public school teacher with 40 years of highly commended and lauded experience in defendants' employ, seeks declaratory and injunctive relief, and damages, arising from the intentional actions of the defendants in discriminating against him because of his age and in retaliating against him because of his opposition to defendants' acts of racial discrimination against students in federally-supported programs, his rights to free speech with regard to said matter of public concern, and his opposition to age discrimination.   Plaintiff is 63 years old.

JURISDICTION AND VENUE

3.      With respect to the federal claims asserted herein, the Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4) for the violation of plaintiff's federal statutory rights.

4.      Plaintiff's claim for declaratory relief is authorized by 28 U.S.C. §§2201 and 2202.

5.      With respect to the state law claims asserted herein, the Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. §1367(a).

6.      Plaintiff filed the instant complaint within 90 days of receipt of a Notice of Right to Sue letter from the United States Equal Employment Opportunity Commission ("EEOC"). EEOC Charge No. 16GA805570.

7.      The principal place of business of defendant New York City Department of Education f/k/a Board of Education of the City School District of the City of New York ("Department of Education") is the Tweed Courthouse, 52 Chambers Street, New York, New York, and therefore, venue properly lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391.

## PLAINTIFF

8.      Plaintiff, David Pakter, is a citizen of the United States and a resident of New York, New York, in New York County.

## DEFENDANTS

9.      The Department of Education is empowered to be the governing body of the City School District of the City of New York ("District") and existing under the laws of the State of New York, and is subject to the provisions of the ADEA, Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, the Federal Fair Labor Standards Act, Federal National Labor Relations Act, Federal False Claims Act and the First and Fourteenth Amendments to the United

States Constitution; as well as the State Human Rights Law, State Civil Service Law, State Labor Law. and the City Human Rights Law.  At all times relevant to this action, the Department of Education has been plaintiff's employer within the meaning of the ADEA, Title VII and other federal statutes, the State Human Rights Law and other cited state laws, and the City Human Rights Law.

10.     Defendant Joel I. Klein is the Chancellor of the District and, as such, is responsible for the operation of the District and its chief executive officer.

## FACTUAL ALLEGATIONS

## BACKGROUND

11.     Since approximately 1968 plaintiff has been employed by the defendants as a teacher of art and commercial art.

12.     Plaintiff holds New York State permanent teaching licenses in Commercial Art and Elementary Grades (pre-K-6).

13.     Plaintiff holds New York City permanent teaching licenses in Commercial Art and Common Branches (grades 1-6).

14.     In September 1968, plaintiff was hired by the Department of Education as a permanent substitute, assigned to teach Elementary School Art at P.S. 43 (Jonas Bronck School on Brown Place in the Bronx).

15.     In approximately 1970, plaintiff was appointed to a probationary position teaching Elementary School Art at P.S. 65 also in the Bronx.

16.     During the 1975 fiscal crisis in the City of New York, all music, art and foreign language many other subject classes were suspended and over 7,000 teachers were laid off in a reduction in force ("RIF"); Plaintiff was assigned to teach all subjects to a class of fourth graders one year and fifth graders the next during the two year critical RIF time frame.

17.     At first plaintiff was assigned to a community operated/controlled school in Brooklyn and then plaintiff was transferred to a position in Manhattan, operated by the DOE.

18.     Around 1978, plaintiff applied for a position teaching commercial art at the High School of Art and Design ("A & D") at East 56th Street and Second Avenue in Manhattan, where he taught for the next 25 years.

19.     Until 2003 Plaintiff was honored as an exemplary teacher at A &D.

20.     One of Plaintiff's most remembered and positively cited accomplishments was the establishment and implementation of a Medical Illustration program at A & D.

21.     This rigorous program which prepared students for high paying professional employment as medical illustrators upon graduation, often motived and imbued the work ethic in students whose background lacked the requisite executive skills for the discipline, tenacity, striving for mastery that they learned in the plaintiff's classes and from him personally.

22.    In 1997, plaintiff was named "Teacher of the Year" among all of New York City's 100,000 teachers and was honored personally by Mayor Rudolph Giuliani, at a ceremony at City Hall, for plaintiff's many teaching achievements.

23.    In 2003, plaintiff noticed that part of the second floor of A & D was no longer readily accessible to the high school operations, it was being incorporated into the elementary school which abutted and shared an outer wall with A & D.

24.    Plaintiff, also lamented that over the last several years prior to 2003, the curriculum at A & D had been narrowed and made shallow in a number of areas. Foreign language (other than Spanish of which most of the students had a considerable vocabulary command already) were eliminated from the curriculum.

25.    Music was also gone from the curriculum though plaintiff knew that a semester course in music was required for high school graduation and there arose not only a cultural and educational issue but a compliance issue as well.

26.    Plaintiff, also knew that $75,000.00 was allocated in the school's annual budget for the discontinued music program; what were those funds being diverted to?

27.    Plaintiff visited the adjoining/contiguous elementary school, to find two circumstances that disturbed him greatly.

28.    The first was the very obvious difference in demographics of the students in the two schools. The elementary school students were children who were white, affluent, lived in the

surrounding Upper East Side of Manhattan. They would undoubtedly graduate to attend the specialized competitive high schools or independent schools. The adjacent high school would attract students of more modest means from all over the city, who wished to enroll in one of its programs, and plaintiff's medical illustration program received the most applications. These students virtually all had tan, brown or black skin.

29.     Thus, when the plaintiff walked in to where the elementary students were taught music which was a portion of the second floor of A &D, but was now annexed to the elementary school, he saw both that it was almost all white children benefitting from what used to be the space of A &D, and that his A & D students of color, had no access to music instruction, to the music space or other portions of the second floor previously enjoyed by A & D students.

30.     In May 2003, Principal Madeline Appell thanked Pakter for his assistance with authoring materials descriptive of the A & D programs, of program development should new funds be contributed, and of making a presentation to "Friends of Art and Design."

31.     Appell also wrote a letter of appreciation stating, "it was a pleasure . . . observing the rich environment you have created in your classroom."

32.     Plaintiff also wrote to Chancellor Joel I. Klein in October 2003 to inform him that the overall matter of disparate treatment between the two schools in all areas of the curriculum deserved his attention.

33.     Plaintiff received a response to his letter to Chancellor Klein. It came in the form of a self-serving misstatement of facts, from the soon to be disgraced General Counsel to Chancellor

Klein, Chad Vignola, to make a record that plaintiff did not observe what he observed, but emphasizing an *ad hominem* attack on plaintiff's teaching based on absurdly erroneous facts.

34.     General Counsel Vignola was gone in three months over the nepotism scandal of assisting Deputy Chancellor for Curriculum Diana Lam obtain a DOE position for her husband and then covering up the malfeasance with more invidious misconduct.

