CASE NO. 08-CV-7673 (DAB)(KNF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID PAKTER,

PLAINTIFF,

-against-

DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK; and
JOEL I. KLEIN, CHANCELLOR OF DEPARTMENT OF EDUCATION, NYC
DEFENDANTS.

PLAINTIFFS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS MOTION TO DISMISS

JOY HOCHSTADT, P.C.
*Attorney for the Plaintiff*
300 Central Park West, Suite 2E
New York, New York 10024
(212) 580-9930

# TABLE OF CONTENTS

PRELIMINARY STATEMENT      I

FACTUAL BACKGROUND      3

ARGUMENT      9

POINT I: PLAINTIFF'S CLAIMS COMPRISE A SINGLE ONGOING  COURSE OF      9
CONDUCT BY THE DOE THAT BEGAN IN 2003 AND CONTINUES TO THE PRESENT

POINT II: MORGAN HOLDS THAT  A "HWE" IS A SINGLE  ONGOING PROHIBITED
"EMPLOYMENT PRACTICE"THAT CONTINUES TO BE MANIFEST ON AT
LEAST ONE OCCASION WITHIN THE TIME-EFFECTIVE PERIOD      14

POINT III HWE THEORY IS APPLICABLE TO ALL"PROHIBITED EMPLOYMENT
PRACTICES" AND POSSIBLY ALL INJURIES      16

POINT IV: PAKTER'S ADEA CLAIMS ARE COVERED BY EEOC CHARGE NUMBER
#160200600690 FILED ON NOVEMBER 14, 2005 COVERING ALL UFT MEMBERS      19

POINT V  TITLE VII IS AN APPROPRIATE STATUTE TO PLEAD RETALIATION
UNDER ADEA: ADEA DOES NOT REQUIRE RTSL      20

POINT VI:  THE COURT HAS SUBJECT MATTER JURISDICTION OVER PAKTER'S
ADEA AND TITLE VII CLAIMS      23

POINT VII:    FCA HAS A PRIVATE RIGHT OF ACTION FOR RETALIATION      24

POINT VIII:  PLAINTIFF *DE JURE* STANDS IN *LOCUS PARENTIS* WITH REGARD TO
STUDENTS ACADEMIC NEEDS AND AFFAIRS      25

POINT IX:  ADEA & STATE E.L. § 296 (HRL) ARE CONSTRUED IDENTICALLY HWE
APPLIES TO ALL NYS LAWS REDRESSING UNFAIR EMPLOYMENT PRACTICES      26*

POINT X:  NEW YORK LABOR LAW 740-b WAIVER APPLIES TO WHISTLE      26*
BLOWER RETALIATION ONLY; RETALIATION FOR HAVING DEFEATED §2568 IS
DISTINCT AND REMAINS ACTIONABLE UNDER OTHER FEDERAL & STATE LAWS

CONCLUSION      27*

\* This document contains only 25 pages of text; in positioning the footnotes on the page where they are cited the word processor left blank areas where a footnote would not otherwise be able to appear on the same page.  The seemingly "extra" pages 26 and 27 are merely compensatory for blank space left in keeping footnotes with the text they are referencing.

## PRELIMINARY STATEMENT

David Pakter, a tenured New York City art teacher who has served for 40 years with distinction, alleges discrimination and retaliation for being a whistle-blower and for ageism[1] (and working beyond full retirement age); he was honored "Teacher of the Year-1997" at City Hall by Mayor Giuliani.

This action has elements common to many whistle-blower and protected-class discrimination and retaliation claims, i.e. harassment, disparate and contrived disciplinary actions and evaluations, unfairly docked pay,, *inter alia*. However, there are first impression issues, as well. Job security for New York City ("NYC") tenured teachers *de jure* is akin to that of Article III Judges. Just as impeachment remedies are available to Congress for the removal of Article III Judges, so too, [Education Law ("Ed..L.") §3020-a]("§3020-a") allows the discipline/removal of tenured teachers. Both procedures are to be used rarely and only when absolutely necessary to the public good.

Enter the current administration of Bloomberg and Klein in 2002. The NYC Board of Education is dismantled and replaced by the Department of Education ("DOE") which the Mayor is empowered to manage. Seminars within the DOE instruct administrators on techniques to reduce the average teacher's salary from $70,000.00 to $60,000.00 *per annum ("p.a.")* even as the DOE had just executed a new Collective Bargaining Agreement ("CBA") with the United Federation of Teachers ("UFT") where the top teacher's salary rises to over $100,00.00 *p.a.*[2],[3]. Teachers brought up on disciplinary charges go from a few dozen each year to many hundred every year.[4] Those awaiting disposition of said charges (almost 800 for the 2007-2008 school year) were significantly older, more minority teachers, higher paid (average salary > $85,000.00 *p.a.*) (D.¶ ) than average[5] Many "charges" are now trivial yet the arbitration panel has gone

---

[1] Full retirement age is when pension payout is based length of service and salary only and not reduced for younger age at retirement. Teachers working longer receive further increments based on salary raises and added service years.

[2] 2009 entry salary with B.A. is $45,530.00, top salary is reached in 22 longevity steps and six differentials for Masters, Ph.D. and coursework. See schedule at http://www.uft.org/member/contracts/moa/teacher_sal_may192008_sal06.pdf

[3] "Average salary" reduction methods taught include: "encouraging" retirement; §3020-a disciplinary charges; Ed. L. §2568 ("§2568") medical/psychological "fitness," exams; schools are reorganized; principals choose "new teachers" to employ in the reformation. School budgets evolve from number of teachers allocated to dollars spent on teacher salaries

[4] The Chancellor also recently publicized the initiative to hire teams of attorneys to go into the schools to help develop disciplinary charges against teachers and to create the documentation to sustain the charge. This plan was quickly abandoned after public outrage. *See* http://overlawyered.com/2007/11/problem-teachers-dig-in-nyc-lawyers-up/ and http://www.decimation.com/markw/wp-content/uploads/2007/08/firing_chart.pdf

[5] Teachers are also much less often now accused of improprieties with a student. Improper relationships with students and improper touching or other such conduct was the mode reason for bringing charges before 2003; now the same number of charges are brought on these grounds as before but the vast balance of increased charges cover the spectrum

from three to a single permanent arbitrator with no choice to the employee, contrary to the §3020-a statute.[6] Arbitrators "report" to DOE *ex parte*; they are not the "impartial hearing officers" §3020-a mandates.

All this takes place under well-publicized cover that student achievement is improving by purging "deadwood," *i.e* teachers fused to "old" teaching methods[7]. (*also see, fn* 5 websites). Experienced teachers, are "troublemakers" when they so much as silently grimace at intentional non-compliance.[8]

Every whit of the above takes place under color of state law, by government supervisors who are constitutionally mandated to provide equal protection to all teachers, and to provide due process that is uncorrupted by bias and *ultra vires* practices. Instead, there is piecemeal "taking," through "reassignment" and ultimately the actual "taking" through termination or constructive termination (*e.g.* coerced retirement), of property interests of life-tenured NYC teachers' employment, amounting to millions of dollars for each teacher for balance of their lives. The mistreatment that disfavored tenured teachers receive, is unrelenting, severe and dehumanizing to the proud professionals they were treated as for decades before the newly empowered (and newly hired, young) Principals were encouraged to rid themselves of any teacher whom they found "unmalleable" to new ideas (another euphemism for older and well-honed in their tried and true skill set and high salaried), meeting the standard of so pervasive and humiliating a workplace as to alter the terms and conditions of employment *viz.* the legal definition of a Hostile Work Environment ("HWE").[9]

---

of inconsequential "misconduct" and contrived incompetence charges against older teachers. Teachers awaiting disposition of charges have been described by one administrator to another as the two peered into a "rubber room." "Here is where they keep the old nags until they are ready for the glue factory." overheard by teacher Michelle Bender in 2007.

[6] When the DOE is questioned on this clear violation of §3020-a, they claim a memo with the UFT exists, but then fail to produce it, Deposition of Theresa Europe, Esq. in Teachers4Action et al v Bloomberg et al 08-CV-0548 (VM)(AJP).

[7] Or when student achievement failed to improve after hiring new young teachers, the DOE scape-goated the experienced teachers, saying the DOE must purge them faster and hire replacement fresh faces. See web sites cited above in *fn* 4.

[8] Pakter's loyal efforts to report violations to DOE only, are now called time-barred by the defense. Surely Equitable Doctrines would have accrual begin no earlier than when he realized that neither DOE or its supposed watchdog Special Commissioner for Investigations ("SCI") agreed to meetings with him not to better comply, but only to craft some allegation of misconduct against him for his concern as a citizen as to conduct of his public employer.

[9] If the teacher brings an action when the harassment, subjective negative reviews, reassignment to the Teacher Reassignment Center ("TRC," *i.e.* rubber room), preferring of unwarranted disciplinary charges begins or is ongoing, the DOE argues that all internal and administrative remedies must be exhausted, that the teacher must await a final disposition, and that to date there has been no adverse employment action. After all, the teacher is receiving full pay/benefits and however harshly treated, it is no harsher than "working" conditions of all teachers similarly reassigned to remain idle while awaiting (usually for years) disposition of charges. If, alternatively, the teacher files grievances, goes through the several level process and either awaits final disposition of charges, or in this case until it is evident that loyal efforts to improve the employer's practices has engendered retaliation and discrimination, then DOE arrives to recite the statute of limitations to bring suit against the DOE is one year as provided for in §3813, and any teacher

2

The HWE endured by tenured teachers' differs from one based on sexism or racism in industry. It always comes from above, never from peer teachers. It is always DOE intended rather than merely condoned. It is precisely because the DOE is unable to summarily terminate a tenured teacher, albeit over years, can constructively terminate or contrive a case and actually terminate after one or more tries[10][11].

It is on this background that we consider Pakter v NYC DOE.

## FACTUAL BACKGROUND

Pakter knew State Education Department's ("SED") rules [Complaint("C.") ¶18].and observed that the minority students[12] at Art and Design High School ("A&D") were being deprived of music required for high school graduation; something was awry (¶¶ 24, 25). A&D received $75,000.00 *p.a.* for music and no music was taught.(C.¶26). Yet space from A&D was annexed by abutting P.S. 59 whose students were mostly white, affluent and resided on Mahattan's Upper East Side. C.¶¶23,29. The annexed space was housing state-of-the-art music instruction (C.¶29). Pakter's complaints that SED regulations were ignored, and of racial discrimination were nuisance to A&D Principal, Madeline Appell, who then served on the Board of "Blueprint for the Arts" and who was shepherding P.S. 59's model music program in space annexed from her school with her encouragement and blessings.

