This particular website showcases watches from my sold out 2004-2005 fashion collection which are no longer available for sale so there is no conflict of interest issues. The students were all well aware that the only way to obtain a watch from my last collection was to earn it by attaining a 90 or higher average on the official school report card.

For the first time in my long career as a teacher, the principal claimed I needed approval from the DOE/ Regional Office to distribute incentive awards. I thereupon emailed a formal request to Mariano Guzman, the Deputy Superintendent for Region Nine, fully describing in detail the full particulars of my company's offer to underwrite an incentive campaign.

It should be noted that the HS of Fashion Industries has for many years maintained their own student incentive program consisting of rewarding students with financial "vouchers" to acquire free art supplies from the official school store.

In addition, on page 6 of the most recent Parents Association Newsletter, the entire page is plastered with the names of stores, companies and neighborhood movie theatres that support the HS of Fashion Industries.

Thus once again the entire issue of my awarding students fashion accessories for high achievement is really a non-issue. But the attempted letter in my file re the above (which the UFT Rep challenged) is simply one more example of the never ending vendetta on the part of the DOE to try to harass me out of the system. Especially since I won the Medical Arbitration Decision last June which forced the Director of the DOE Medical Office, Dr. Audrey Jacobson to formally recant in writing a knowingly false claim she made one year ago, much to her embarrassment, and at great cost to the City."

Specification 6 of David's new charges as he awaits his second 3020a hearing was that he made the New York City Board of Education 'look bad' in the NY Teacher article written about his case and published on March 15, 2007. **Spec #6** says: "caused widespread negative publicity and notoriety to the HS of Fashion Industries and the New York City Department of Education in general when his "unprofessional behavior" was referenced in a UFT newspaper".

"Thus I was not only set up and victimized but later charged in the 3020-a Specifications for my new, second, 3020-a Trial with the crime of letting the UFT publish the facts of my first 3020-a Railroading," David said. The NYC BOE re-considered, and withdrew this charge. David awaits his second 3020a hearing.

In September 2008 Pakter sued the NYC Board of Education in Federal Court:
U.S. District Court
**United States District Court for the Southern District of New York (Foley Square), CIVIL DOCKET FOR CASE #: 1:08-cv-07673-DAB**

David Pakter's Complaint
New York City's Notice to Dismiss
New York City's Memorandum of Law in Support of the Motion to Dismiss

Related story: Diana Lam's ouster:
**On the Lam**
New York Magazine
LINK

The mayor wanted basic change in the schools, and Diana Lam provided it—until unsavory tactics proved her undoing. Where does

the chancellor turn now?
By Robert Kolker, Published Mar 15, 2004

Joel Klein is not the man he was two years ago when Mike Bloomberg asked him to head the nation's largest public-school system, and much of his evolution—especially his belief that children learn as much reading alone as they do from being taught by teachers—took place at the knee of Diana Lam. In a cabinet of private-sector and think-tank émigrés, Lam, Klein's deputy for instruction, was the only career educator; while most of his team focused on rejiggering the bureaucracy, Lam introduced the one piece of reform that actually had to do with the way kids are taught. But now that she has left in disgrace—forced out for nepotism, igniting the mayor's first major personnel scandal—Klein finds himself in an awkward position: He feels the need to defend her as an educator while condemning her sin. And yet, even as the scandal grows, Klein's condemnation seems halfhearted.

"Some people for ideological reasons disagreed with her about the curriculum," Klein says. "That became an issue. And in this business, people get polarized. That's unfortunate. But I think that she was a sound educator, and I have confidence in her educational judgments."

Klein defended Lam to Bloomberg, too, before the mayor finally persuaded him to get her resignation, which suggests either a certain political myopia or a devotedness to the deputy who became his mentor. In the beginning, Klein had hired her to be a change agent, offering her the job after just a few meetings not because of her educational philosophy but because they clicked. "I liked her style," he told me last year. Did he know anything about the educational programs she used? "No," he admitted. But he did know this: Four times, in four different cities, Lam would start up a campaign of parental engagement, introduce a new curriculum, and see test scores bump up a tick or two. And for an education novice whose boss needed the scores to go up before the next election, that seemed like a good deal.