35.     Plaintiff was rated Unsatisfactory for the first time in 22 years for the 2003-2004 year. The only category of over 20 parameters that comprised the annual evaluation for which plaintiff was cited was lateness.

36.     Plaintiff then asked the music teacher utilizing the music room and A & D resources for her class, whether he might videotape her class in action in its new found space using its newly acquired resources; she gladly granted her approval.

37.     Plaintiff then discussed the matter with his school administrators as to the glaring inequity of the situation.  Plaintiff's allegations were dismissed until he mentioned that he had videotaped the class and the disparate treatment was glaring.

38.     The videotapes were demanded, when plaintiff refused to relinquish them to Appell, on September 22, 2004, Appell accused Pakter of insubordination for refusing to hand over the tape, but she also called an emergency faculty meeting the day after the videotape was shot, and announced her immediate resignation and departure.

39.     The next day September 23, 2004 plaintiff was accused of insubordination. The days

after that September 24, 2004 plaintiff was removed from his school and reassigned to a dismal

"reassignment center" (rubber room) effective immediately, where teachers with criminal charges

await the disposition of their cases, and teachers with pending administrative disciplinary charges

await the charges, the hearings and the decisions, which may lose them their jobs.

40.     Plaintiff had no idea why he had been sent to a reassignment center or of what he was

being accused.

41.     After plaintiff had been reassigned for several months, plaintiff then learned that an

investigation by the Special Commissioner for Investigations ("SCI") was underway to investigate

how pornographic images had been uploaded or downloaded onto one of the several student

computers in the Medical Illustration laboratory.   The SCI could not link the computer images to

plaintiff, as everyone in the school had access to those computers.

42.     While an A.P. Maryann Geist-Deninno attempted to implicate plaintiff, and she was

the one to have initiated the SCI investigation, SCI reported that they could find no nexus between

the images and Pakter. Thus, plaintiff was never charged with the pornography allegation.

43.     Plaintiff had taught over 150 different students in that Medical Illustration room daily.

Other teachers, all maintenance personnel, all administrators had access to that room; in addition

plaintiff had not had access to the room for over three months when the images were discovered and

another teacher had been using it as a classroom.

44. On information and belief, plaintiff alleges that DOE employees, uploaded or down loaded the images onto one of the computers in the medical illustration lab, in order to fabricate misconduct charges against the plaintiff and terminate his life-tenure property interest in his employment.

45. Then the DOE began negotiations with the Plaintiff, that if he relinquished any and all copies of the videotape and swore that he had retained no copy, he would be returned to his regular assignment and charges of misconduct against him would be dismissed.

46. When plaintiff refused to attest that he would keep no copy whatsoever, he was told he would be brought up on disciplinary charges for insubordination.

47. Since the DOE pornography allegation could not be brought as a "charge" after the SCI investigation; the plaintiff could not be brought up on serious misconduct *viz.* placing and viewing pornography on DOE computer property during time he was being paid by the DOE.

48. Nevertheless DOE sought plaintiff's termination on matters it added to "beef up" the charges.

49. Defendants added fabricated charges of insubordination (failure to relinquish the tape which he made with the teacher's consent, never having been warned that videotaping would be construed as misconduct; teachers videotape classes all the time–in fact, it was an absolute prerequisite to permanent certification in New York State, and is also routinely used in honing pedagogical skills in graduate course work in education).

50.    Defendants also instructed a payroll secretary of A & D to add numerous latenesses to plaintiffs cumulative time record.    Plaintiff's UFT Chapter leader in A & D, Lawrence Taylor stated that other A & D teachers had been cited for lateness more often than the plaintiff, but did not get rated unsatisfactory for the entire year nor get brought up on disciplinary charges.    Defendants knew or should have known that this disparate punishment perpetrated by state actor violates plaintiff's right to equal protection under the fourteenth amendment.

51.    Since the most serious charge, that of placing "pornography" on a DOE computer was foiled, however, when the SCI failed to issue a report which stated that the allegation that the plaintiff and no one else had misused the computer during school hours to import or view the images on during the school day, they could not substantiate the allegation and it was dropped. In fact, their report stated the allegation was unsubstantiated as virtually everyone in the school had access to the computer in question .

52.    Instead of being sent back to his assignment, plaintiff was told he must remain at the reassignment center pending the resolution of the insubordination and lateness charges.

53.    Plaintiff was notified of the charges against him in April 2005, by Alexis Penzell the Local Instructional Supervisor ("LIS") who enumerated a list of reasons plaintiff was alleged to be unfit to teach and his termination was sought.

54.    In May of 2005, John Lachky, the Principal at A & D who succeeded Madeline Appell, decided to also take the medical route to terminating plaintiff by reporting to the LIS that plaintiff's behavior "too erratic to be fit for duty."    Thus, when the "pornography allegation" could not be

developed into a disciplinary charge and without it plaintiff was unlikely to be terminated, Lachky made the same unsubstantiated allegation to the LIS as a reason to have plaintiff examined under Educ. Law §2568 to find him mentally unfit to teach. Lachky added to his letter that plaintiff frequently went to the portion of the building where there were young children. This was done in an attempt to insinuate, that plaintiff viewed pornography and then went to leer at the young children. Defendants knew or should have known that to again bring up refuted allegations in a medical context by state actors attempting to terminate plaintiff was to violate plaintiffs due process civil rights under the 14th Amendment and under 42 U.S.C. §1983.

55.   This was in addition to the LIS also simultaneously pursuing the fabricated disciplinary charges under Education Law 3020-a for insubordination and lateness. Defendants knew or should have known that as state actors acting under color of state law, this too, violated plaintiff's 14th amendment rights. Defendants knew or should have known that these contradictory acts by state actors were retaliative, harassing and in violation of plaintiff's constitutional rights.

56.   Leaky wrote to the Medical Bureau of DOE, citing the same charges of insubordination, lateness, and loading "pornography" onto a DOE computer (despite the latter having already been reported to Lachky as unsubstantiated), so that in addition to being brought up on charges of misconduct, plaintiff was also being accused of being mentally ill as an explanation for the same alleged behavior.

57.   On information and belief, while other disfavored teachers have either been disciplined or sent to the Medical Bureau to be found unfit, and in one case both routes were taken but the spurious charges to the medical bureau, were at least different from the ones cited as misconduct.

58.     While both were concocted, on information and belief, plaintiff's is the only case where the identical charges were brought as discipline, i.e. seeking the teacher to be found morally unfit to teach, while the very same charges were brought as evidence of mental instability, to be found psychologically unfit for duty when the strongest allegation failed to survive the SCI investigation.