When Principal Appell dismissed Pakter's concerns, Pakter contacted Special Commissioner of Investigation ("SCI") [Exhibits ("E") 8,19,12,13 and wrote to Chancellor Klein (E 14) as a citizen concerned both about A&D students graduating with a cloud over their diplomas and to alert DOE to probable discrimination against African-American and Latino students (C.¶32), and diverting entitlements meant for low income students, to privileged largely white students. Instead of responding gratefully for

"disciplined" via the 3020-a process may only appeal the arbitral award under §3020-a provisions (having a 10 day statute of limitations) with review limited to corruption, bias and exceeding the authority of the arbitrator. Absent judicial review, or no vacatur, upon review, the DOE argues collateral estoppel, issue preclusion, *res judicata* despite a flawed and corrupt §3020-a arbitration.

[10] Assigned counsel for the 3020-a specifically will not argue disparate treatment as a defense in the proceeding, since the best possible outcome after several years of being subject to a HWE on the basis of age, race and disability (or combination thereof, in that frequency D. ¶) is exoneration, thus, leaving the claims to be later pursued in another action.

[11] Given that DOE may renew or not renew the $1,400.00-$1,800.00/day stipend it is paying each of the 24 panel arbitrators for subsequent years service for 54, five hour workdays per year plus expenses and extra pay for longer days if they occur, arbitrators do what is necessary to keep their jobs. The UFT wished not to renew a specific arbitrator because she fired everyone; the DOE offered the UFT another seat on the CBA committee to keep her.

[12] Virtually all students at A&D are African-American or Latino and live all over the city

bringing said facts to the Chancellor's attention, Pakter received an *ad hominem* attack.[13] an affront to one who had devoted decades to inner city students. C. ¶33.

After Pakter's testimony at SCI (E 10), letter to Klein (E14), and non-responsive reply, a separate daily log of Pakter's school arrival times was kept but there was no such log for any other A&D teacher.[14][15]

The Principal doled out disparate treatment C.¶ 35 to unfairly convert non-issues into misconduct charges.[16][17][18][19] E 15, p 3.

While Pakter's complaints about A&D students being deprived of curriculum requirements that were offered previously (*e.g.*~five world languages were offered; now, Spanish only) was meant to improve instruction, Pakter has been subjected to an unrelenting campaign of subsequent retaliation, harassment and attempts to terminate him.(E's 15, 17) The HWE began by refusing Pakter's guest speakers for "Career Day," not done to others, nor previously to Pakter. Half of the Gifted Medical Illustration students were removed from Pakter's acclaimed program. He received numerous "disciplinary" letters from four different administrators for conduct for which no other teacher had ever been reprimanded and for which Pakter had never previously been criticized. Principal Appell directed Assistant Principal ("A.P.") Geist-Deninno to visit Pakter's class unannounced and to rate the lesson "Unsatisfactory."[20]

---

[13] From Chad Vignola, then General Counsel to Klein, soon disgraced and fired, for his role in the Diana Lam scandal.

[14] The tapes of Pakter's appeal hearing for his U rating are available at DOE-ORPAL and will be provided at discovery.

[15] At the end June Pakter had to endure a disciplinary meeting attended by his UFT representative to discuss the alleged latenesses that were no different from his arrival at A&D for decades, nor was it different from the arrival of most other teachers at A&D for whom it was never an issue.

[16] Unlike other city High Schools where teacher times began 3-5 minutes before students arrived, A&D required teachers to arrive 10 minutes before their first scheduled period. But, teachers arrived five or seven minutes after the official A&D teacher time, and were never be late to class.

[17] The targeting also violates Title VII, ADA, or ADEA when the teacher belongs to a protected category and the reasons for the targeting reflect discriminatory animus based on stereotypes wrongfully attributed to the protected class.

[18] At another High School, the Principal never permits teachers to leave the building or arrive late; she requires take the entire day off. This leads to a few days taken each year. Teachers are targeted by excessive absence claims.

[19] Each public school supervisor's or administrator's duties are pursuant to state law, each failure to grant equal protection of the law to every teacher in their employ, is a violation of the 14th amendment constitutional rights of each targeted teacher. The arrogation to Principals, to destroy the tenure of any teacher the Principal elects to be relieved of, has converted the DOE into an ongoing pervasive, and continuing HWE for every teacher who has tenure and whose salary is well above the present or targeted goal amounts (*vide infra*). High-salaried is a proxy for age when salary increases with length of service and it is impossible to attain maximum salary before age 40. See, web sites in *fn.* 4

[20] Per CBA observation of Pakter at his longevity was improper, if Pakter had been observed that year. In any event, Pakter foiled the attempt to unfairly rate his class unsatisfactory by videotaping his classes.

4

Pakter was then falsely accused by A.P. Mason with violating a Chancellor's Regulation when he ordered books for classroom use, which he had been doing for decades without incident. Pakter was given a rating of "Unsatisfactory" for the 2003-2004 school year based solely on alleged punctuality infractions (no other deficiency was noted on the 24-part rating form). When Pakter grieved the letters and appealed the rating, school administration presented fabricated "punctuality records" *(see fn 26 infra)* and admitted that arrival times were kept on Pakter alone out of 200 teachers.

Pakter was removed from all classroom service on or about September 24, 2004 immediately after videotaping the vigorous music practice at P.S. 59 in the annexed A&D space (C.¶¶9,36-40,45.46.49). Pakter was assigned to a TRC[21] despite being Teacher of the Year for Mayor Rudolph Giuliani..(E 15).

The warehoused teachers are a morose beset group crowded into putrid quarters where unskilled security guards and other hourly workers ("aides") are assigned to monitor their comings, goings, and compliance to draconian rules now required of these veteran tenured teachers all with Masters or Doctorates[22]. Pakter was not left to be in what peace was possible there; he was removed from the Manhattan TRC where A&D is located and sent to a Brooklyn "rubber room" requiring commuting.[23]

Pakter was ordered to appear July 14, 2005 for a §2568 exam (C.¶¶60-61) so that the DOE could bypass putative "due process" of the §3020-a. Here the same allegations of the pornography already found to be bogus by SCI *(see fn 23)* were proffered anecdotally to allege Pakter had a bizarre change of behavior.[24] C.¶¶54-59.[25] Pakter was summarily removed from payroll without any due process based on the Medical Bureau's "determination" that he was "unfit for service at this time" C¶¶62-66,72-79).

---

[21] At the TRC there are no duties but the rules included prohibitions on electronic devices, work, congregating in any corridor, visitors, personal phone calls, *inter alia,*,

[22] Unconditional tenure requires the attainment of an earned Master's Degree. Most teachers go on to further graduate scholarship as there are three salary steps for educational attainment after the earned master's for maximum salary.

[23] Five months after Pakter was sent to "teacher detention" far from A&D without explanation (but immediately after he refused to relinquish every last copy of the video tape of the music class), pornography was mysteriously "found" on a computer for student use in his former classroom. C.¶¶41-44,47,48. SCI failed to substantiate the allegation that Pakter had anything to do with the pornography (E 15, p.3), the DOE had to find another way to terminate Pakter. C¶¶50-53.

[24] This was despite the SCI repudiation of the undoubtedly intentionally placed inappropriate materials on the computer after Pakter was removed from the school to bolster the disciplinary case against Pakter.

[25] He was seen by several DOE psychologists, all at the direction of the DOE's Medical Director. A series of humiliating and inane "psychological tests" (E 15 p.3) were administered after which Pakter was declared "not fit for duty at this time" by DOE Medical Director Dr. Jacobson on Aug 16, 2005, by suppressing the normal medical indicia.

Nevertheless, Pakter was brought up on §3020-a charges that were the same baseless allegations as his referral for medical evaluation.[26] Pakter was simultaneously both removed from payroll as "unfit" psychologically and brought up on charges for which he was fined, $15,000.00 for alleged lateness, despite the UFT Representative at A&D testifying that many teachers arrived at the same time as Pakter or later without incident (E 13, p.3). The Principal testified that Pakter was the only teacher for whom a daily "punctuality log" was maintained.[27] C.¶¶93–96. This is also despite the clear mandate of §3020-a permitting an educator to be suspended or fined as a punishment, but never both.

Both the fine and being required to go through the 3020-a hearing process on a totally fabricated allegation while off payroll was painful. C.¶¶91,92,100,101. It was also unprecedented. [28]

Simultaneously, Dr. Charles Schwartz[29] examined Pakter on January 11, 2006 (C.¶¶67-71,80-81) but delayed releasing his decision in Pakter's favor for six months (E 15 p.2) at the direction of the DOE Medical Bureau, thereby Pakter was without salary for an entire year[30]. C.¶¶82-86. Almost a year later

---

[26] Such "double jeopardy" is totally illogical and especially harmful to the subject by a "Catch-22." Either he was mentally sound and could be subject to discipline for "just cause," or he was not "fit for duty" and not responsible for the conduct; he logically could not be both. Not so, as far as the DOE was concerned. For Just Cause criteria *Cf.* Grief Brothers Cooperage Corp. V. United Mine Workers of America, 42 LA 555 (Daugherty 1964).

[27] The payroll secretary who was called to testify by DOE, arrived at the hearing, but was not asked to testify by DOE because her testimony would have been that she had been given a list of latenesses by the Principal to enter into the log for Pakter's pumctuality and she did what she was told because she feared questioning the directive. The Principal had already testified that he had the file set up for Pakter, alone, but he falsely testified that the contemporaneous observations of the payroll secretary that comprised the entries.