In Lam, Klein had found a fellow anti-incrementalist; in a pedagogical culture of marathoners, she was a sprinter. Revamp the middle schools? No problem. Cut out social promotion in the third grade? Done. Devise a special-ed plan and break up the big high schools? You got it. She was dynamic and uncompromising at a time when managing the educational bureaucracy was at the forefront of the mayor's thinking about education.

She was also impolitic, a lousy listener. She didn't mind whom she provoked. The $800,000 buyout in San Antonio. The wacky three-day campaign for mayor in Boston. The bad blood in Dubuque. And the last few months in Providence, where she rigged a bidding war with Portland, Oregon, to boost her salary and then abruptly accepted the job in New York, giving notice by e-mail. In the end, Lam didn't need any help imploding.

Last summer, newspapers were tipped off that her husband, Peter Plattes, was working in a department that reports directly to her. Lam claimed that Plattes never formally accepted the job, but another tipster revealed this to be a lie. Guessing who whispered to investigators about Lam's indiscretions has become a parlor game at Tweed Courthouse. "She was done in by people inside the system who work for her," says one source who sat on a board with Lam. "Not by reporters or teachers."

In the final act last week, when a report by the schools investigator forced Bloomberg's hand, Lam made sure she wouldn't flame out alone: She said she'd been given the blessing of general counsel Chad Vignola, who resigned a few days later. For a mayor who has staked his reelection on cleaning up the schools, this is no time for an

accountability crisis. But Klein, claiming all is well, continues to cast himself as a reformer—and Lam as a target of those who opposed reform.

"She didn't mind whom she provoked. In the end, Lam didn't need any help imploding."

Lam's enemies were ideological and political as well as personal. Phonics fans like Diane Ravitch were appalled by her philosophy of allowing long blocks of unstructured time for children to simply read and write on their own. Liberals hated the pressure the program put on teachers. The joke around Tweed was that for the first time, teachers-union chief Randi Weingarten and Manhattan Institute pundit Sol Stern agreed on something—that Diana Lam was a disaster.

"Wherever she went, the teachers hated her," says Stern. "Her forte is a tremendous emphasis on top-down staff development. You haul all of the teachers and principals out of the classrooms constantly and pound into them what it is you want done." Those headlines about how teachers are shocked that they have to keep lessons to less than eleven minutes—Lam took the blame for that. Which is why Weingarten felt comfortable sending Lam off last week with the hope that "we can start making educational decisions based on what works for children rather than on one administrator's personal ideology."

In recasting the system in Lam's image, Klein embraced a curriculum already used in wealthier parts of town like the Upper West and Upper East sides—alarming conservatives who believe poor kids need something more structured, like phonics. Klein and Lam capitulated, making a phonics program available to qualify for federal money, but it's clear Klein still believes in Lam's approach. "People want to put adjectives on it instead of understanding the texture and nuance," Klein says, "which is a much more complicated set of issues about how you not only teach children how to read words but to have an excitement for reading—to share ideas. So I think this is the right solution, and I think people are giving this a bad rap."

in the last several months, lam had become so disliked that Klein was shielding her from public exposure. "Clearly, she was the lead educational thinker," says Eva Moskowitz, chair of the City Council's education committee. "But there was a vacuum when it came to who would be allowed to publicly defend the rationale. I don't think either Klein or Lam really took seriously the level of dissatisfaction in the system."

Now that she's gone, there's not much of a chance for Klein to exhale. "I think we have the right mix of talent," he says. "Let's wait and see if we bring in somebody else to fill that role on a permanent basis."

If?

"Well, it'll depend, obviously, on whether we find the right person," he says.

Much of what people found provocative about Diana Lam—the new curricula, the speed of the reforms—remains in place. But from here on out, Klein will be taking the heat alone. He's graduated.

Home | Rules Regulations & Laws | Resources | Just Asking | What Do You Think?
Current Events | Stories & Grievances | Contact | Contribute | Disclaimer | Website Problems

© 2003 The E-A

http://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=7501          1/22/2009