59.     The fact that the one charge that had to be dropped because the investigation turned up no nexus, was still used to insinuate mental disability, shows an intentional denial of plaintiff's due process rights in the extent of attempts to illegally terminate him. Such actions taken under state law by state actors, are especially serious constitutional right deprivations.

60.     In June 2005, plaintiff was ordered to be examined by the medical department, pursuant to Education Law § 2568. This NYS statute applies only to the NYC school system and allows Superintendents of School District in cities with populations exceeding one million to order a fitness exam for any pedagogue to determine the ability of the teacher to carry out the physical and mental requirements of their employment. If found unfit, the teacher can be caused to be forced into disability retirement.

61.     The letter ordering the exam stated prominently that failure to appear would result in disciplinary action, and failure to bring a witness to the exam would require that the teacher sign a waiver that they were given notice to bring one witness and declined to do so knowingly, so that they could not object later of the failure of the exam to be witnessed.

62.     Plaintiff was examined perfunctorily in July 2004, by DOE staff Dr. Ann Garner who reported that he was "fidgety," "grandiose," "hypomanic," :delusional" and "paranoid".

63. Plaintiff was also sent two weeks later to a psychometrist, Richard Schuster who administered various verbal and cognitive tests; one test seemed more a test to diagnose severe deterioration of cognitive function with such statements that he must affirm or deny e.g. " a shoe goes on your head"; "monkeys live in fish tanks"; "a room in a house has walls"; "the color of grass is red"; "cars have four wheels"; "cats have five legs." This last test, the MMPI, was administered despite the fact that a federal appeals court had ruled it had no bearing on whether workers can carry out their responsibilities. Such treatment to a person with high cognitive functioning was painful, humiliating. Kafkesque, inductive of paranoia even if the symptom was absent before.

64. Schuster reported that plaintiff's clinical profile was within normal limits, but nevertheless recommended that plaintiff undergo psychiatric treatment including appropriate medication. Why would Dr. Schuster make such recommendations when the plaintiff was evaluated as normal. Such "gaslighting" perpetrated under color of state law violates all clauses of section I of the fourteenth Amendment.

65. Based on these reports, plaintiff was found "not currently fit for duty" in a letter received August 20, 2005, and was summarily taken off the payroll effective September 1, 2005.

66. As is typical of medical bureau determinations, it was signed by Audrey Jacobson M.D., head of the Medical Bureau, but Dr. Jacobson had never examined the plaintiff, and no one who had examined him had signed any document released to him.

67.     Plaintiff immediately appealed the decision of the DOE Medical Bureau in September 2005 but was not scheduled for Medical Arbitration with an outside arbitrator until January 2006, all the while being kept off payroll, and without any current or accruing benefits.

68.     Arbitration requires the selection of a disinterested arbitrator, either by the rank and strike method or by each party selecting an arbitrator and the two arbitrators deciding on a third arbitrator who shall arbitrate the dispute.

69.     Not so with the DOE; DOE selects the arbitrator in all arbitrations, plaintiff was off salary and had no choice in the matter. The arbitrator, knows this, is invariably paid well (five to seven times or more what state education laws allow) and wishes return engagements for very easy work of at most a few hours. The arbitrator understands that the employee is challenging the DOE's medical or psychiatric decision which has taken the employee of the payroll.[1]

70.     Dr. Charles Schwartz, Chair of Psychiatry, Montefiore Hospital was selected by the DOE as the medical arbitrator.

71.     The report that Dr. Schwartz was to concur with or dissent from, found that plaintiff's affect was grandiose and hypomanic. Therefore, it stated he presented a danger to the students and would confuse them.

---

[1] Some medical arbitration involves line of duty injuries and whether the employee should be ordered back to work or is entitled to continue to convalesce at full pay and benefits pursuant to a line of duty injury – there the employee and the DOE are again in opposition but over the issue that the employee contends more time is needed to convalesce. In either case the outside arbitrator is solely picked by the DOE, knows the decision s/he is being asked to arbitrate and invariably concurs and corroborates the DOE position because on information and belief reassignment to another case means another easy $1000.00-$2000.00 or more.

72.    The DOE Medical Bureau, had found the plaintiff to be delusional; he claimed he was rich, lived on Park Avenue, had won accolades for his teaching as the "Teacher of the Year," was feted by Mayor Giuliani for that award, and that he was an accomplished master portrait painter, and could paint in the style of the "old masters" almost without peer among contemporary artists.

73.    Therefore, this delusional man could not be allowed to interact with NYC students.

74.    A simple referral to their own computers would have indicated that the employee's address was 900 Park Avenue, and that each and every other so-called "delusion" was an absolutely truthful fact of Mr. Pakter's life.

75.    Nevertheless at the stroke of the Chief of the Medical Bureau's whim, plaintiff was off the payroll in an instant and not returned to it for a full year, despite this being state action to abrogate his property interests in his life tenure state employment without any due process.

76.    Plaintiff feared losing his medical benefits, his life insurance, considerable portions of his pension accumulation, and his ability to practice his profession–the teaching of NYC youngsters how to be all that they can be, through art, through commercial exploitation of technology-assisted art forms such as medical illustration, through being a role-model and an advisor, and especially being their teacher who cared.

77.    As far as being hypomanic–do not those doctors working for the same employer know that every successful teacher is always part actor, ever putting on a show to engage and entertain the students in order to fully involve them in instructional activities presented as exciting experiences.

78.    It is the teacher with too little affect who puts the kids to sleep and turns them into clock watchers for the class to end.

79.    Because petitioner has always been such an outstanding teacher, both he and students derive great satisfaction in the teaching and learning experiences in plaintiff's classes; thus, plaintiff's separation from his students was extremely cruel to both teacher and students.

80.    When finally ordered to the medical arbitration after being off salary for six months,, plaintiff hired as his medical consultant Alberto Goldwaser, M.D. a very well-respected forensic psychiatrist, who served as chair of the Ethics Committee of a well-recognized American Psychiatric professional association.

81.    Dr. Goldwaser was permitted to give his analysis after the interview, to review the documents, and to make comments representing his opinion of the DOE's medical record.

82.    Dr. Schwartz was to give his report in ten days after the examination as is required both by state law and the CBA. However, on information and belief Dr. Schwartz communicated verbally to the DOE that he found plaintiff to be fit for service shortly after the arbitral exam.

83.    It was thus, after the interview that the ten day return time for the report was delayed as Dr. Schwartz reported to a number of sources who contacted him that the DOE instructed him that DOE had additional documents to submit for his consideration and he should await them and consider them in making his determination.

84.     No additional documents were ever sent by DOE; and only after numerous calls to urge the issuance of the report, including by an eminent physician, who was a relative of plaintiff was the report ever issued some six months after the "examination."