[28] The Hearing Officer, despite knowing Pakter was taken off payroll before the hearing as psychologically unfit, exceeded his authority when he nevertheless went ahead with the §3020-a hcarings instead of ordering that Pakter to undergo impartial final binding medical arbitration. The §3020-a hearing process was further corrupt and bias when Pakter's discovery demands of the DOE were not compelled by the arbitrator. The arbitrator's rulings limited Pakter's defense (C.¶¶97-99); Pakter's was allowed three witnesses, while the DOE was not limited; Pakter's objections were unfairly overruled, while DOE's incessant objections and opposition to Pakter's applications were largely sustained, often off the record. The arbitrator went off the record to state that he intended to "throw out" all punctuality charges but he was somehow persuaded to change his mind and to levy the punitive "fine" of $ 15,000, instead. C.¶100. He then took eight months to render a decision (when the § 3020-a statutory limit is 30-days). The DOE was asking for Pakter's termination, there was little evidence of wrong doing, but a §3020-a decision could be moot if the Medical Arbitrator's decision was negative and came first (but the latter took six mouths) but the §3020 arbitrator neither fired Pakter as DOE demanded nor threw out the tardiness allegations as he had promised to do during the hearing, and instead fined Pakter $15,000.00.

[29] Chief of Psychiatry at Montefiore Medical Center was hired by the DOE to preside over the medical arbitration,

[30] Upon meeting Pakter for the medical arbitration, Dr. Schwartz announced that had just been informed by the DOE that State Law required that his report must be rendered in 10 days. However, when DOE was informed that he found Pakter "fit" DOE requested that he not write his report until he received documents they were sending him (which never came).

Pakter received a brief letter from the Medical Bureau stating that the prior determination had been an error. Pakter was returned to the payroll but was never again allowed to teach art, a job at which he had been so successful for 35 years, nor to A&D, despite Appell's resignation/retirement for her role in what Pakter complained of. C.¶¶87-91. E 15, p.2.

Instead Pakter was told to report a high school to serve as a "day to day" substitute teacher. A.P. Giovanni Raschilla at the new Fashion Industries H.S. ("FI") harassed Pakter with demeaning letters to file which he admitted to Pakter he wrote at the direction of Hilda Nieto, FI Principal. *Id.*. Within 20 days of arrival at FI, Pakter, was again removed from the classroom and returned to the "rubber room," the alleged misconduct so contrived and ridiculous so as to be laughable,[31] but sad and frustrating to Pakter. A.P. Raschilla at FI later told UFT staff member Jim Callahan that orders to "get something on Pakter" had come from "the top" to FI school administration. The DOE never changed Pakter's payroll designation from A &D to FI while he was there; a telling indication that he was not expected to be there long.

Though a TRC is located less than one-fourth mile from FI, Pakter was targeted by HR by being sent to a TRC[32] in Harlem[33] [34] Each of Pakter's reassignments since September 2004 has been progressively more punitive and more demeaning aimed at getting by attrition what would be more difficult to obtain by arbitration.[35] The hearing for Pakter's second set of §3020-a charges[36] were to begin

---

[31] The allegations which were not disclosed for almost an entire year after Pakter was removed from FI, were that he had given another employee of FI a gift during school hours (albeit during lunch break), that he incentivized student achievement by offering a watch to each student earning > 90% G.P.A., that he gave the URL where the students could select watch style, that he made unauthorized gifts of plants to FI [the plants, however, are still at FI, and that he had embarrassed the school and the DOE by speaking to UFT's Jim Callahan who then wrote an article about Pakter's problems with the DOE [this was despite the most embarrassing revelation in the article was not uttered by Pakter who must be afforded free communication with his Union officials but by Raschilla, a non-UFT-supervisor, who was never disciplined in any way for revealing that Principal Nieto had received instructions from above to "get something on Pakter" and whose statement was made directly to Callahan. Besides the charge that the DOE/school were embarrassed by the article, which was finally withdrawn, the other charges have not been dismissed nor arbitrated after 27 months.

[32] As the rubber rooms or teacher detention centers are euphemistically titled. PESH (Public Employees Safety and Health) has issued numerous violations to the DOE for crowding, unsafe and inadequate emergency egress, and unsafe air quality for human occupancy, yet the violations go uncorrected.

[33] Although all "reassigned" teachers in Region 9 which included FI were at 333 7th Ave. HR dispatched Pakter to the 125th Street location, where all teachers had worked in Region 10 before Pakter's arrived.

[34] Pakter's new "workplace" was a small windowless room with no immediately available fresh drinking water. There were no duties for him to perform other than to sit idle all day under the watchful eyes of two uniformed security guards.

[35] The 3020-a arbitration process has been under scrutiny since mid-2008 with the filing of Adams *et al* v SED *et al* 08 CV 5996 (GEL). This action names SED and each of the permanent panel of arbitrators as defendants and alleges

7

September 15, 2008; they were then delayed until an unspecified time in October. Pakter is still awaiting their rescheduling; it is now the fourth week of 2009; thus Pakter has been in the TRC for 27 months on nonsensical "charges" (E's 15, p.1;16) and the trial is still nowhere in sight.[37] [38] [39] [40] These prison-like conditions only exist because DOE would summarily dismiss Pakter, if they could, but they can't do more, because they can't make the case he has done anything wrong. Never once in any of the preposterous allegations has there been a word that Pakter has given anything but outstanding instruction for 40 years. Never once has it been suggested that Pakter has ever not performed the administrative record keeping functions of his position completely, efficiently and correctly. Never once has it been even hinted that Pakter's ability to maintain decorum, have the students at all times act respectfully, and be an outstanding role model for the excellent artist, designer, educator and citizen that he is, is being questioned. The only thing that is ever being questioned albeit, tacitly, and clouded with a shroud of absurd pretexts is that the

corrupt arbitrators take direction *ex parte* from DOE's Theresa Europe, Esq. rather than researching any questions that arise. Thus, they exceed the authority vested in them by SED, and demonstrate bias. The action also alleges SED failed to supervise arbitrators to maintain the process as impartial by allowing DOE, a party to each arbitration of a NYC teacher, to essentially "run its own show" while the SED kept the "cover" of due process by appointing arbitrators to specific cases (the teachers having no say in the matter). The DOE itself was added subsequently, as a defendant, for its role in denying due process to NYC teachers including the possibility of requesting the assignment of the most pointedly pro-DOE and harshest punishers as arbitrators to the teachers that DOE is most eager to purge from its midst. In the most recent decisions after the arbitrators' defense had been mounted in Adams et al., the harshest arbitrators have written uncharacteristically milder arbitral awards so that outcomes seem less skewed in like cases by arbitrator..

[36] For bringing two plants to adorn the school, reiterating his long standing promise to provide each student attaining a 90% or greater GPA, a watch, and speaking to a UFT staff member about his tribulations with the DOE.

[37] Except for the 20 days at FI, undoubtedly solely for the purpose of contriving new charges against him once the arbitrator did not terminate Pakter but merely levied a hefty fine, Pakter has spent all of the past 53 months in "teacher detention" or totally banished from all DOE facilities and unpaid during the banishment.

[38] Meanwhile Pakter is denied the right to practice his profession, relegated to be warehoused where uniformed guards escort the re-assignees to the lavatory facilities. Teachers are also escorted to the "rubber room" upon arrival at the W. 125th St. building in the morning, then escorted outside the building for one brief morning break and escorted back, for a forty-five minute lunch break and then escorted back, for a brief afternoon break and escorted back and finally escorted out at the end of the (CBA specified) workday of six hours and fifty minutes. "Reassigned teachers" may not traverse the corridors nor ride the elevators except when escorted by uniformed guards. It is meant to feel like prison by DOE

[39] To be required to go daily to this "workplace" is to suffer a consummately HWE where a compelling case for intentional constructive termination can be established. What professional would or could tolerate such treatment; who could blame anyone whom on advice of mental health professional has refused to participate in such retaliation for simply not relinquishing their life tenure when it became obvious that was desired by the DOE, a state actor, at all times acting under color of State Law.

[40] NYC Law Department has the duty to defend its client, the DOE. Therefore, its attorneys arrive at this Court to argue again and again there has been no adverse employment action, the plaintiff is still receiving a paycheck, health, life and retirement benefits; the DOE is entitled to assign any of its employees to any of its locations. . . .

8

DOE was caught on videotape in the midst of an illegal practice, (E 17) and Pakter still has the tape, Pakter, to date, has survived every intentional attempt to get him permanently off the payroll, and the DOE is still trying to make it so humiliating to come to "work," that Pakter retires[41]. How much more can DOE trample on his constitutional and statutory rights to coerce him to cede his property and liberty interests in his tenured and once mutually beloved career.

## ARGUMENT

### POINT I: PLAINTIFF'S CLAIMS COMPRISE A SINGLE ONGOING COURSE OF CONDUCT BY THE DOE THAT BEGAN IN 2003 AND CONTINUES TO THE PRESENT

The DOE wants to be rid of Pakter; all their actions have that goal they have not as yet achieved.[42] There has not been one act that is not a component of that solitary goal; these are not isolated incidents that end, are forgotten by the employer and are unrelated to the next time the employer does some unfair egregious wrong to the same person. Had Pakter even briefly been returned to teaching art at a high school, the position he is still appointed to perform at A&D[43], and treated once more as an art teacher in good standing, with his duties restored, there night be a colorable argument that some sets of incidents were independent of subsequent acts. However, there has been no restoration of duties as an art teacher for even one day in 52 moths. There has been no hiatus in the continuing wrong perpetrated by the DOE; it is still ongoing; time limitations have yet to begin to run for the laws for which Pakter makes claims.[44]

Diminution of responsibilities is actionable under Title VII/ADEA; Pakter's responsibilities have not only been reduced, they have been eliminated. See, Patrolman's Benevolent Ass'n of New York v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002); Preda v Nisho Iwai America Corp., 128 F.3d 789, 789

---

[41] During the last five plus years Pakter has reached what the DOE regards as full retirement age (62), and yet he is still employed, what more can DOE do to rid itself of Pakter?

[42] After this Action was served, DOE postponed arbitration of the frivolous charges for which it is demanding Pakter's termination. Justice delayed is justice denied, as he languishes assigned to a "rubber room": §3020-a has 60 day time limit which DOE ignores hoping that it can avoid arbitration as teachers retire or resign from the horrors of the "room."

[43] Pakter was never transferred to the payroll of FI and is still officially assigned to A&D as a commercial art teacher.

[44] The FCA is an exception; to induce the "whistle-blowers" to act promptly to end the fraud against the government the timely period accrues when the *qui tam* relator first learns of the false claim(s). However, the 1986 amendments create a private right of action for retaliation and extended that provision from three to six years.