85.     The determination of the medical arbitrator was that the medical bureau had erred in finding the plaintiff had mental health issues that rendered him unfit for service.

86.     By this time plaintiff had been off the payroll and without salary for an entire year.

87.     Plaintiff did learn, however, that for a significant portion of the time, salary checks were being issued to him and were being forwarded to the school but the school was not mailing them to plaintiff.  Defendants knew or should have known that the withholding of funds that were allocated to plaintiff was larcenous and when performed by state actors in violation of plaintiff's equal protection  constitutional rights.

88.     Plaintiff was informed of this withholding of printed paychecks that were orders to pay him by various school officials, so this deliberate malfeasance was widely known and being conspiratorially and intentionally done.

89.     Most egregious of all was that plaintiff was repeatedly told that if he agreed to retire, that as soon as he executed his retirement papers, the withheld checks would all be released to him.

90.     This represented coercion to retire before plaintiff would otherwise plan to retire and provides the nexus between defendants acts and that they were in violation of the ADEA.

91.     Plaintiff's 3020-a disciplinary hearing also came up for trial during the time he was off the payroll.

92.     He was accused of insubordination (not relinquishing the tape) and of excessive lateness.

93.     At the 3020-a hearing the Principal, Lachky, testified that the payroll secretary, compiled Pakter's attendance and punctuality history from her own contemporaneously prepared records, day by day that led to the charges.

94.     He also stated that he had a special lateness file opened for plaintiff, to keep a closer record of plaintiff's punctuality by the payroll secretaries Diane DiSalvo and Darlene Alba-Hart than for any other pedagogue.  Lachky knew or should have know that such disparate treatment was a violation of plaintiffs rights to equal protection when performed by state actors under color of state law.

95.     The payroll secretary was called and prepared to testify that she entered the data that she was given on a paper by the Principal, knew they were fabricated, but was fearful of being deemed insubordinate herself if she questioned the instructions she was given; however as she was being prepared for her testimony at the 3020-a site, the DOE at the last moment as she was about to enter the hearing room decided not to call her to testify.

96.     Despite this testimony that the lateness charges were fabricated, knowledge by the hearing officer that the pornography charges had been withdrawn as unsubstantiated, and that the insubordination charge was based on a on non-existing or contrary prior policy where videotaping was

even encouraged, and this tape regarded a matter of important public interest (the first amendment standard for a public employee), the so-called "impartial hearing officer" found Pakter guilty of insubordination and excessive lateness and fined him $15,000.00 after he had already been off salary for a year.

97.     In putting on his own case after the DOE had completed presenting their witnesses against him, plaintiff was only permitted to call a single witness, his UFT chapter leader from A & D, Larry Taylor. The abridgement of plaintiff's due process rights were in violation of Educ. L. 3020-a and in violation of plaintiffs due process constitutional rights, as not only were the perpetrators, preventing plaintiff from defending himself against fraudulent accusations state actors, acting under state law (3020-a), the perpetrators involved in the 3020-a hearing itself were members of the New York Bar, admitted officers of the Unified Courts of the State of New York.

98.     The perpetrators comprise the so-called "impartial hearing officer" hired by the state, the DOE attorney, also a civil employee,  who was not pursuing truth and justice for all the people of New York, but a zealous prosecutor, whose employer sought plaintiff's termination, and assigned union counsel who let the other two "get away" with unfair play, lest his zealous advocacy become a pivotal reason for even harsher treatment to Pakter, after all DOE was clamoring for Pakter's termination and the arbitrator merely fined him, albeit, a hefty $15,000.00.

99.     At the end of the trial, assigned union counsel was finally able to persuade the arbitrator to allow two union officials testify.  They stated that Pakter fought to protect the constitutional rights of mostly minority students at A & D who were being cheated.

100.    Pakter was fined the $15,000.00 at a time when he had been taken off the payroll and was receiving no salary whatever.

101.    Thus, even when plaintiff won the medical arbitration, and hired private counsel to seek restitution of the year's lost pay, he was "out" $15,000.00 for a penalty improperly imposed as well as for legal fees to collect his more than one year back-pay.

102.    Plaintiff, was later told by Principal Lachky, that the pressure to "get rid" of Pakter, "was coming from the top."

103.    Because plaintiff was found guilty of some charge, however, trivial, unwarranted and in violation of both the "just cause" standard requiring the prosecution and penalty to be comparable to other teachers charged with the same offense and in violation of plaintiff's constitutional rights to equal protection of the law by state actors, plaintiff was never sent back to a regular classroom assignment for which he was honored as "best in the city."

104.    Virtually all teachers accused of multiple "specifications" or allegations, no matter how nonsensical, vindictive, or retaliative they are, are found guilty of some specification and are never returned to regular service; instead they are relegated to be day-to-day substitute teachers, covering myriad classes, required to follow the lesson the regular class teacher has left.

105.    Thus, in addition to there being about 800 tenured teachers in "rubber room" awaiting their fate,  there are another 800 tenured teachers assigned to such Absent Teacher Reserve ("ATR") positions.

106.     These teachers represent both teachers whose 3020-a procedures are over and their penalty was other than termination, and tenured teachers whose school has been downsized or reorganized, and they have not been included in the remaining faculty.

107.     The intentional demoralization is coercive and meant to pressure the tenured teacher to resign or retire; it variably is perpetrated on the most experienced, senior, best paid, older teachers, in violation of the ADEA which the EEOC investigation initiated by the charge of the UFT determined to be established and entered into conciliation sessions with the DOE between September 6 and September 13 of 2007.

108.     When the EEOC was unable to reconcile with the DOE, it issued a right to sue letter to the UFT's president Randi Weingarten on September 13, 2007. After discussions between UFT and EEOC, EEOC issued individual right to sue letters under the ADEA to individuals named (and therefore investigated by EEOC) in the November 2005 charge filed by Weingarten, who requested them on or about December 13, 2007.

109.     UFT has filed several individual ADEA claims in this Court during March 2008 for several of its individual members.

110.     Other UFT members filed their ADEA claims in this Court before 2008 as a group from a specific Manhattan high school other than A & D. The trial begins September 8, 2008 before Judge Rakoff. On information and belief the teachers are to present 63 witnesses to attest to the ADEA violations of DOE.

111.    The UFT is pursuing the ATR assignment itself as a disparate treatment, disparate impact claim under New York City Human Rights Law on behalf of all ATR's.

112.    Thus, the "teacher of the year" was not only brought up on bogus medical charges, when that did not survive arbitration, he was brought up on fabricated disciplinary charges identical to the medical complaints, fined and then sent to teach as a day to day substitute, in any area of the curriculum. The foremost art teacher in the city is sent to substitute teach for absent teachers–one day as a gym teacher, the next as a science teacher and so forth, relegated to follow whatever lesson they have left for him to deliver.