(2d Cir. 1997).[45][46] When considering whether the incidents of harassment constitute a HWE, the Court must consider the totality of the circumstances, Whidbee v. Garzarelli Food Specialties, 223 F.2d 62, 69 (2d Cir. 2000). In Farragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (citing Harris v. Forklift Systems, 510 U.S.17, 21-22 (1993), the Supreme Court published a non exclusive list of factors which included the severity of the conduct; whether the conduct was humiliating; whether the conduct unreasonably interferes with an employee's work performance. A plaintiff can establish a HWE by showing either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuing and concerted to have altered the conditions of plaintiff's working environment. Cruz v. Coach Stores Inc., 202 F.3d 560, 570 (2d Cir. 2000). Pakter's reassignment and persecution has been intentionally designed by DOE to be hostile and induce resignation, or to ultimately end in termination no matter how long it takes.[47] Any Principal may single out any teacher for discriminatory treatment under color of state law; however it goes *pari passu* with age, longevity on the job, salary (the latter two being proxies for age)[48] and perceived threat to Principal's job security.

---

[45]   In order to prevail under the theory of HWE (C.¶194), Plaintiff needs to establish that he was subjected to a workplace that is sufficiently severe or pervasive so as to alter the conditions of his working environment and create an abusive one. See, Meritor Saving Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Pakter has done that.

[46]   Pakter must show a specific basis for imputing liability for the HWE to the employer. Fitzgerald v. Henderson, 251 F. 3d, 345, 357 (2d Cir. 2001). It is the acts of the employer *only*, here.

[47]   As to the pain and humiliation, on the one hand we have an acclaimed and respected teacher, who had developed a computer assisted design medical illustration program which selected energetic,talented students. It was a rare gem in a comprehensive high school providing instruction to typical NYC minority youngsters and not in the academically elite few high schools where admission is competitive and student diversity is still a work in progress. Pakter received accolades and thrilled to his students' mastery of uniquely salable skills. Compare Pakter's well appointed classroom, displaying own art work and the best of his present and former students' art; it was an inspiring atmosphere imbuing in each student pride and kinship to be part of the endeavor. Then consider the alternative to which the employer sent him daily for the last 26 months. It is a small windowless room in a warehouse/commercial edifice. Uniformed security agents, stationed at the door, whose diction and demeanor indicate minimal education, enforce "rules," and supervise mostly age >55, well-educated professionals who must sign in and out every time they seek a mere drink of water or to use the rest room. Teachers sit on molded plastic straight back armless chairs. The guards earn ~$16.00 per hour. The professionals they must oversee do have access to anywhere unescorted. but the "room" earn mostly between $80,000.00 to $100,000,00 and they have been singled out for arbitration of non-consequential conduct that is being labeled as misconduct so serious that it purportedly justifies the "taking" of property interests (worth usually $1,000,000,to $3,000,000.00 over the balance of their lives). Liberty interests are abridged here as well.

[48]   The practice or policy begins in the school It continues until the teacher has been terminated pursuant to a §3020-a decision, constructively terminated by dissuasion from going through a §3020-a after being advised that it is rare that the teacher is totally exonerated, and if not, will be barred from public school employment anywhere in the U.S., while if they resign or retire the record will be expunged and they will only be ineligible for NYC public school employment. The process usually takes two years after removal from the school, but has often taken much longer (26 months after removal, Pakter's hearing has not been scheduled; it is 52 months since he was first removed, never to return to work

10

The statute of limitations for HWE is found in National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002). Morgan, holds that in an ongoing atmosphere of discrimination, the individual instances of painful, humiliating and demeaning acts not all or sometimes not any of them may be actionable as a single act but cumulatively they are very destructive, degrading and prohibited by Title VII [ADA, ADEA[49] *inter alia*]. Liability to the employer accrues for allowing the practice of continuous, ongoing and repetitive discrimination to occur[50]. *Id.* at 108. The statute of limitations reaches back to treat the entire series of wrongful events and conditions as a single act that starts with the first violation or unlawful condition of Title VII, and continues to the most recent act or mistreatment. *Id* at 112. Therefore, it is only the most recent incident in a continuing violation has to have occurred within the 300 day statute of limitations for the prerequisite filing of an EEOC charge and cross-filing with Division of Human Rights ("DHR") or *vice versa.* Furthermore, Morgan holds that even if some or all of the individual incidents were sufficiently severe to be actionable on their own, when they form the continuum of a HWE claim they are part of the ongoing prohibited practice and they may not be barred as to recovery, whether or not they could have been claimed in their own right during the statutory time limit. Therefore, once having established that the employer's wrongful conduct was sufficiently related to a single discriminatory and unlawful animus, to terminate Pakter for being a whistleblower or get him to retire because he is old enough and the employer wants him to, and will use any and every possible means, then the employer is liable for all its bad acts. While the animus here began in 2003, it continues to this day. There are no discrete acts here. The most recent wrongful acts of the defendants, include but are not limited to, malicious prosecution of absurd disciplinary charges including "unauthorized donation of plants to his school" (but the plants are still displayed at the school 26 months after removing Pakter for having

---

in his appointed title). The HWE practices continue from the time the Principal begins to target the teacher, all through the harassment that goes *pari passu* with case building, being reassigned to the humiliating "rubber rooms" without knowing why, to months later being brought up on spurious charges that represent malicious prosecution, to the actual sham adjudications by arbitrators who want to retain their continuing engagement with the DOE for 270 hours a year or more @ at $280,00-$360.00 per hour plus expenses, and seem to be reporting to DOE, a party to each of the cases.

[49] HWE is recognized for ADEA claims in this Circuit. *See* Boise v. Boufford, 121 Fed.Appx. 890, 893 (2d Cir.2005); Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999).

[50] Here the employer is orchestrating the discrimination, and requiring subordinates to carry it out in addition to DOE.

"donated" them);[51] the pre-hearing for said malicious prosecution was held on May 11, 2008. Under the provisions of §3020-a, a hearing must begin within 15 days of the pre-hearing. It is now over eight months later and no hearing has begun; therefore, Pakter is kept in limbo rather than the charges being resolved so that he could return to work instead of being required to "sit" in a fetid "rubber room." awaiting a hearing 26 months after he was taken from even an ATR[52] assignment (63 months since the harassment began, and 52 months since he last worked as an art teacher).

On January 15, of 2008, the UFT, filed a "NOC" in Pakter's behalf (E 1) against the DOE. It complies with §3813: it was noticed within 90 days of accrual, it allowed >30 days before an action was filed but <365 since accrual.[53] Accrual was also within 300 days of his filing with DHR and EEOC. DOE added another new charge approximately 90 days before Pakter filed with the DHR/EEOC, *i.e.* Pakter's attendence at the "rubber room". The rubber room is so humiliating that it is tantamount to "constructive termination."[54] There are no duties to perform there and Pakter was docked for everyday that he did not spend the requisite number of hours there. Pakter's attendance record for the first 37 years of service in a classroom is exemplary and speaks for itself. Thus, this new specification after removal from a school and also made during the statutory 300 day limit is arises from DOE's own intolerably demeaning relegation the "rubber room."[55] DOE is faulting the victim for being victimized.

However, when a single discriminatory act is responsible for perpetuating or effecting an ongoing

---

[51] The charges were preferred on October 23, 2007 within the 300 days before Pakter filed his claims with DHR and EEOC. For the 11 months before Pakter was informed what he was accused of he was relieved of all duties and confined to a rubber room. No one could have imagined that the allegations involved speaking to UFT staff as to how the Medical Bureau came to reverse itself, incentivizing students to earn 90% G.P.A., or donating two plants to the FI lobby where the plants remain 26 months later while Pakter was removed within a few days would be the cause his termination was sought after his first 35 years of service as a "star." The Notice of Claim ("NOC") was filed within 90 days of receiving the charges, this Action was filed within the 1 year allowed under ¶ 3813. The amended complaint shall cite these facts.

[52] Stands for Absent Teacher Reserve. A pejorative assignment for a tenured teacher. *See fns* 46, 47 *infra.*

[53] Amended Complaint citing to it; affixing E 1 ;3, 5. it is being filed approximately at the time of this memorandum.

[54] *See,* Fleary v. State of New York Mortg. Agency, WL 335701 (EDNY 2006) Viera v. Olsten Kimeberly Quality Care, 63 F.Supp.2d 413 (SDNY 1999) [95 CV 2827(JES)]

[55] The DOE is again manufacturing misconduct when they create a constructive termination milieu with no duties, in any event, and then claim absenteeism. DOE saved half Pakter's salary while prohibiting him from doing any work.

12

or later effective outcome, claim must be made within the mandated time limitations of the act.[56] [57]

Further evidence that Pakter remains the victim of a single continuous adverse employment "practice" rather than 40 or more individual adverse actions[58], is that Pakter at all times has remained appointed and tenured as an art teacher at A&D[59] though he has not been permitted in the building in 52 months. From his removal from A&D and dispatch to a "rubber room;" then taken off the payroll indefinitely without due process because the medical office determined him to be "unfit for duty at this time"(while suppressing the medical data it collected); based on his Principal's request; to his temporary assignment as an ATR[60] [61] then removal from FI and sent back to the TRC to await further charges. Each was just another wrinkle in the attempt to "get Pakter." Pakter was fined at a time he was off the payroll when fines or suspensions are allowed but a combination of the two is prohibited under §3020-a. Even

---

[56] The defense cites Ledbetter v Goodyear Tire & Ribber Co., 550 U.S. 618 (2007) as an example where Title VII and Equal Pay Act claims were time-barred after many years of subsequent neutral non-discriminatory treatment had elapsed. Also in Delaware State College v Ricks 449 U.S. 250 (1980) the Plaintiff was time-barred in complaining about his termination because the one year terminal contract he was awarded after the decision to not offer tennre was neutral and non-discriminatory while the core decision not to grant tenure was time-barred by being more than the statutory interval after the decision not to grant tenure.

[57] Speaker of the House, Hon. Nancy Pelosi has recently publicly announced that Congress is prepared amend Title VII and the EPA to more clearly specify that it did not intend the Ledbettor decision. It has clarified the statutory language so that Ledbettor would have been eligible for all backpay owed. Congress plans to vote and submit the newly amended version for President Obama's signature as soon as the emergency economic legislation is enacted.