113.    Further, the ATR assignment in itself, is looked on by peers and administrators as pejorative and less professional; ATR's are caused additional pain, treated in demeaning ways and humiliated causing undue pain to those who are so assigned, almost all of whom are older teachers.

114.    After his 3020-a and medical arbitration reinstatement, Plaintiff was assigned as an ATR to Fashion Industries High School ("FIHS") at West 25th Street between Seventh and Eighth Avenues in Manhattan.

115.    There was very little to cheer up the new school. Aside from the magnificent Diego Rivera murals which adorn the lobby, there was little evidence of contemporary cheerfulness.

116.    Plaintiff, wishing to ingratiate himself with his new Principal, Hilda Nieto, brought a plant which he delivered to the Principal's secretary stating it was for the Principal; plaintiff thought she might like it in her office.

117.    Indeed, while Nieto did appear to appreciate the plant as it still adorns her office, she never mentioned it, nor thanked Pakter.

118.    Plaintiff also purchased two more plants and placed them in the school adorning the school lobby.

119.    On information and belief, these two plants, too, appear to have been well appreciated in FIHS,  as they are still in the school lobby where plaintiff placed them almost 24 months ago, though he was removed from the school shortly thereafter, based on allegations of "unauthorized donations" (the plants) to the school.

120.    Nevertheless, these two plants, became specification #5 in another round of disciplinary charges brought under Educ. L. 3020-a against the plaintiff.

121.    Other specifications to again seek plaintiff's termination, return him to the "rubber room" within 20 days of his reinstatement to service (and not even reassign him to the center less than 1/4 mile from FIHS, but he was dispatched to commute to a dismal center miles away in upper Manhattan), and again bring him before a permanent-panel state paid-arbitrator which he again would have no role in selecting) consisted of the following:

a.    Pakter was accused of promoting his family's watch business during school hours in November 2006 when in fact he was merely reiterating his longstanding promise (for thirty years), to students, that any student earning a 90% grade average would earn a watch, was specification #1 of the new charges.

b. Pakter was accused of giving watches to students as gifts during school hours in October or November of 2006. Indeed, plaintiff kept his promise to those students who earned a 90% grade average on their report cards; this was specification #2 on the new set of charges.

c. Pakter was accused of giving a watch to school aide Maria Corchado during school hours in October or November 2006. Yes, a minimum wage worker was given a watch for her son, during plaintiff's lunch break, because her budget was too limited to provide the child a gift; this was specification # 3 of the new set of charges.

d. Pakter was accused of speaking the following during class time for a class he was covering as a substitute during October or November 2006:

(I) Spoke about his family's watch business

(ii) Provided the URL for the watch business

(iii) Showed students the brochure from the watch business

(iv) Told students that any student earning a 90% grade average or better would be given a watch

(v) Showed two watches to students

(vi) Made reference to his personal life

(vii) Said that he was removed from A &D for being a whistle blower

The above seven statements to students while serving as their substitute teacher was specification #4 of a second set of charges for which he was removed from classroom duty less than one month after being reinstated to it.

e.      Pakter was accused of showing the class an "R" rated feature film. "El Mariachi" is an acclaimed film by the noted Mexican Director Roberto Rodriguez. The violence of gun fighting (which was not prominent in the scenes plaintiff selected for the 25 minute film clip he showed to the class, whereby he could prepare them as to what to look for before the screening took place and then conduct a discussion afterwards in the 42 minute class period). "Schindler's List" and "Saving Pvt. Ryan" are also R-rated for their graphic violence. This allegation comprised specification #5.

f.      In November 2006 Pakter was accused of having brought two plants to the school without the Principal's prior authorization. If that is such misconduct, how come they are, 21 months later, still where they were placed. Pakter has been banned from the school since the plants arrived. This was specification #6, but the plants remain prominently displayed in the building to date.

g.      In March of 2007 after being removed to the rubber room to await the above charges, a feature article was written about the DOE's relentless pursuit of Pakter in the UFT monthly periodical *New York Teacher* for his "whistle blowing." The DOE cited this as a final specification (which it much later withdrew/dismissed after the UFT made a claim against the DOE) claiming that plaintiff should be disciplined for embarrassing the DOE and his school by cooperating with the UFT reporter and allowing the article about him to be published. This action/charge, false and malicious prosecution to discipline a union member for communicating his treatment by the employer to the union, is in violation of the NLRA, FLSA, and the first Amendment.

122.    The new 3020-a trial was to begin September 15, 2008.

123.    For some reason the hearings have been adjourned but not to a date certain.

124. Plaintiff must return to the daily detention of seven hours per day at the reassignment center with other teachers also gloomily awaiting their 3020-a determinations to also await a "hearing" on such spurious and nonsensical, retaliatory and illegal charges as cited above.

125. Some teachers have languished in the "rubber rooms" for more than three years for their trials to commence; others have waited a year for their determinations and the arbitral award to be handed down. State Educ. Law §3020-a requires that the process be completed in 60 days.

126. Plaintiff's position at A & D was filled by a younger teacher who upon information and belief, was 25-39 years old.

127. During the 2003/2004, 2004/2005 and 2006/2007, 2007/2008 school years, defendants have treated plaintiff less favorably than younger teachers, created a hostile and intimidating work environment for plaintiff because of his age and retaliated against plaintiff for his opposition to age discrimination and to his opposing the defendants acts of racial discrimination by their actions set forth in the preceding paragraphs. During 2005/2006 defendants banned him from their premises completely and failed to pay his full salary for humiliating reasons that they merely ascribed as "error" a year later.

128. Upon information and belief, at various times during the period of in or about August 2003 through the present, defendants have subject plaintiff to complaints unlike those they have ever leveled at other teachers, defamed plaintiff by falsely and intentionally wrongfully finding him to be mentally ill, subjected plaintiff to a year without work and without pay, intentionally, all because of his age and his internal "whistle blowing" and in retaliation for plaintiff's opposition to defendant's

unlawful and discriminatory violation of numerous federal and state civil rights, human rights and educational statutes and constitutional provisions.

129.    Upon information and belief, defendants did not subject younger teachers to the harassment and discrimination to which plaintiff was subjected during the period in or about August 2003 through the present.

130.    The actions of defendants as aforesaid have been and are continuous in nature, constituting a continuing wrong.

131.    During the period of August 2003 through the present, plaintiff has opposed defendants' discrimination against him because of age, whistle blowing, opposition to racial discrimination in federal programs in various ways, *inter alia*, and by filing a charge of age discrimination with the EEOC and the NYS Division of Human Rights, by opposing the unfair and abusive use of the teacher medical evaluation and arbitration process, by opposing and contesting the disciplinary charges brought against him, and by opposing the other unfair treatment perpetrated by defendants.