[58] The number of adverse employment actions increases to more than 1500 if the degradation and humiliation of each day guarded in the rubber room for intentionally retaliatory reasons is considered; if each day the Medical Bnreau procrastinated scheduling the medical arbitration (knowing its own determination was based on suppressing indicia of normality) is considered and for each day it deliberately instructed Dr. Schwartz to hold his report pending receipt of additional documents (which never arrived),(once DOE knew that he found Pakter "fit"), while Pakter was locked out of the employer's premises and off the payroll, is considered; it caused excruciating pain as if in a Gulag rather than NY.

[59] Pakter was originally assigned to A&D 30 years ago where he taught with distinction until testified before SCI and wrote to Chancellor Klein. A&D nominated Pakter for the Teacher of the Year Award for 1997.

[60] A day-to-day substitute covering absent teacher's classes who is not appointed to any school or in any subject earns a modest per diem and can earn only $23,000 even for covering classes each day classes are held during the school year. A substitute teacher assigned to a single teacher's classes during an absence that lasts longer than 30 days, begins to receive the entry level teacher's salary, thereafter ($45,530 *p.a.*) for the balance of that assignment. An Absent Teacher Reserve ("ATR"), which is a life tenured teacher appointed in a specific certificated title licensed by the State but assigned to day to day substitute work earns their regular salary and benefits (which can reach to slightly over $100,000), but is ostracized, disrespected, and mistreated at both schools and district offices.

[61] ATR's may find their own job within the system, but this is unlikely for older teachers with charges having been upheld, even in small part against them. Now that the "practice or policy" has changed from schools being previously billed for teacher positions to now being billed for the aggregate of each teacher's salary makes it virtually impossible for veteran teachers with even moderate longevity increments to be hired by a school as a regular teacher. Yet the DOE hires thousands of new teachers annually; by discarding the seniority system, and institutionalizing age discrimination that both included Pakter, and that the EEOC was unsuccessful in conciliating. *See* Exhibit 3.

that took eight months for a decision when the statute requires it be rendered in 60 days. Pakter was brought up on a second set of ridiculous 3020-a charges; those charges were then amended twice, both in 300 days prior to filing of the EEOC complaint on August 15, 2008:[62]

## POINT II: MORGAN HOLDS THAT A "HWE" IS A SINGLE ONGOING PROHIBITED "EMPLOYMENT PRACTICE"THAT CONTINUES TO BE MANIFEST ON AT LEAST ONE OCCASION WITHIN THE TIME-EFFECTIVE PERIOD

In Morgan, the analysis focuses on the statutory language "employment practice" as the focal point for the decision. Absent the concept of "employment practice" as opposed to single or discrete "occurrences" (Morgan, 536 U.S. 101, 110), each adverse event would have its own time-limited interval. expired, and each would have to rise to being sufficiently adverse to be actionable. Each would have to be reported to state and federal agencies for investigation (*Id* at 113) and no relief would be available for the devastating harm inflicted by a series of less serious but continual occurrences, or a continuing violation, as in this case, *i.e.* the employer's relentless campaign to humiliate, *de facto* demote, harass, detain, dock, fine, accuse, defame. slander, and libel,[63] Pakter it simply does not have the power under law to fire outright. This employer has instead, deliberately and maliciously sought to debilitate this employee again and again in order to terminate, which it thrice attempted but has failed to achieve.[64]

The holding of Morgan also provides that recovery for prohibited conduct which occurred in the time-barred period is as eligible for damages relief as conduct occurring in the time-effective period, so long as the last wrongful act was not also time-barred and the claim is based on "HWE" (*See.* Harris v

[62] The amendment was to cite Pakter's attendance record at the dismal rubber room where he was assigned no work, was supposed to just "sit" and was docked for each hour and each day he was not there. He should have been thanked for saving the DOE half his pay. The latter charge was disclosed to Pakter for the first time on May 11, 2008 at the prehearing. The Defense cites them as some kind of misconduct. Going to day-prison for teachers to be guarded and not allowed to do any work; why would the DOE complain if the teacher was not getting paid unless the DOE prefers deliberate debasement of its targeted teachers to saving taxpayer funds when they take reprieves from the deliberate HWE. Or is the reason so that it has another pretext to spout to its counsel and that opposing counsel can claim to the Court to further libel Pakter, albeit while claiming qualified immunity of the DOE and prosecutorial immunity to the Law Department.

[63] The employer shall, of course, claim "qualified immunity" to claims of wrongful accusations, slander, defamation, libel and malicious prosecution, however, intentional, unreasonable actions show extreme animus, bad faith, malice for which there is no immunity. *See.* Matlosz v, J.P. Morgan Chase, 2005 WL 2242196 (SDNY 2005) [03 CV 235 (JK)].

[64] Pakter's *de jure* termination was sought in the 2005, 3020-a hearing that resulted in a $15,000.00 fine (close enough to the DOE's demand so that the arbitrator would not be terminated and Pakter could be relegated to serve as an "ATR" thereafter until he could be charged again with something else).. The intent is evidenced from the fact he was never transferred to the FI payroll and remains today a member of the official faculty of A&D, which forwards his pay.

Forklift Systems Inc., 510 U.S. 17, 21 (1993).

Further, Morgan at 115, quoting Harris, (510 U.S. at 21) quoting Meritor Service Bank, FSB v Vinson (477 U.S. 57, 67) states, "We have repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of prohibition 'is not limited to "economic" or "tangible discrimination" and that thus 'terms' and 'conditions' of employment in the narrow commercial sense." Faragher v. Boca Raton, 524 U.S. 775, 786 (1998). "It includes requiring people to work in a discriminatorily hostile or abusive environment" Morgan at 116 quoting Harris at 21.

Much of Morgan (436 U.S. 101) is concerned with distinguishing single occurrences such as failure to hire, dismissal, or even the decision not to grant tenure (See Ricks supra) from a continuum of demeaning incidents that constitute the HWE" Also see for "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir.1994) (quoting Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir.1992)).

Therefore, any HWE of a pervasive continued nature, whether relating to pay and pay taunting,[65] repeated transfer to intentionally pejorative assigments, false accusations, reassignment to a horrid detention center on maliciously and falsely proffered disciplinary charges, malicious prosecution on fabricated and ridiculous charges, and summary removal from the payroll for an indefinite period which was pursuant to a bogus internal determination that Pakter was mentally a danger to students (only overturned after a year by an outside referee), all comprise the HWE. All the conduct was related in that each and every injustice was aimed at bringing about the unlawful termination of Pakter's life-tenure. In fact, it is not only Pakter's property interests that are the target, Pakter's liberty is abrogated, when he, as a highly qualified professional, is forced to sit 7 hours a day, 184 days a year, in a guarded room which he cannot leave without a uniformed guard escort and is required to do no work. It is loss of the liberty interests that the DOE uses to coerce disfavored teachers to relinquish their property interests that are more

---

[65] As opposed to the silent personally non-demeaning (until discovered) decision made decades earlier and without further employer acts of wrong doing in recent years in Ledbetter v. Goodyear Tire & Rubber Co. [550 U.S. 618 (2007)]. Congress has sigualed, however, that it is ready to amend the law so that the courts will have no difficulty in interpreting that it intends to remedy the entire wrong done to Ledbetter by having the limiting period run from discovery of the illegal action.

difficult to quickly wrest[66]. This case is unlike other employment cases because except for Chancellor Klein, most of his predecessors understood that leaving tenured professionals alone was mandated unless there was some true breach of "good behavior."[67] [68]

## POINT III HWE THEORY IS APPLICABLE TO ALL"PROHIBITED EMPLOYMENT PRACTICES" AND POSSIBLY ALL INJURIES

There is nothing in the analysis of Morgan which would limit its application to Title VII claims or to even to those claims within the purview of the EEOC. The discussion in Morgan addresses the nature and continuing wrongs in HWE. The HWEs as described in Morgan, are equally applicable to any discriminatory or unfair or prohibited "employment practice" under any of the statutory or constitutional claims made in this case. All statutory and constitutional claims where an on going "practice" could be found would be very broad but no broader than theories of continuing conspiracies or corrupt enterprises[69] are, to include long time-barred acts within time-effective judicial review in order to award just relief without inappropriate resort to traditional equitable doctrines. Quoting from Drees v. Suffolk County, 2007 WL 1875623 (2007 E.D.N.Y.)with regard to § 1983 claims,

...the statutory time period should also be considered by the Court as part of a "continuing violation" that created a hostile work environment at the SCPD from 1991 through the present. (Pl.'s Br., at 5-6.) As the Supreme Court explained in National Railroad Passenger Corporation v. Morgan, "the incidents constituting a hostile work environment are part of one unlawful employment practice," and, therefore, "the employer may be liable for all acts that are part of this single claim." 536 U.S. at 119 Accordingly, in the case of plaintiff's hostile work environment claim, "the statute of limitations requires that only one sexually harassing act . . .

Drees v. Suffolk County, 2007 WL 1875623 (2007 E.D.N.Y.)

Given this analysis, the HWE construction allows that there has been one concerted act to "get rid of Pakter" that began in 2003 and is still ongoing and so far unachieved for each and every of the rights

---

[66] DOE has argued that it is not discrimination if all reassigned teachers are treated equally harshly, and that the DOE also has the right to assign its employees to whichever location it operates that it deems in the best interests of the DOE. Nonsense; it takes all the teachers it seeks to discriminate against, herds them together in a circumstances that is unconscionable, and then says they are not being discriminated against, the 800 (out of 145,000) are being treated equally

[67] True diminution of cognitive of function can be dealt with by the §2568 exam and forced retirement, but it is actionable when, as in Pakter's case, it was clearly used to pre-empt even a modicum of due process of § 3020-a

[68] When Rudy Crew became Chancellor, he inherited packed "rubber rooms" which he promptly emptied by returning the teachers to their classrooms in all but cases of true embezzlement, serious corporal punishment or sexual crimes.

[69] Or those claims made under professional malpractice, or continuing revolving credit transactions *inter alia* where accrual begins at the last transaction.

invoked in this case, e.g. § 1983 (substantive and procedural due process and equal protection claims),

Further, a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)

The ongoing nature of the HWE applies to all federal claims (except possibly *qui tam*, but not retaliation suits under FCA[70]) including FLSA, Title VI, Title VII ADEA, ADA, §1983. *See* Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004); Roberts v. County of Nassau, 140 Fed.Appx. 277 (EDNY 2005).