132.    The aforesaid actions of defendants, i.e., harassment, creation of a hostile and intimidating work environment, subjection of plaintiff to unfair and abusive medical evaluation tactics and removal from the payroll for over one year for wrongfully alleging mental illness, initiation of disciplinary charges in which plaintiff's termination was sought, and is again being sought and humiliating treatment in connection with those disciplinary charges, were all undertaken in order to force him to separate from employment and/or retire earlier than he would otherwise wish

to, and because of the plaintiff's age, and because he opposed defendants' illegal acts of age and racial discrimination, and upon information and belief, such actions were not taken against younger teachers.

133.    Plaintiff's age and his opposition to defendants' acts of race discrimination in educational federally funded programs and age discrimination were motivating factors in defendants treatment of plaintiff, and defendants use of medical and disciplinary processes, were pretexts for discrimination and retaliation.

134.    All of defendants' acts of discrimination and retaliation were willful and intentional.

135.    Because of defendants' unlawful actions, plaintiff has suffered lost wages plus interest per session work in the 2003/2004, 2004/2005, 2005/2006, 2006/2007, and 2007/2008 school years, and has been harmed physically and emotionally.

136.    On or about August 29, 2008, the EEOC issued a Notice of Right to Sue to plaintiff, which notice was received by plaintiff on or about September 2, 2008.

137.    Following the EEOC issuing the Notice of Right to Sue letter, plaintiff served the initial Complaint, dated September 2, 2008, on the named Defendants.

## FIRST CLAIM

### Pursuant to ADEA, 29 U.S.C. §621 *et seq.*

138.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137. of this complaint with the same force and effect as though fully set forth herein.

139.   Plaintiff is protected by the provisions of the ADEA.

140.   The aforesaid actions of defendants in harassing plaintiff, creating a hostile work environment, subjecting plaintiff to unfair and abusive medical evaluation tactics, initiating disciplinary charges seeking plaintiff's termination on fabricated, erratically enforced, protected allegations were all undertaken to attempt to force plaintiff to retire earlier than he would otherwise wish to, and were undertaken because of the plaintiff's age and/or because he opposed defendants' illegal acts of age discrimination, all in violation of the ADEA.

141.   Defendants illegally withheld paychecks belonging to plaintiff which were promised to be turned over to him on the condition that he retired sooner than he otherwise would plan to retire.

142.   All of defendants' acts of discrimination and retaliation in violation of the ADEA, were willful and intentional.

143.   Plaintiff has satisfied all of the procedural and administrative prerequisites to suit as set forth in 29 U.S.C. §§626(d) and 633(b).

144.   As a result of the defendants' discrimination and retaliation against plaintiff on the basis of his age and opposition to age discrimination, plaintiff has suffered lost wages for per session work plus interest and consequential reduction of pension benefits.

### SECOND CLAIM

### Pursuant to Federal Financial Funding of Educational Programs 42 U.S.C. §2000-d

145.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137. of this complaint with the same force and effect as though fully set forth herein.

146.    The New York City School System as a recipient of federal funding for educational programs is required to comply with Title VI of the Civil Rights Act of 1964 as specified by 42 U.S.C. 2000d-4a which includes any agency, public or private, receiving federal funding for any of its educational programs.

147.    Compliance with said programs are subject to Judicial Review, pursuant to 42 U.S.C.§2000-d-2.

148.    Non-discrimination with regard to race, religion and national origin is required is required under 42 U.S.C. §2000-d-6 in all its programs for any agency receiving federal financial assistance for any educational program.

149.    No eleventh amendment immunity with regard to discrimination is available to recipients of federal funding for any of its educational funding.

150.    Because of plaintiff's opposition to discriminatory acts he observed, and his report of said unlawful acts and conduct to the Chancellor, rather than being thanked for being ever vigilant to assist with compliance, plaintiff was retaliated against in the most invidious and egregious manner available.

151.    Plaintiff was removed from his position and sent to "reassignment detention" where he had to report each day to sit and do nothing while awaiting trumped up disciplinary charges for insubordination for failing to surrender the video-taped evidence of the discriminatory acts, though he had the permission of the teacher of the class he recorded to tape the lesson.

152.    Plaintiff lost per session pay for after school and summer programs and activities. Plaintiff, while awaiting the disciplinary charges, was required to undergo a State Educ. Law§2568 exam to determine whether he was mentally fit to teach, a humiliating exercise, during which the

DOE slandered and libeled him with untrue characterizations of emotional disturbance and removed him from the payroll for over one year, during which he was not permitted in any DOE facilities, and without any due process abrogated his property interest in his life-tenure as a tenured teacher.

153.    A typical teacher would have been subject to *de minimus* allegations of incompetence in similar circumstances (as the "rubber room" detention centers are filled mostly with teachers who did nothing to deserve such pejorative treatment, but were not recently heralded as the teacher of the year by the prior mayor, as plaintiff was; here they would have to invent a recent psychological breakdown to explain the such a diametric rift in performance from the best of 100,000 to incompetent).

## THIRD CLAIM

### Retaliation under the Civil Rights Act of 1964; 42 U.S.C. §2000-e

154.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1through 137. of the complaint with the same force and effect as though fully set forth herein. Defendants' acts of discrimination and retaliation constitute an unlawful discriminatory practice within the meaning of 42 U.S.C. § 2000-e.

## FOURTH CLAIM

### Pursuant to the National Labor Relations Act "NLRA" 29 U.S.C. 156 *et seq*

### and the Fair Labor Standard Act 29 "FLSA" U.S.C. 215 *et seq.*

155.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1through 137. of the complaint with the same force and effect as though fully set forth herein.

156.    It is a violation of 29 U.S.C.§ 157 to abrogate any employee's right to assist in union organization, operations, or activities including communications.

157.   Plaintiff's experiences with the employer after he complained about the discriminatory misappropriation of resources in the music program at A & D, were the subject of an article in the UFT monthly periodical in March 2007.

158.   The DOE brought plaintiff up on disciplinary charges for embarrassing his school and the DOE by cooperating with the writer of an article describing his ordeal with false disciplinary charges and with false medical charges based on later determined "erroneous" mental disturbance.

159.   The DOE never rebutted or denied the truth of the details in the article.

160.   For an employer to restrain, coerce, or interfere with union communications to its membership, or take action against individual members for participating in such activities is an unfair labor practice under 29 U.S.C. §158.