There is no evidence that the non-compliance that Pakter wished to bring to Klein's attention in a meeting with him in 2003, do not continue to exist, or that Title VI violations have been corrected and are no longer part of an ongoing prohibited practice. Pakter has ample evidence of to whom within the DOE he met, spoke to, conferred with and received written notification that they would not pursue an investigation; "these matters are best handled at the local school level." See E's 10,11 At A&D Pakter was removed from his post as an invidious pretext, and the new Principal[71] maliciously sent a letter to the Medical Bureau demanding Pakter be examined for mental competency under §2568 violating equal protection and due process. Many administrators worked in concert to reign scourge and persecute Pakter over the last 63 months. Numerous DOE administrators conspired to unlawfully discriminate against Pakter.[72] Additionally, FLSA contains language referring to "practices" and it is the ongoing practices that given the facts of this case are within the "single continuing wrong" that allows acts not committed within the last three years to extend back as long as a single act was within that three year limit prior to September 2, 2008. *See* Kimel v. Florida Bd. of Regents, 528 U.S. 62, 120 (2000) to learn that FLSA's enforcement

---

[70] See *fn* 27 *supra.*

[71] The prior Principal Madeline Appell, about whom he was complaining, resigned and retired from service the day Pakter was first reassigned to the "rubber room"; it was also the day after threats of Pakter being brought up on charges of insubordination if he did not cede every copy of the tape of the P.S. 59 children at music class in A&D space, to either Principal Appell or to her DOE superiors.

[72] Unfortunately there is no legal consensus on whether time limitations accrue in civil conspiracy from the final overt act as they do in criminal conspiracy or each overt act, *i.e.* FLSA violations run to its own time limitations (which with pay runs from each paycheck) but show no consensus for other prohibited acts not covered by Titles VI, VII, ADEA. *Cf.* Crummer Co. v Du Pont, 223 F2d 238 (5th Cir. 1955) *cert den* 350 US 848 (1955);Jones v. Coughlin, 665 F. Supp. 1040 (SDNY 1987), *later proceeding* 696 F Supp 916 (SDNY 1988); Winkler-Koch Engineering Co. v Universal Oil Products Co, 100 F. Supp 15 (DC NY 1951); Risk v. Kingdom of Norway, 707 F. Supp. 1159 (N.D. Cal. 1989), aff'd, 936 F.2d 393 (9th Cir. 1991);Fitzgerald v. Seamans, 384 F. Supp. 688 (D.D.C. 1974), *aff'd in part, remanded in part,* 553 F.2d 220 (D.C. Cir. 1977); Saunders v. National Basketball Ass'n, 348 F. Supp. 649, (N.D.Il 1972); Keeran v Wahl Co., 320 Ill App 457, 51 NE2d 598 (1943).

provisions are incorporated into the ADEA, and those remedial options operate together with the ADEA's enforcement provision. In C.I.R. v. Schleier, 515 U.S. 323(1995), it is evident that the provisions of FLSA and ADEA parallel each other. Therefore, drawing the parallel since, a HWE is recognized in ADEA claims in this Circuit, [*See* Boise v. Boufford, 121 Fed.Appx. 890, 893 (2d Cir.2005); Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir.1999)] HWE equally applies to FLSA. Acts committed against Pakter were ongoing at least until June 30, 2008, 45 days before filing this action. Pakter, on the other hand, began to report problems in the school system less than five years before filing this claim, but the adverse actions that are part of a HWE continue to this very day.[73][74] Probably the most egregious of all, was that Pakter awaited his 3020-a hearings to be vindicated only to find the arbitrator was taking directions from the DOE and was not a neutral[75].and that the whole procedure was flawed, denying

---

[73] By one year after Pakter was first removed from his school and classroom, his treatment had become so antithetical to the treatment he had enjoyed from the DOE for the previous 35 years that he began to audiotape his meetings and interactions with the DOE. Therefore, audiotape exists for all "off the record" statements/rulings in the 3020-a.

[74] Defense cites Pearl v City of Long Beach, L.I. 296 F.3d 76 (2d Cir. 2002), as example of a time barred § 1983 claim alleging violations of Amendments IV, V, VIII, and XIV. We agree; the claim was brought 30 years after the alleged misconduct by police, even if it is the first time confession of lying by witnesses was available. The § 1983 claims herein made by Pakter began less than five years before the filing of the action and continue to this day, whereas Pearl describes conduct which he was subjected to. as a one time incident. However, egregious, it was a single occurrence and it was thirty years before a claim was filed. *Id.*

[75] SED in Albany never offered arbitrators any resources on SED policy or administrative regulations. Therefore when such questions as could a teacher found psychologically unfit to teach, simultaneously be subjected to 3020-a proceedings on the same charges, or could another older (late 60's) disfavored tenured teacher also with a spotless record be assigned only classes out of her license, be observed in said classes which no one ever certified her to teach, be deemed incompetent, terminated for failure to adequately control the behavior of the special education emotional disturbed students she was assigned, and thereafter be ineligible to teach the general education students in her appointed, tenured, and licensed area anywhere. See SED Case No. 7133/8258 (2008). The UFT does not intercede except in exceptionally rare cases, as it has also learned by experience that SED supports its school districts, and there is an unwritten agreement that the UFT will not go to State Court concerning the 3020-a arbitrations, if the DOE does not do likewise to contest CBA arbitrations. The UFT did go to Court on one occasion and made a NOC on one other occasion (Pakter's see E 1). DOE conceded on the one point in Pakter's case that directly affected UFT operations and finally dismissed the charge of embarrassing the DOE via the article in the UFT newsletter, but maintained the others ("plants" and "watches")–that is when Pakter sought present counsel. In the other case a tenured teacher in his early 70's was brought up three times on the identical facts and incidents, completely exonerated twice, restored to his school and position only to be immediately reassigned to await the same charges on the same facts for a third time did the UFT file an Article 78 proceeding in NYS Court. Even there the Justice is attempting to hold out for a settlement to the case rather than having to rule. With the number of Acting Supreme Court Justices, and those not yet elected for their second 7 year-term, both sub-sets are under political pressure not to rule against the City, and it is precisely these vulnerable Justices who accept "City Parts." Thus, the UFT has become disenchanted with bringing actions in state court. It is precisely these types of problems with the 3020-a process and its explosion in number of cases brought as a pretext for age and salary discrimination (a proxy for age as salary goes *pari passu* with length of service and thus, age as it is impossible to reach top salary below age 40 as 22 years of service must be completed first), that led to two action(s in this District, *i.e.* Teachers4Action *et al* v Bloomberg, *et al* ("T4A") 08-CV-0548 (VM)(AJP), and Adams, *et al* v SED *et al* 08 CV 5996 (GEL).

due process. By a <u>Morgan</u> analysis, these employment practices were intentionally, wrongfully and continually directed at Pakter, all continued as a single action or employment practice for almost five years when this action was initiated and are ongoing to this very day. While analyzed as a HWE single continuous action, the injuries inflicted are also squarely 14th Amendment violations of both equal protection and due process. They are also all actionable pursuant to § 1983.

## POINT IV: PAKTER'S ADEA CLAIMS ARE COVERED BY EEOC CHARGE NUMBER #160200600690 FILED ON NOVEMBER 14, 2005 COVERING ALL UFT MEMBER-TEACHERS

On November 14, 2005 the UFT, filed a charge with the EEOC ( #160200600690) under the ADEA[76] (E 2). The EEOC exhaustively investigated the allegations for the next twenty-two months gathering its own evidence. Then, EEOC and DOE went into a conciliation process as provided for by the ADEA. It took place between September 6, 2007 and September 13, 2007. C.¶¶107-110 The EEOC concluded the conciliated process had failed and sent the UFT a "right to sue letter" ("RTSL") (E 3).[77] [78] C.¶108. Pakter was covered by the complaint and the RTSL, though there is no statutory requirements for the RTSL under ADEA, it merely can shorten the statutory 60 day waiting period if issued sooner. *See* 29 USC§ 626(d). (E 3). Since there is no requirement for a RTSL under ADEA, the 90 day expiration date it bears is ineffective for ADEA. UFT, brought an action on March 10, 2008 in this Court [08 CV 02420(LTS)]. The UFT had by then filed separate a NOC on Pakter's behalf on January 15, 2008, (see

---

[76] On behalf of its members protected by the ADEA, who had unfairly (after decades of satisfactory service) been rated unsatisfactory and many who were already facing §3020-a charges (E 2). Older teachers were several times more likely to suddenly receive their first "U" annual rating and were also several times more likely to be brought up on § 3020-a compared to younger tenured teachers.

[77] UFT advised the EEOC that it did not plan to file a class action or even a multi-plaintiff action, but would file single plaintiff actions, if any, and other of the 60 named complainants might, in addition, prefer to engage private counsel. Thus, the EEOC issued RTSL's dated December 10, 2007 which reached the complaining parties and the union on December 12, 2007. Ultimately the UFT filed a single action based on the ADEA on March 10, 2008; 08CV02420(LTS)

[78] The EEOC had been requested to issue and did issue several RTSL's even before the conciliation process was undertaken, as it is required to do anytime 180 days has passed and it has not concluded its investigation. Thus, the teachers at High School of Graphic Arts (see E 2: ¶¶ 35-49) filed an ADEA action before the conciliation. <u>Diana Friedline</u> *et al* v <u>NYC-DOE</u> *et al* 06-CV-01836(JSR); at trial, the jury awarded damages to three of seven plaintiffs whose case went to the jury.

19

E 1) and Pakter expected that the UFT would follow through.[79] It was not until May 11, 2008, two months after the UFT brought its ADEA action (for which there was no legal impediment to Pakter joining), that the UFT persuaded DOE to rescind the "interview" charge[80]. The statute of limitations had not run on any of the retaliation FLSA, § 1983 or other violations.[81] It became even clearer, however, that the injuries to Pakter were still accruing in a HWE Pakter had also filed a *pro se* NOC filed 10 months earlier (E 4).