161.   Such retaliation, coercion, harassment are also prohibited acts under the FLSA 29 U.S.C. §215 (a) (3).

162.   As a result of the defendants' discriminatory and retaliatory acts, plaintiff has suffered lost wages for per session work plus interest, and consequential reduction of pension benefits, and as suffered, continues to suffer, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non-pecuniary losses.

## FIFTH CLAIM

### Violation of Federal False Claims Act (FCA) 31 U.S.C. § 3730 (h)

163.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137. of the complaint with the same force and effect as though fully set forth herein.

164.   Section (h) of the False Claims Act states as follows:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section [31 U.S.C. § 3730], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.   Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

165.     The plaintiff alleges that the DOE repeatedly and falsely certified that all its programs were in compliance with Title VI of the civil rights act of 1964 and Title I of the Elementary and Secondary Schools Act of 1965; 20 U.S.C. §6301, that funds were being spent as allocated to improve the education of low income students and that allocations and programs were being operated on a non-discriminatory basis with regard to race.

166.     The plaintiff was ignored, given platitudes and twisted explanations distorting his allegations until he revealed he had videotaped evidence of the discriminatory and unlawful acts and false claims of his employer.

167.     Though videotaping was widely practiced openly, acknowledged as promoting student instruction and pedagogy, and in fact, until the promulgation of new regulations that are yet to go into effect the taping of a regularly assigned class is an absolute requirement for obtaining permanent teacher certification, plaintiff's spectacular teaching career was pillaged the moment he refused to relinquish all copies of the tape and swear under oath that he handed over each and every copy in existence to the DOE.

168.    Thus, for four years plaintiff has lost all per session fees, he also lost over an entire year's pay when the DOE falsely claimed he was mentally unfit to teach (the latter was later restored but under the act he would be entitled to twice back pay as well as attorney's fees *inter alia*).

169.    Plaintiff would also be entitled to unspecified special damages under the act and these should be very substantial as the treatment which he received for his good citizenship in seeking compliance, so that low income students of color were not denied resources and instruction that was being certified was going to them but was being diverted, was egregious.

170.    Plaintiff's life was turned on end for the past four years and the wrongs have not ceased; they constitute on ongoing and continuing wrong, as he is still suspended from his position (albeit with pay at the moment but not with the lucrative per session overtime), he is subject to reporting daily to the onerous reassignment-center/ "rubber-room"; he is harassed with trivial and ridiculous charges, e.g. that he showed two watches to students as examples of the incentive rewards he planned to give those who had earned them; he was knowingly falsely found mentally unfit to teach by the medical department and taken off payroll.  One year later the same Medical Director Dr. Audrey Jacobson admitted "an error" had been made a year earlier.[2]

## SIXTH CLAIM

### Pursuant to N.Y. State Human Rights Law Exec. L. §290 *et seq*

171.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137 of the complaint with the same force and effect as though fully set forth herein.

---

[2] This was despite that all the tests performed on Plaintiff a year earlier showed him to be mentally fit, that the medical office knew the results before taking plaintiff off payroll and that therefore the "error" was no error but intentional malicious mistreatment of the plaintiff and denial of his many rights.

172.    State Human Rights Law E.L.§296 (1) prohibits the discrimination in employment based on age.   Plaintiff is 63 years old and his treatment was not visited on younger employees.

173.    State Human Rights Law E.L. § 296 (7) prohibits the retaliation against any employee who has opposed illegal discriminatory acts under the Human Rights Law.

174.    Under state law the retaliation for having opposed racial discrimination in educational programs is actionable under the state HRL.

175.    Plaintiff alleges that he has been retaliated against for his opposition for racial discrimination in educational programs for over four years.

### SEVENTH CLAIM

### New York Civil Service Law § 75-b and as New York Labor Law §§ 740, 741

176.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1through 137 of the complaint with the same force and effect as though fully set forth herein.

177.    The above laws prohibit public and all employers respectively from retaliating against employees who report noncompliance with regulatory or statutory requirements or dangerous situations.

178.    Plaintiff reported internally race discrimination in educational programs, first within his school, and then to the Chancellor of his school system.

179.    Plaintiff was ignored until he videotaped the disparate treatment between allocation/misappropriation of resources from low income students of color to upper middle class white students, while the school was certifying that the resources were being used for the low income students attending the abutting school.

180.    Videotaping regularly assigned classes is a state certification requirement; videotapes are encouraged for other pedagogy purposes; but when plaintiff refused to relinquish all tapes to the employer and swear that he retained none of the discrepant resource allocation, unrelenting retaliation has been visited upon him.

181.    Twice he has been brought up on bogus "charges of misconduct" and once he was removed from the payroll without due process for over one year by DOE employees of the Medical Bureau claiming that he was mentally unstable, a determination the DOE found to have been "in error" a year later.  This is not withstanding that he was the acclaimed "Teacher of the Year" a few years earlier and feted by then Mayor Rudolph Giuliani in a ceremony held in his honor for the purpose at City Hall.

182.    Despite being off payroll for over a year on an admittedly "erroneous" medical determination, plaintiff was fined for the same so-called "misconduct" protected under these statutes.

183.    The conduct of the disciplinary hearings are always in violation of the very law they are brought under, Education Law 3020-a, and thus, also deny due process.

### EIGHTH CLAIM

### Pursuant to N.Y. City Human Rights Law

184.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1through 132. of the complaint with the same force and effect as though fully set forth herein.

185.    Defendants' acts of discrimination and retaliation constitute an unlawful discriminatory practice within the meaning of Section 8-101 *et. seq.* of the New York City Administrative Code.

NINTH CLAIM

Violations of Plaintiff's Statutory and Constitutional Civil Rights Pursuant to 42 U.S.C. 1983

186.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137. of the complaint with the same force and effect as though fully set forth herein.

187.    In addition to all of the above statutory violations cited above, plaintiff's, constitutional and civil rights were violated.

188.    As to any of the statutory rights enumerated above without private rights of action, plaintiff's civil rights to request compliance without retaliation, coercion and harassment where not otherwise provided for constitutes a first amendment violation and a civil rights violation under 42 U.S.C. § 1983.

189.    As to any state statutory right, there is the presumption that statutory provisions are enforced; therefore even state statutory violations, if the conduct was undertaken under color of state law by state actors, as all the conduct alleged herein is, violates the equal protection clause of Section I of Amendment XIV to the United States Constitution as reached through 42 U.S.C. § 1983.

190.    State actors, under color of state law committing acts that they have never before perpetrated in the history of the DOE, but committed against plaintiff, also denied him equal protection of the law when they both removed him from the payroll because he was allegedly "mentally disturbed" and at the same time fined him $15,000.00 for the very same allegations they were simultaneously characterizing as misconduct.

191.    State actors, under color of state law, also denied plaintiff due process in violation of Section I Amendment XIV to the U.S. Constitution when they removed him from the payroll for over a year claiming he was mentally unbalanced only to later call that "an error."