Finally, the ADEA does not require a RTSL but Pakter requested and received one E.5. The statute instead specifies that 60 days shall have elapsed between filing with the state agency and initiating an action in Federal Court (unless the case is closed earlier as would be indicated by the issuance of a RTSL). This provision allows the conciliation provisions of the ADEA to be used to seek to solve the discrimination without Federal Court litigation. In this case Plaintiff filed an individual action much later than the 60 days since the ADEA claim (E 2) was filed by his union. That claim was exhaustively investigated, conciliation was undertaken, it failed and the UFT received a RTSL. Pakter was a member of the subset of members in whose behalf the UFT had made its charge. New RTSL's were later issued to individuals for individual action(s). In addition, an RTSL was issued by EEOC to Pakter on November 19, 2008, and the statutory 60 days have long passed since Pakter's mid-August filing with DHR which has since closed its files (*Cf* E 2,3,5,6,9. An amended complaint is being filed essentially simultaneous to this Opposition Memorandum under F.R.C.P.15(a)(1)(A). The facts and filing date of said Amended Complaint conform to the statutory "60 day" provision and the 90 day RTSL provision on its face (E. 5).

## POINT V TITLE VII IS AN APPROPRIATE STATUTE TO PLEAD RETALIATION UNDER ADEA: ADEA DOES NOT REQUIRE RTSL

All retaliation claims whether for Title VII, ADA, ADEA, *inter alai* Act, may be reported to the

---

[79] The UFT's NOC (E 1) did eventually lead to a withdrawal of the specification that Pakter had committed misconduct by allowing himself to be interviewed by UFT staff for the purposes of an article in its newsletter, *The New York Teacher*, but included a tacit deal with the UFT that *UFT* would not pursue the claim in Pakter's behalf: Pakter agreed to nothing.

[80] UFT's notice of claim for Pakter, superceded an earlier one which Pakter had filed a *pro se* against the DOE on or about February, 24, 2007.which gave notice to the DOE for all claims as to its HWE, ADEA, whistle-blower and retaliative violations occurring until that point. See E 4

[81] Other than perhaps the *ad hominem* verbal assault in Mr. Vignola's letter which was hardly actionable on its own, Pakter did not become sensitized/aware that there was a definite HWE, pattern of retaliation until Winter/ Spring 2004.

20

EEOC as protected behavior and are properly pled and claimed under 42 U.S.C. 2000-e.[82] The employer's animus which through its actions reaches vendetta proportions against Pakter, includes retaliatory components against all of Pakter's claims, including but not limited to ADEA. Parsing which animus was the prevalent one for each of the unwarranted and cruel wrongful act committed by the employer is unnecessary; as Title VII teaches that even if retaliatory animus comprises one of several reasons for the adverse action, then the adverse action is unlawful.[83][84] Even if Pakter did not belong to the protected category of being disabled, or any protected category, the employer violated Title VII by not only wrongly accusing Pakter of being too disabled to do his job and order him to a §2568 exam, but DOE physicians conspired to suppress psychological test results and make a false determination, in order to oblige DOE. The false accusation of some aspect of the Title VII, ADA, or ADEA entitles Pakter to protection of the Act and it does not matter why DOE wanted Pakter "out." In Pakter's case it was retaliation for opposing the way Appell was denying African-American an Latino students aspects of their required and entitled education; it is actionable under other statutes as well. However, even if the employer falsely accused Pakter of mental incompetence without it being an already retaliatory act, Pakter's opposition to it (demanding medical arbitration, preempting further conspiracy by the medical arbitrator, telling the UFT reporter), grants him protection under "opposing the unlawful practice" of the employer. Cf.[85] and

---

[82] ADEA claims are processed by the Justice Department, (see E 6 cover letter to RTSL),

[83] Whistleblower retaliation e.g. under N.Y.L.L.§740-b shall be parsed from other retaliation acts to avoid waivers.

[84] Retaliatory discharge, e.g. in violation of Title VII occurs whenever a "retaliatory motive plays a part in, . . . whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033,1039 (2d Cir. 1993) as quoted in Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1177-1178 (2d Cir. 1996). Likewise, if retaliation based on opposition to prohibited practices under the ADEA is only one part of the retaliation for opposing any prohibited employment practice, then the retaliation is unlawful as retaliation for opposition to unlawful practices under the ADEA.

[85] An analogous fact pattern is found in Matlosz v. J.P. Morgan Chase 2005 WL 2242196 (SDNY 2005) [03 CV 235 (JK)]. A peer (Ram) to Matlosz' direct superior disliked Matlosz and wanted to make trouble for him. The animus was for purely personal and non-protected reasons. At a management meeting Ram, falsely stated that Matlosz was going to be a liability because Matlosz sexually harassed women who were subordinates of Matlosz and one had confided in Ram. Matlosz' direct superior, was at the meeting and reported the incident to Matlosz. Matlosz and his superior jointly decided that the false accusation should be dealt with by reporting it to HR. When HR investigated, the animus heightened and the accuser's retaliation heightened until soon.Matlosz was terminated. While Matlosz was an "at will" employee in the private sector (as opposed to Pakter, a life-tenured municipal employee), only the sex-discrimination charge for wrongful accusation of sexual harassment was dismissed, the Title VII retaliation charge was retained for trial, as were the slander and slander per se claims Malicious falsehoods do not enjoy the "qualified privilege" that the meeting

21

Crawford v Metropolitan Gov. of Nashville *et al.*, _US_ (2009) 08-1595 (*dec. January 26, 2009*) which expands who and for what reasons retaliation is actionable.

The ultimate issue in any employment discrimination case is whether plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an impermissible animus, i.e., that there was discriminatory intent. Tomney v. International Center for Disabled, 357 F.Supp.2d 721 (SDNY 2005).[86] It is unlawful to retaliate against an employee because the employee has opposed a discriminatory practice, may be found if adverse employment action was based in part on retaliatory purpose, even if that was not sole or even major motive. Dooner v. Keefe, Bruyette & Woods, Inc., 157 F.Supp.2d 265. (SDNY 2001).[87] By stating his age, Plaintiff has identified himself as protected by the ADEA. Plaintiff was performing his duties satisfactorily for 40 years and had recently received NYC's highest honor for his outstanding service: "Teacher of the Year." However, the moment Plaintiff testified before the SCI, wrote to the Chancellor to report non-compliance to the detriment of the students, the DOE began of building a false disciplinary case.[88]

When Pakter indicated that he had videotaped evidence of the non-compliance, he was ordered to surrender the tape and all copies immediately. This was despite the fact that teachers videotape classes regularly for all sorts of reasons related to the improvement of instruction[89]. [90]

---

itself, planning departmental career paths which was part of the participants duties, would have otherwise enjoyed.

[86] If the employer in an employment discrimination case articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it simply drops out of the picture; the burden then shifts back to the employee to show, without the benefit of any presumptions, that the employer's decision more likely than not was motivated, at least in part, by a discriminatory reason. Schreiber v.Worldco, LLC, 324 F. Supp.2d 512 (SDNY 2004).

[87] Pakter, opposed his employer's attempts to discriminatorily use §2568 to get him out of the schools and off the payroll by wrongfully finding him "unfit for duty" and he prevailed. He opposed violations to Title VI, and he opposed that a significant sum of money was allocated to music at A&D, but there was no instruction in music whatsoever at the school.

[88] It did so with a barrage of letters to file concerning *de minimus* or invented infractions over which neither plaintiff nor his fellow teachers had ever been reprimanded before, and which his fellow teachers are still practicing without incident. (Also see E 7 most recent blog on other teachers being discriminated against and E 8 as to the mandated role of SCI and guarantee of protection to "whistle blowers"). Plaintiff only needs to have a good faith motive to report DOE's illegality.

[89] Pakter videotaped his classes once he realized retaliation was at work against him preemting "incompetence" charges

[90] Pakter also taped the class to improve instruction of students in his school. To plaintiff's knowledge or to the knowledge any other current or former DOE teacher whom he has asked, no other teacher has been ever asked to

22

The "tell" of retaliation is demonstrated in that for the following 11 months Pakter, was approached by DOE often with offers to settle the disciplinary charges. The conditions would always be the same, he would return to his prized classroom, the gifted students would be reassigned to him, all charges against him would be dropped, all the negative letters in his file removed and the one U rating (the first in his 25 years at A&D) would be reversed. In return Pakter had to agree to only three conditions. He surrender all tapes of the music classes; he give sworn testimony that he had turned over any and all tapes and that if any were to surface that were unknown to him at that time he would give them to the DOE as well; that he release DOE from all claims of any nature whatsoever and would not pursue any claims accrued or accruing to that day. Said offer is tantamount to an admission of retaliation. Pakter, refused the offer. While offers of settlement made in good faith are generally inadmissible; these were not made in good faith. DOE attempted to leverage bad faith false accusations for good faith evidence of non-compliance.

## POINT VI: THE COURT HAS SUBJECT MATTER JURISDICTION OVER PAKTER'S ADEA AND TITLE VII CLAIMS

Pakter made claims to DHR and simultaneously to the EEOC on August 15, 2008. On August 29, 2008 the EEOC asserted to Pakter's counsel that the RTSL would be mailed that day[91].

29 USC 626 (d) specifies that a claim may not be filed until 60 days after a complaint has been filed with the EEOC. This statutory provision is to allow "conciliation" of ADEA claims, The November 14, 2005 complaint by the UFT on behalf of all of its tenured members who are protected by the ADEA and who also only recently began to suffer unwarranted adverse employment actions was filed with the EEOC

---

surrender all copies of any tape keeping none for himself or herself. Within 24 hours of refusing to turn over any and all copies of the tape, Pakter was removed from his classroom microcosm which he had nurturingly built, adorned and added to, for 25 years, never to be allowed to return again. Simultaneously, the Principal, Madeline Appell who sat on city-wide board overseeing "Blueprints for the Arts," through which an initiative in the adjoining school could be hailed as a stellar example (were it not for the reallocated resources earmarked for and even physically integral to A&D), resigned as Principal of A&D and retired.

[91] Apparently the EEOC employee mis-spoke and only then learned that a complaint must be first dismissed by the initiating state agency before it can be dismissed by the EEOC.. Counsel completed the complaint on a national holiday and submitted it to the Clerk of the SDNY for assignment on the morning of September 2, 2008 before mail delivery, apparently counsel writing and signing the complaint on September 1, 2008 could only anticipate and not assert what would happen on September 2, 2008. The statement therefore was inadvertently premature. The several administrative preconditions were executed in due course; dismissal notices and the EEOC RTSL were received ( Es 5, 6, 9) curing any impediment to this Court properly asserting subject matter jurisdiction at this time.