192. State actors, under color of state law, also denied plaintiff due process in violation of Section I Amendment XIV to the U.S. Constitution when they brought him up on the very same charges as the medical allegations as misconduct and then violated each and every provision of the 3020-a state law meant to offer some modicum of due process in the conduct of disciplinary hearings against tenured teachers with a property interest in life-tenured positions.

193. Yet despite these violations in due process, $15,000.00 of plaintiff's property was taken as a "fine," when fining and suspending is an either, or, and both are prohibited under the 3020-a law.

194. State actors, under color of state law, also denied plaintiff due process in violation of Section I Amendment XIV to the U.S. Constitution when they brought him up for a second time on the most trivial and ludicrous of charges and again seek his termination in his property interest in his life-tenure (without regard to age) in his state/city employment.

195. State actors, under color of state law, also denied plaintiff due process in violation of Section I Amendment XIV to the U.S. Constitution when they fail to meet all the seven parameters of the well-established "just-cause" standard, and instead declare "just cause" has been demonstrated when they establish by the preponderance of the evidence that the "specifications" however ludicrous, trivial, and irrelevant to the performance of the teaching role.

196. State actors, under color of state law, also violated plaintiff's rights under Amendment I to the U.S. Constitution when they sought to discipline him for sharing his ordeal with his fellow UFT members, though they never alleged that there was any untruth in what he shared.

197. State actors, under color of state law, also denied plaintiff rights under Amendment I to the U.S. Constitution when they sought to silence him by demanding all copies of a videotape he

prepared to demonstrate and correct racial discrimination in his school, when videotaping had never been prohibited and was in fact a requirement of state teacher certification.

198.   As a result of the defendants' discriminatory acts, plaintiff has suffered lost wages for per session work plus interest and consequential reduction of pension benefits, and has suffered over a year's isolation banned from all DOE installations without pay, has incurred legal expenses to get backpay, continues to suffer new bogus retaliatory charges, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non pecuniary losses.

199.   Denial of per session employment, creation of a hostile work environment, and discrimination in the terms and conditions of public employment on the basis of age, as well as retaliation for opposing discriminatory practices, by state actors, amount to a violation of the right to equal protection of the laws, as guaranteed by the 14th Amendment to the U.S. Constitution.

200.   Defendants  have intentionally and invidiously discriminated against plaintiff with respect to his public employment because of his age and to retaliate against him for opposing age and race discrimination.

201.   Defendants[3] participated directly in the violation of plaintiff's constitutional rights. Defendants failed to remedy the violation of plaintiff's constitutional rights after being informed of it and/or created a policy or custom under which the unconstitutional practices occurred or allowed the continuance of such policy or custom and/or were grossly negligent in supervising subordinates

---

[3] Application shall be made to the Court for leave to name additional defendants during and pursuant to the discovery phase of this action.

who committed the wrongful acts and/or exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

202.     The discriminatory actions of the defendants were part of the policy or custom of the defendants, and were reviewed by and adopted by the defendants Department of Education, by virtue of their initiation of disciplinary charges against plaintiff and other acts.

203.     By their actions, defendants have intentionally deprived plaintiff of valuable rights in public employment based on unlawful and discriminatory motives of age and retaliation.

204.     All of defendants' actions were taken under color of State law.

205.     Defendants by their actions have violated plaintiff's right to equal protection of the laws as provided by the 14th Amendment to the U.S. Constitution.

206.     Because of defendants' intentional acts, plaintiff has suffered lost wages for per session work and consequential reduction of pension benefits, and has suffered, continues to suffer, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non-pecuniary losses.

207.     Defendants have acted with malicious intent and/or with reckless or callous indifference to plaintiff's federally protected rights, entitling plaintiff to punitive damages.

WHEREFORE, plaintiff respectfully requests that this Court:

(1)     adjudge and decree that defendants have violated the ADEA, 29 U.S.C. §§ 621 *et seq.*
Title VI and the retaliation provisions of Title VII of the Civil Rights Act of 1964, of the National
Labor Relations Act, the Fair Labor Standards Act, and the False Claims Act and have done so
willfully, that defendants have violated the State Human Rights Law, State Labor Law, State Civil
Service Law and the City Human Rights Law and that defendants have violated 42 U.S.C. §1983;

(2)     award plaintiff appropriate back pay and pension adjustment, an equal sum as
liquidated damages and pre-judgment interest in amounts to be proved at trial, arising from the denial
of per session work;

(3)     award plaintiff twice backpay (once has been paid to date) for the year off salary
pursuant to the provisions of the False Claims Act

(4)     award compensatory damages for past and future extreme embarrassment, humiliation,
mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from
defendants' violation of plaintiffs' rights under the ADEA and Title VII of the Civil Rights Act of
1964 for discrimination and retaliation suffered in an amount to be determined at trial;

(5)     award compensatory damages for past and future extreme embarrassment, humiliation,
mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from
defendants' violation of plaintiffs' rights under the Fair Labor Standards Act and the NLRA for
interference with, and restraint of plaintiff's free communications with his union and its other
members in an amount to be determined at trial;

(6)     award compensatory damages for past and future extreme embarrassment, humiliation,
mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from

defendants' violation of plaintiffs' rights under the New York State Human Rights Law and New York City Human Rights Law in an amount to be determined at trial;

(7)     award compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiffs' rights under the New York State Civil Service Law and New York State Labor Law for restraint, retaliation and interference with union activities and communication and for retaliation for "whistle-blowing" in an amount to be determined at trial;

(8)     award compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiffs' rights to Equal Protection under the U.S. Constitution, in an amount to be determined at the time of trial;

(9)     award compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiffs' rights to Due Process under the U.S. Constitution, in an amount to be determined at the time of trial;

(10)     award compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiffs' rights to First Amendment protections under the U.S. Constitution, in an amount to be determined at the time of trial;

(11)     award punitive damages arising from the violation of 42 U.S.C. §1983 by defendants, in an amount to be determined at trial;

(12)    award plaintiff the costs of this action, together with reasonable attorney's fees, as

provided by the ADEA, 29 U.S.C. §626(b) and by incorporation, 29 U.S.C. §616(b), and as provided

by 42 U.S.C. §1988 and as provided by 31 U.S.C. § 3730 (h) ; and

(13)    grant plaintiff such additional equitable and legal relief as the Court deems just and

proper in the circumstances.

Dated: New York, New York          JOY HOCHSTADT, P.C.
       September 1, 2008           Attorney for Plaintiff
                                   300 Central Park West
                                   New York, New York 10024

                                   By: _____ ___
                                          Joy Hochstadt (JH 0935)