23

over three years ago. For the next 22 months the EEOC exhaustively investigated the allegations but was unable to conciliate them (see E 3). The statutory provision was met several times over because of the exhaustive investigation on behalf of all ADEA protected members (see E 2 ¶ 2.) The 1st Amended Complaint filed at about the same time as this Memorandum, conforms to the statutory requirement of 60 days elapsing until it, which supercedes the original complaint, is filed. In the alternative, the closing of the case and issuance of the RTSL by both EEOC and DHR also meets the statutory requirement of prior closing of agency cases (Es 5, 6, 9) or waiver would most equitably apply in light of the history here.

## POINT VIII:    FCA HAS A PRIVATE RIGHT OF ACTION FOR RETALIATION

The 1986 amendments to the FCA created a private cause of action for an individual retaliated against by his employer for assisting an FCA investigation or proceeding, § 3730(h). It also revised the FCA's statute of limitations; Section 3731(b).provides that "[a] civil action under section 3730 may not be brought ... more than 6 years after the date on which the violation of section 3729 is committed."[92] Pakter turned to the supposedly independent investigative agency mandated to "watchdog" the DOE, the Special Commissioner for Investigation to investigate. Pakter's reception SCI soon turned from welcoming to investigating Pakter and the retaliation began in earnest. In at least Title VII cases, it is not only retaliation for going to the EEOC that is actionable, but retaliation for reporting to internal departments that is protected, *e.g. see* Matlosz v. J.P. Morgan Chase 2005 WL 2242196 (SDNY 2005). Pakter was seeking to begin an oversight investigation of corruption at SCI. The SCI is constantly submitting reports of its investigations to prosecutors. Thus, when SCI did not pursue his report (E 10), he too went to the Manhattan District Attorney. (E 11),

---

[92]    In 2001, relator Wilson brought an FCA *qui tam* action against petitioners, along with an FCA retaliation claim. Graham County Soil and Water Conservation District v U.S., 545 U.S. 409 (2005). Wilson who was employed as a secretary alleged that county officials retaliated against her for alerting federal officials to the purported fraud and for cooperating with the ensuing investigation, ultimately forcing her 1997 resignation. Her prior employers successfully moved to dismiss the retaliation claim as untimely, on the ground that North Carolina's 3-year statute of limitations governed Wilson's FCA action and barred it. Reversing, the Fourth Circuit found it unnecessary to borrow a state limitations period because one was supplied by § 3731(b)(1) and the Supreme Court affirmed this ruling. *Id.*

24

## POINT IX: PLAINTIFF *DE JURE* STANDS IN *LOCUS PARENTIS* WITH REGARD TO STUDENTS ACADEMIC NEEDS AND AFFAIRS

Who better would know what students are entitled to in their academic program than their teachers? If the parents would have standing, then a devoted teacher, who has been incumbent in the system, for 35 years at the time and 25 years in the specific school who has championed and incentivized his students to high academic achievement,[93] should have the same standing. He makes this claim solely for declaratory and injunctive relief to ensure that the minority students at A&D will not be deprived world language instruction, music instruction and other curriculum omissions he noted were encroaching on the full spectrum of instruction to which A&D students were once exposed.[94] It is the experienced long-tenured teacher who knows the curriculum requirements, who has seen that children are being denied their proper entitlements and who is not only encouraged but mandated (under penalty for failure to report) to report irregularities and omissions to the SCI [E 12 (see ¶ e,)]; protection against retaliation is guaranteed. E 13. Pakter solely wished to correct non-compliance at his school by first approaching the Principal, then by approaching and testifying before SCI. As a courtesy and as a loyal employee, he advised the Chancellor by letter (E 14) of his meeting and testimony before SCI. If the minority students are supposed to receive entitlements based on Title VI non-discriminatory measures, then the person(s) who can best know and report whether the students are receiving everything they are entitled to are their teachers.[95] The students would not be aware of this and the parents would not be aware of this. Pakter asks for no relief for himself.

---

[93] And for which he was suddenly and maliciously brought up on disciplinary charges for awarding students watches, when he had offered any student earning a 90% GPA a watch for over 23 years at the time.

[94] Defense cites to Commodari v Long Island University, 89 F. Supp.2d 353, 378 and several other cases where plaintiffs have sought relief for themselves for adverse employment actions they alleged were discriminatory, is not on point. Pakter makes no claims for himself under Title VI. He derives his standing, solely as a teacher acting in *locus parentis*, to seek the declaratory and injunctive relief on behalf of the minority A&D students he has been deeply committed to for 30 years.

[95] Virtually all NYC public school receive Title I funds that are designated for curriculum programs and materials for students. Students are asked to have their parents fill out a "means-test" to determine their eligibility for free lunches. In schools where eligibility reaches 80%, no student is required to pay.

## POINT X: ADEA & STATE E.L. § 296 (HRL) ARE CONSTRUED IDENTICALLY HWE APPLIES TO ALL NYS LAWS REDRESSING UNFAIR EMPLOYMENT PRACTICES

Since claims under the New York Human Rights Law (HRL) are analyzed identically to claims under the ADEA, the outcome of an employment discrimination claim made pursuant to the HRL is the same as it is under the ADEA. Meacham v. Knolls Atomic Power Laboratory, 61 F.3d 134 (2d Cir. 2006) *petition for certiorari filed* 2007 WL 1433410. Therefore the HWE analysis applicable to ADEA is equally applicable to age discrimination, educational program discrimination for the students, and retaliation for opposing unlawful acts of the latter under HRL. At least one discriminatory act was committed in the 300 days prior to filing with DHR, a NOC was timely filed fulfilling §3813, this Action was filed within 365 days of the incident claimed in the NOC. All other NY Statutes that either have recognized HWE or that redress unfair employment practices, and thus should recognize HWE, should allow relief for Pakter's claims from the time the unfair practices began in 2003. Thus NYLL §740 and NYCSL §75-b should be construed in light of HWE.[96] Many of the affixed exhibits demonstrate that Joel I. Klein, co-defendant promulgated policies, and specific acts which promoted discrimination against Pakter. While NYC may claim XI Amendment immunity to state claims, Klein cannot.[97]

## POINT XI: NEW YORK LABOR LAW 740-b WAIVER APPLIES TO WHISTLE BLOWER RETALIATION ONLY; RETALIATION FOR HAVING DEFEATED §2568 IS DISTINCT AND REMAINS ACTIONABLE UNDER OTHER FEDERAL AND STATE LAWS

There should be no need to sever the retaliation as a Whistleblower from an additional and totally distinct cause of action retaliating against Pakter for having defeated the bogus determination that he was "unfit." Pakter was supposed to accept the medical bureau's determination and retire. He was 60 years old. Because he had been hired in 1968 (C.¶¶ 2,11), he was entitled to retire at unreduced pension which then

---

[96] We distinguish from Amorosi v S. Colonie Indep. Sch. Dist., 9 N.Y.3d 367. 369, where a counselor was denied tenure after taking several maternity leaves. She never suffered humiliating guarded rubber rooms, predetermined and perjured §3020-a hearings that were supposed to offer due process, ridiculous disciplinary charges *inter alia* that comprise the HWE here. Further, unlike Title VII where individuals cannot be held liable, § 296 (6) specifically provides for holding individuals who aided/abetted discrimination or retaliation personally liable.

[97] Three Principals, four A.P.'s and two doctors are added as defendants to in the 1st Amended Complaint whose aiding and abetting was most egregious, and who also have no XI Amendment immunity for state claims. The 1st amended complaint is being filed approximately simultaneously to this Opposition Memorandum

credited him for 37 year of service.[98] Pakter was supposed to go away; instead he demanded medical arbitration; DOE had a "sweetheart arbitrator" but Pakter foiled that; he arrived with his illustrious psychiatric consultant who participated and questioned until an honest consensus was arrived at. C.¶¶ 80,81. Thereafter Pakter had to be returned to payroll, reimbursed for lost earnings with interest and written a letter that the medical bureau had been "in error" a year earlier. When Pakter arrived at FI in October 2006, they had orders to "get Pakter" and have been retaliating ever since. This retaliation is actionable under Title VII, NYCHRL with its punitive action provisions, and NYSHRL, while DOE may be immune pursuant to Amendment XI the actors responsible for the unlawful conduct are not. The Whistleblower retaliation is not actionable except under NY LL § 740 or the FCA or FLSA. Pakter prefers holding the claims in abeyance pending discovery to ascertain whether the diverted funds (yes they were diverted if they were received for music and there was no music at A&D) can be traced to a federal source. The third and newest distinct cause of action for retaliation is for the embarrassing UFT news article *re* Pakter. The nexus between retaliation and the ADEA is to be found in *fn*. 79. The DOE, not Pakter designed its salary schedule and defined benefit pension algorithm. The fact that Pakter earns more and eventually retires at higher payout the longer he remains in DOE employ is not his doing and the employer's attempt to contain cost by getting him out as soon as possible, is actionable under ADEA,[99].

### CONCLUSION

WHEREFORE as the legal basis or rationale, or both, for each claim and cause of action under each statute is defended. Plaintiff therefore, respectfully requests that Defendants Motion to Dismiss be denied in its entirety, that Defendants be required to make a responsive pleading to the 1st Amended Complaint without delay and that Court order such other and further relief in favor of the plaintiff as the Court deemsjust and proper.

---

[98] In 2005 Pakter would be entitled to a basic pension of at least $77,000 p.a. about 90% of his then salary. Now Pakter is entitled to a basic payout >$97,000 p.a, or >97% of his current salary. He has also earned almost $80,000 in salary payments greater than the pension payout in the last 45 months. The sooner Pakter retires the more DOE saves long term.

[99] Whether it is age discrimination or it is retaliation for intentionally remaining employed for 40 years and remaining so, even after the pension payout exceeds salary at retirement (which shall also increase) in less than 18 months for Pakter

27

Dated: New York, New York
      January 26, 2009

Joy Hochstadt, P.C.
Attorney for the Plaintiff
300 Central Park West
New York, New York 10024-1590
212 580 9930
joy.hochstadt.pc@gmail.com

                                                ECF
_____
By: Joy Hochstadt

\* This document contains only 25 pages of text; in positioning the footnotes on the page where they are cited the word processor left blank areas where a footnote would not otherwise be able to appear on the same page. The seemingly "extra" pages 26 and 27 are merely compensatory for blank space left in keeping footnotes with the text they are referencing.