UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DAVID PAKTER,

                              Plaintiff,

        -against –

NEW YORK CITY DEPARTMENT OF EDUCATION
("DOE") f/k/a BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE CITY OF
        NEW YORK;
JOEL I. KLEIN, as Chancellor of the CITY SCHOOL
        DISTRICT OF CITY OF NEW YORK and individually;
MICHAEL LAFORGIA, as LIS, Manhattan DOE
        and individually,
ALEXIS PENZELL as LIS, Manhattan DOE
        and individually;
JUDITH RIVERA as HR Deputy Director DOE
        and individually
MADELEINE APPELL, as Principal of Art and Design High
        School ("HS&D") and individually;
JOHN LACHKY as Assistant Principal A&D, then as
        Principal HSA&D and individually;
MARY ANN GEIST-DENINNO as Assistant Principal
        A&D and individually;
HAROLD MASON as Assistant Principal A&D
        and individually;
HILDA NIETO as Principal Fashion Industries ("FI")
        High School and individually;
GIOVANNI RASCHILLA as Assistant Principal FI
        and individually;
SONIA STUART, as employee of DOE
        and individually;
AUDREY JACOBSON, M.D. as Medical Director DOE,
        and individually;
ANN GARNER MD, as staff psychiatrist DOE
        and individually;
RICHARD SCHUSTER, Ph.D as consulting psychologist
        for DOE, and individually;
                              Defendants.
--------------------------------------------------------------------------X

CIVIL ACTION #
08-cv-7673 (DAB)

Plaintiff Demands
a Jury Trial

U.S. 09 RECEIVED
DISTRICT COURT
S.D.N.Y.
PM 8:10
'11 -1

SECOND AMENDED
COMPLAINT

Plaintiff David Pakter, by his attorney, Joy Hochstadt complaining of the defendants, alleges:

## INTRODUCTION

This action is brought as a result of Defendants individual and in many instances *ultra vires* acts that were part of an ongoing pattern, and scheme of continuous conduct against and/or through which they targeted, discriminated and/or retaliated against Plaintiff Pakter and which acts among other things included (i) violations of 1st Amendment through retaliation by state actors for speech on an important public matter - intentional race discrimination against students of the NYC School System; (ii) violations of 14th Amendment rights through denial of equal protection and due process in the disciplinary hearings, medical / psychiatric examinations, withholding salary and removal from payroll; (iii) violations of Civil & Due Process Rights as protected by 42 U.S.C. §1983; (iv) violations of Title VII of the Civil Rights Act of 1964, ("Title VII") due to retaliation for opposition to protected activities under the Act and under ADEA; (v) violations of the anti retaliation provisions of the Federal False Claims Act; (vi) violations of rights guaranteed by the Federal Age Discrimination in Employment Act as amended ("ADEA"); (vii) violations of rights as guaranteed by New York State Human Rights Law – NYS Executive Law § 290 *et seq.* - for age discrimination in employment and retaliation for opposing race discrimination in educational programs; (viii) violation of due process and rights guaranteed by certain NYS Educ. Law Sec. 3020a and 3028 (d); (ix) violation of rights guaranteed by the provisions of the collective bargaining agreement between Plaintiff's union and the Defendants; (x) creation of hostile work environment by the continuous nature of the wrongful acts; (xi) de facto termination and/or reduction of responsibilities, (xii) slander, slander per se, defamation and defamation per se and other (xiii) common law torts.

## JURISDICTION AND VENUE

1)      The Court has original jurisdiction of over Plaintiff's claims under the 1st, 4th and 14th amendments of the U.S. Constitution 28 U.S.C.§§ 1331 and 1343(a)(3) and (4) for violation

of Plaintiff's federal statutory rights., including but not limited to Plaintiffs claims pursuant to (i) Title VII of the Civil Rights Act of 1964, ("Title VII") as amended [retaliation for opposition to protected activities under the Act and under ADEA], codified as 42 USC §2000-e et seq.; (ii) the retaliation provision of the Federal False Claims Act ("FCA") [false certification of non-discrimination in federally funded Title I programs], codified as 31 U.S.C. §3730(h), §3731(b). §3729; (iii) Federal Age Discrimination in Employment Act as amended ("ADEA"), codified as 29 U.S.C. §621 et seq.; (iv) 1st Amendment [retaliation by state actors for speech on an important public matter (intentional race discrimination against students of the NYC School System, inter alai)]; 14th Amendment [denial of equal protection and due process by state actors), and 42 USC§ 1983 due process violations.[1]  The Court also has original jurisdiction for Plaintiff's claims for declaratory judgment, pursuant to 28 U.S.C. §§2201 and 2202. The Court also has original jurisdiction as NYS Education Law § 3020(a) was/is unconstitutional on its face and/or as it has been applied to Plaintiff.

2)      The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. §1367(a) with regard to New York State and New York City claims. Including but not limited to violations of New York State Human Rights Law ("State Human Rights Law") regarding age discrimination in employment and retaliation for opposing race discrimination in educational programs, codified as New York Executive Law §290 et seq.; NYS State "Whistle Blowers" Law codified as New York Educ. L.§3028-d and the New York City Human Rights Law ("City Human Rights Law"), codified as Section 8-101 et seq. of the New York City Administrative Code, and Sections 8 and 11 of Article I of the New York State Constitution, and the common law torts of slander *per se*, defamation and intentional infliction of emotional distress.

3)      Venue is proper in this district as Plaintiff resides in, Defendants maintain a place of business in, and the acts that give rise to Plaintiffs claims occurred in, this district.

## PLAINTIFF

4)     Plaintiff, David Pakter, is a citizen of the United States and a resident of New York, New York, in New York County. He is employed by DOE and subordinate to all other defendants.

## DEFENDANTS

1)     Defendant Department of Education ("DOE") is empowered to be the governing body of the City School District of the City of New York and exists under the laws of the City and State of New York. At all relevant times, the DOE is/has been Plaintiff's employer.

2)     At all relevant times, Defendant Joel I. Klein ("Klein") has been the Chancellor of the DOE and, as such, is responsible for the operation of the DOE and its chief executive officer

3)     At all relevant times prior to 2007, Defendant Michael LaForgia ("LaForgia") has been the LIS for Region 9; the administrative unit to which High School of Art and Design ("HSA&D"), and Fashion Industries High School ("FIHS") are assigned.

4)     At all relevant times since 2007, Defendant Alexis Penzell ("Penzell") has been the LIS for Region 9; the administrative unit to which High School of Art and Design ("HSA&D"), and Fashion Industries High School ("FIHS") are assigned

5)     At all relevant times, Defendant Judith Rivera ("Rivera") was Deputy Human Resources Director for Manhattan

6)     At all relevant times, Defendant Madeline Appell ("Appell") was Principal HSA&D") and served as such until approximately September 25, 2004.

7)     At all relevant times, Defendant Hilda Nieto ("Nieto") served as Principal of FIHS.

8)     At all relevant times, Defendant John Lachky ("Lachky") was Assist. Principal and then Principal HSA&D.

9)    At all relevant times, Defendant Mary Ann Geist-Deninno ("Geist-Deninno") served as Assistant Principal HSA&D.

10)    At all relevant times, Defendant Harold Mason ("Mason") served as Assistant Principal HSA&D.

11)    At all relevant times, Defendant Giovanni Raschilla ("Raschilla") served as Assistant Principal FIHS.

12)    At all relevant times, Defendant Sonia Stuart ("Stuart") was an employee of Defendant DOE.

13)    At all relevant times, Defendant Audrey Jacobson MD ("Jacobson") served as Medical Director of DOE.

14)    At all relevant times, Defendant Eliane Meyer, MD ("Meyer") served as Deputy Medical Director of DOE

15)    At all relevant times, Defendant Ann Garner MD ("Garner") served as staff psychiatrist of DOE.

16)    At all relevant times, Defendant Richard Schuster, Ph.D. ("Schuster") was consulting psychologist for and retained by DOE.

17)    Each of the above individual Defendants Klein, Penzell, Appell, Nieto, Lachky, Geist-Deninno, Jacobson, Mason, Raschilla, Stuart and Schuster are sued herein in the capacity as employees and/or agents of Defendant DOE, as well as in their individual capacities for their *ultra vires* acts.

### FACTS RELEVANT TO ALL CAUSES OF ACTION
**Pakter's Professional Experience, Credentials & Awards**

18)    Since approximately 1968 Pakter has been employed by the defendants as a teacher of art and commercial art.

19) Pakter holds New York State permanent teaching licenses in Commercial Art and Elementary Grades (pre-K-6).

20) Pakter holds New York City permanent teaching licenses in Commercial Art and Common Branches (grades 1-6).

21) Pakter has been continuously employed as a classroom teacher by the Department of Education since September 1968..

22) Around 1978, Pakter applied for, and was hired to a position teaching commercial art at the HSA&D.

23) Until 2003 Plaintiff Pakter was honored as an exemplary teacher at A &D.

24) One of Plaintiff Pakter's most remembered and positively cited accomplishments was the establishment and implementation of a Medical Illustration program at A & D.

25) This rigorous program which prepared students for high paying professional employment as medical illustrators upon graduation from Specialized Art Colleges, often motivated and imbued the work ethic in students whose background lacked the requisite executive skills for the discipline, tenacity, striving for mastery that they learned in the Plaintiff Pakter's classes and from him personally.

26) In 1997, Plaintiff Pakter was cited as "Teacher of the Year" among all of New York City's 100,000 teachers and was honored personally by Mayor Rudolph Giuliani, at a ceremony at City Hall, for Plaintiff Pakter's many teaching achievements.

## 2003

27) In 2003, Plaintiff Pakter discovered and "blew the whistle" on changes in the school curriculum that removed music classes (as well as other courses) from the courses available to his minority students, maintaining this was a violation of and was not in compliance with requirements and regulations.

28)    Plaintiff Pakter also "blew the whistle" about $75,000.00 that he knew was specifically allocated to and was being paid to his school for the discontinued music program and that those funds were being improperly held and/or diverted by persons in his school.

29)    Plaintiff Pakter observed, reported and "blew the whistle" on the disparate educational opportunities and curricula that were being offered to and that children / students of color were being deprived of access to music space, courses and equipment.

30)    He blew the whistle to the Special Commissioner of Investigation ("SCI"), the "watchdog" investigative unit of DOE

31)    In October 2003 while he was reporting these conditions to SCI, Plaintiff Pakter also wrote to Defendant Klein to inform him of (i) the overall matter of disparate treatment of students based on race, in NYC schools in all areas of the curriculum deserved his attention and (ii) improper and/or discriminatory conduct occurring in the NYC DOE system.

32)    Approximately one week after Plaintiff Pakter wrote Defendant Klein, Defendant LaForgia directed that or caused Pakter be targeted and subjected to Whistle-blower Retaliation.

33)    Defendant LaForgia informed Defendant Appell that he was coming to the school and demanded a meeting immediately to discuss "David Pakter", whom he had never met before.

34)    The meeting was attended by Defendants LaForgia, Appell, Lachky and Geist-Deninno and at the conclusion of the meeting, Defendant Appell directed Defendant Geist–Deninno to visit Pakter's room unannounced and rate whatever lesson Deninno observed as "Unsatisfactory".

35)    Defendant Geist - Deninno was unable to carry out this directive because Plaintiff Pakter had previously installed a video camera in his room to record and protect himself against just such retaliatory behavior.

36)     Next, Defendant Mason was directed to and embarked on a pattern of harassment, discrimination and retaliation through filing of repeated and baseless letters to Plaintiff Pakter's personnel file in which Defendant Mason made accusations against Plaintiff Pakter accusing him of insubordination, incompetence and other offenses that Defendant Mason claimed warranted discipline through the 3020-a process.

37)     Defendant Mason also taunted and attempted to provoke Plaintiff Pakter to respond one way or another just so that Defendant Mason could then accuse Plaintiff Pakter of insubordination.

38)     Defendant Geist-Dennino harassed, criticized and accused Plaintiff Pakter of improper use of his time and class because Plaintiff Pakter took time at the end of his 90 minute medical illustration class to provide his intellectually gifted students with the opportunity to engage in an interdisciplinary enrichment activity utilizing the French Language so that the students (many of whom were already skilled and/or fluent in the Spanish Language) could expand their skills to another romance language.

39)     Defendants response to Plaintiff Pakter's enrichment activity was to continue ridiculing him, harassing him, making improper / derogatory remarks about him in front of his students and peers and to cause improper and punitive disciplinary letters to be placed in his file.

40)     This conduct continued unabated for the remainder of 2003 and the conduct was such that it was difficult to work and Plaintiff Pakter was subjected to ridicule, harassment, improper / derogatory remarks about his experience, competence, dedication and fitness for duty.

### 2004

41)     In April 2004, Defendant Appell directed and/or caused the Assistant Principals working under her authority and supervision to target, harass, retaliate and resume the campaign against Plaintiff Pakter.

42)     Defendant Appell directed and/or caused false charges to be made against Plaintiff Pakter and filled his teacher file with accusatory, baseless and embarrassing letters.

43)     Defendant Appell directed and/or caused Plaintiff Pakter's nominees to be excluded from being invited as Guest Speakers on "Career Day", thereby punishing, discriminating and/or retaliating against Plaintiff Pakter.

44)     Defendant Appell directed and/or caused Plaintiff Pakter's Senior Medical Art Class to be taken from him, effective the start of the next school term, and be transferred to a less qualified younger Art Teacher, again punishing, discriminating and retaliating against Plaintiff Pakter and his innocent students.

45)     Defendant Appell directed and/or caused Plaintiff Pakter's Medical Art Class Room to be assigned to other classes in such a way that it and the valuable property in the room would be destroyed.

46)     In June 2004, Defendant Appell directed and/or caused Plaintiff Pakter to be assigned to and placed on the late "Time Schedule" without his consent, against his wishes and in violation of his seniority rights.

47)     In Spring 2004, Plaintiff Pakter's "blew the whistle" on certain false claims that were being made of alleged necessary window repairs done at his school, when many such repairs were unnecessary and the monies appeared to have been authorized in a fraudulent manner and the repairs not performed. In this regard, Plaintiff Pakter, at the specific request of THE OFFICE OF THE SPECIAL COMMISSIONER OF INVESTIGATION FOR THE NEW YORK CITY SCHOOL DISTRICT, informed investigators from the Office of Inspector General for the NYC Construction Authority of the submission of fraudulent and false reports regarding certain not performed and/or unnecessary "window replacements".

48) It was within hours of Plaintiff Pakter's meeting with the investigators from the Office of Inspector General for the NYC Construction authority, that Plaintiff Pakter was informed that his Senior Medical Arts class would be taught by a younger and a less qualified teacher who had not even requested the class.

49) For the School Year 2003 – 2004, Plaintiff was rated "Unsatisfactory" for the first time in his twenty years of teaching at Art & Design High School and based upon false accusations of "un-timeliness" or "not being punctual" which ratings were part of the pattern of harassment, discrimination and retaliation.

50) Plaintiff Pakter's concerns about the problems with the music program, discrimination against minority students, the misuse and/or withholding of dedicated funds and other problems continued.

51) To prove his point, Plaintiff Pakter requested permission of a colleague to videotape her class which videotape would prove and support Plaintiff Pakter's reports and whistle blowing claims.

52) The teacher gave permission and Plaintiff Pakter made the videotape.

53) Plaintiff Pakter then again intended to discuss the discrimination, misuse of funds and compliance problems with Defendants.

54) However, although Defendants dismissed all Plaintiff Pakter's assertions, Defendants reacted with alarm when it was disclosed to them and they became informed of the existence of the videotaped class.

55) Defendants demanded that the videotape be produced and turned over to them.

56) On September 22, 2004, when Plaintiff Pakter refused, in the presence of his Union representative to relinquish the videotape to Defendants Appell and Lachky, he was accused of insubordination

57) On the morning of September 23, 2004, Defendant Lachky informed Plaintiff Pakter that something "big" was going to be announced that afternoon by Defendant Appell during an unscheduled emergency after school Faculty meeting.

58) Defendant Appell had called an emergency faculty meeting after she learned of the existence of the videotape and announced her immediate resignation and departure from DOE employ. The next day Defendant Appell initiated steps to turn over the school to Defendant Lachky.

59) In September 2004, Defendant Appell demanded that Plaintiff Pakter appear and produce a Video Tape (and all copies thereof) that he made of a predominantly white P.S. 59 Music Class (Defendant Appell had turned over the second floor of Plaintiff Pakter's school building to PS 59 an abutting elementary school), which video tape Plaintiff Pakter made to demonstrate the discrimination, violation of rights, potentially unauthorized or false use of federal funding that was occurring and which caused the mostly minority students of Plaintiff Pakter's school to be denied and/or prevented from access to the same classes, courses and learning opportunities as their non-minority class mates.

60) Plaintiff Pakter refused to turn over the videotape and demanded that the NYC DOE's policy of discrimination against the minority students' cease.

61) In response, Judith Rivera, Deputy Director of the HR Department directed and/or caused Plaintiff Pakter to be removed from his school and class and be "reassigned" to the Rubber Room in Manhattan.

62) On the morning of September 24, 2004, Defendant Lachky entered Plaintiff Pakter's Medical classroom and handed Plaintiff Pakter a letter signed by Judith Rivera, Deputy Director of Human Resources that ordered Plaintiff Pakter to report immediately to the Regional Headquarters based on an unspecified "serious allegation".

63) On September 24, 2004 Plaintiff Pakter was removed from his school and reassigned to a dismal "reassignment center" (rubber room) effective immediately, where teachers with criminal charges await the disposition of their cases, and teachers with pending administrative disciplinary charges await the charges, the hearings and the decisions, which may lose them their jobs.

64) Plaintiff Pakter had no idea why he had been sent to a reassignment center or of what he was being accused.

65) On or about September 28, 2004, Plaintiff Palter was ordered to appear before Judith Rivera who proceeded to hand Plaintiff Pakter a written directive signed by Rivera informing Plaintiff Pakter that he was being transferred out of the Manhattan Rubber Room and was to report to Lawrence Becker at 65 Court Street in Brooklyn who would then reassign Plaintiff Pakter to a new Rubber Room in Brooklyn.

66) Plaintiff Pakter was aware that such a reassignment out of the District in which he taught was improper and ran contrary to official Chancellors Regulations.

67) Plaintiff Pakter informed Defendant Rivera that he believed her conduct was illegal, improper, discriminatory, harassment and retaliation for his refusal to release the Video Tape showing the discriminatory practices against minority students.

68) Defendant Rivera refused to reconsider and Plaintiff Pakter was removed from the Manhattan Rubber Room and transferred to Brooklyn.

69) Following Plaintiff Pakter's removal from his school Defendant Geist-Deninno broke into and obtained unauthorized access to his metal file closets in which he stored his personal and professional materials and she rifled, stole and/or destroyed Plaintiff Pakter's property.

70)     Contemporaneous with Plaintiff Pakter being reassigned to the Brooklyn Rubber Room, Defendant DOE conveyed a message to Plaintiff Pakter via a high ranking Union Official that if Plaintiff Pakter turned over to them all copies of the videotape and swore that he had retained no copy, he would be returned to his regular assignment as teacher of Medical Illustration at Art & Design High School and all charges of misconduct against him would be withdrawn.   Furthermore, Defendant DOE promised Plaintiff Pakter that as an added incentive to surrender the videotape, Plaintiff Pakter would be allowed to draw up a "wish list" of the many educational deficits and deprivations Plaintiff Pakter maintained the minority students at Plaintiff Pakter's school were suffering.

71)     When Plaintiff Pakter refused to attest that he would keep no copy whatsoever, he was told that disciplinary charges for insubordination would be made against him.

### 2005

72)     Even though Plaintiff Pakter had been removed from his school, Defendants unlawful conduct, harassment, retaliation and false charges continued, apparently because they believed they needed more accusations against him to use against him in a 3020a proceeding that can lead to termination.

73)     In this regard, in January 2005, Defendant Geist-Deninno claimed to have "found" / "discovered" pornography on a student computer in Plaintiff Pakter's former Medical Illustration room.

74)     This event occurred five months after Plaintiff Pakter had been removed from the School. after hundreds of people had access to the student computer on which the alleged pornography was "found." In any event, the allegations were completely false but were made in furtherance of the discrimination, harassment and retaliation that was being leveled against Plaintiff Pakter.

75) The pornography allegation could not be brought as a "charge" because the SCI's investigation would not support such a charge and Defendants used fabricated charges of insubordination, including failure to relinquish the video-tape showing the discriminatory practices against minority students, which video was made with the teacher's consent.

76) Defendant Geist-Deninno later admitted to Plaintiff Pakter that it was Defendants Appell and Lachky who issued the orders to carry out the campaign of retaliation, harassment, discrimination and punitive measures against Plaintiff Pakter.

77) Plaintiff Pakter continued to speak out against the Defendants unconstitutional, improper, discriminatory, harassing, retaliatory and abusive conduct.

78) Instead of being sent back to his assignment, Plaintiff Pakter was forced to remain in the Rubber Room pending the resolution of the insubordination and alleged lateness charges.

79) Defendants embarked on a new campaign against him and to violate his rights.

80) On or about June 21, 2005, Plaintiff Pakter received by Certified Mail a directive that Plaintiff Pakter was ordered and/or caused to have to submit to medical and psychiatric evaluations by the DOE Medical Officers, on July 14, 2005 so that they could determine if Plaintiff Pakter was "fit for duty".

81) Defendant Lachky accused Plaintiff Pakter of insubordination, lateness, and loading "pornography" onto a DOE computer and insinuated that his alleged insubordination, alleged lateness and other alleged improper conduct was the product of alleged mental illness.

82) Plaintiff Pakter was singled out by Defendants who discriminated against him by filing charges as a basis for disciplinary proceedings, and simultaneously filing the same charges as evidence of mental instability or being unfit for duty.

83) Defendants Lachky and Penzell were directly responsible for and caused the issuance of letters and demands that Plaintiff Pakter appear and submit to these medical and psychiatric examinations.

84) Defendants Lachky and Penzell insisted that the "Reasons for Requesting Medical Examination of Teacher" was that they believed that Plaintiff Pakter was "unfit for duty".

85) Plaintiff Pakter was then subjected to a barrage of embarrassing and humiliating tests that were being orchestrated by Defendants and in particular Defendants Lachky and Penzell so that they could get rid of him (i.e. terminate his life-tenured employment).

86) The letters and reports that Defendants and in particular Defendants Lachky and Penzell sent related to these demands for medical and psychiatric examinations contained false and embarrassing statements about Plaintiff Pakter's allegedly being unfit for duty.

87) Defendants Garner and Meyer assisted Defendants Lackhy and Penzell by ordering or causing orders to be issued that Plaintiff Pakter was to report for medical and psychiatric testing at a time when they all knew that Plaintiff Pakter was in fact "fit for Duty".

88) During June, July and August 2005, in furtherance of the scheme to declare Plaintiff Pakter "unfit for duty", Defendant Jacobson directed and/or caused her offices to assist the other defendants and wrongfully facilitate charges being made against Plaintiff Pakter as being "Unfit for Duty".

89) June and July 2005, these defendants directed and/or caused the submission of false reports to an outside medical consultant, which false reports included alleged symptoms and/or findings that Defendants had "discovered" and which they believed warranted a finding that Defendant Pakter was "Unfit for Duty".

90) Plaintiff Pakter was subjected or caused to be subjected to improper, irrelevant, unconstitutional (The MMPI Test) and embarrassing tests for the purpose of discrediting him in his employment.

91) Plaintiff Pakter was examined by Defendant Garner who falsely claimed and reported that he was "fidgety," "grandiose," "hypo manic", "delusional" and "paranoid".

92) Plaintiff Pakter was subjected to a test to diagnose severe deterioration of cognitive function through a series of statements that he was to affirm or deny e.g. " a shoe goes on your head"; "monkeys live in fish tanks": "a room in a house has walls"; "the color of grass is red"; "cars have four wheels"; and "cats have five legs."

93) Defendants administered tests that were painful, embarrassing and humiliating to Plaintiff Pakter.

94) Notwithstanding Defendants findings that Plaintiff Pakter's clinical profile was within normal limits, he was directed and/or recommended to be subjected to psychiatric treatment including medication.

95) In August 2005 on the basis of the improper testing and false reports, Defendants informed Plaintiff Pakter that he had been found "Unfit for Duty".

96) Plaintiff Pakter challenged the testing, false reports and findings and demanded formal and binding medical Arbitration.

97) In response, Defendants caused and directed that Plaintiff Pakter be removed from payroll and kept off salary as he exercised his constitutional, due process and contractual rights.

98) Defendants ploy of causing and/or directing that Plaintiff Pakter be kept off payroll was yet another form of harassment, discrimination, retaliation and wrongful conduct.

99) At the Medical Arbitration, which ended in January, 2006, Defendants' reports that Plaintiff Pakter was allegedly "Unfit for Duty" were found by Defendant DOE's own

handpicked Final Binding Medical Arbitrator to be false and/or fabricated or non supported by scientific evidence. Despite the Medical Arbitrator's stated admission to these facts during the Medical Arbitration Hearing, attended by the renowned Forensic Psychiatrist and Chairman of the Ethics Committee for Psychiatry, Dr. Alberto M. Goldwaser, M.D., D.F.A.P.A., and despite the stated admission by the Medical Arbitrator, Dr. Charles Schwartz, that he knew that a Decision was legally required within 10 (ten) days of the Medical Arbitration, the formal admission in writing, by Defendant DOE that the original finding that Plaintiff Pakter was "Unfit for Duty" had been found to be "incorrect", was delayed for almost 6 (six) months by Defendant Jacobson thus depriving Plaintiff Pakter of his salary for almost 6 (six) additional months.

100)     In the interim and as a result of Defendants' false claims that Plaintiff Pakter was unfit for duty and the use of the Medical & Psychological examination procedures against Plaintiff Pakter, he was completely kept off payroll for a total of almost 12 (Twelve) months and submitted to embarrassment and ridicule, as well as harassment, discrimination, retaliation and hostile work environment.

101)     For the School Year 2004 – 2005, on information and belief Plaintiff was again rated "Unsatisfactory" based upon attendance records for reporting to a Rubber Room that was intentionally assigned far from Plaintiff Pakter's school, and in another Borough and which ratings were again part of the pattern of harassment, discrimination and retaliation.

102)     Plaintiff Pakter was forced to go through the first 3020a process at a time when he was kept off payroll as a result of the Defendants wrongful acts related to the efforts to have him declared and his being improperly declared "unfit for duty", and while he was awaiting the medical arbitration.

## 2006

103)  Notwithstanding the fact that the medical and psychiatric charges against Plaintiff Pakter were shown to be false and fabricated. Defendants refused to restore him to service.

104)  Defendants' harassment, intimidation and retaliation entered a new phase.

105)  In 2006, Plaintiff Pakter was assigned to a new school (Fashion Industries High School) where he was subjected to harassment by Defendants Nieto and Raschilla almost from the first day.

106)  Defendant Nieto directed and/or caused Defendant Raschilla to "shadow" and/or follow Plaintiff Pakter around the school and to look for alleged improper conduct that warranted discipline.

107)  From September to November 2006, Defendant Raschilla at the direction of Defendant Nieto caused multiple baseless, harassing and embarrassing letters, filled with false and fabricated charges, to be placed in Plaintiff Pakter's file.

108)  From September to November 2006, Defendant Raschilla at the direction of Defendant Nieto directed that Plaintiff Pakter be pulled out of classes without justification and demanding that he attend "disciplinary meetings".

109)  From September to November 2006, Defendant Raschilla at the direction of Defendant Nieto caused Plaintiff Pakter to be subjected to verbal and psychological harassment, intimidation and embarrassment through following him around the school, pulling him out of classes and other conduct that subjected him to ridicule, stress and hostile work environment.

110)  In November 2006, Defendants Nieto and Raschilla caused and/or directed the filing of false and baseless allegations against Plaintiff Pakter and demanded that he be removed from the school.

111)    From September to December 2006, Defendants Nieto and Raschilla made false reports to SCI Investigators accusing Plaintiff Pakter of improper conduct such as selling his artwork and fashion watches to students and/or faculty, which reports and allegations Defendants Nieto and Raschilla knew were false.

112)    Plaintiff Pakter continued to speak out concerning what he considered to be unlawful, unconstitutional, harassing, discriminatory and retaliatory tactics against him and continued to try to assert his constitutional, due process and contractual rights.

### 2007

113)    From 2006 to 2007, Defendants continued their pattern of harassment, discrimination, retaliation and subjecting him to hostile work environment.

114)    Immediately before the start of the 2007 – 2008 school year, Defendant Nieto summoned Plaintiff Pakter to a meeting at which she presented him with a set of false and/or fabricated charges that she alleged had been substantiated by an SCI Investigation.

115)    The charges and/or allegations against Plaintiff Pakter were not just false or fabricated, they were meritless and preposterous.

### The 2007 False – Retaliatory 3020a Charges and The Improper Hearing Process

116)    In 2007, Plaintiff Pakter  received the following charges:

- *promoting his family's watch business during school hours in November 2006 (Note the facts were that Plaintiff Pakter was merely continuing his longstanding practice of incentives and motivation to students by offering any student that earned a 90% grade average that the student would earn a watch:*

- *Plaintiff Pakter was accused of giving watches to students as gifts during school hours in October or November of 2006 (Note:  These were the rewards for the students performance and achievements);*

- *Plaintiff Pakter was accused of giving a watch to a school aide Maria Corchado during school hours in October or November 2006 (Note: The fact was that Plaintiff Pakter was being kind to a minimum wage worker who was given a watch for her son because she could not afford to get her child a gift);*

19

- *Plaintiff Pakter was accused of improperly informing students for whom he was a substitute (i) about his family's watch business; (ii) providing the URL for the watch business; (iii) showed students the brochure from the watch business; (iv) telling students that if they earned a 90% grade average or better they would be given a watch; (v) showing two watches to students; (vi) making reference to his personal life; and (vii) stating that he had been removed from another school for being a whistle blower;*

- *Plaintiff Pakter was accused of showing the class an "R" rated feature film "El Mariachi" (an acclaimed film by the noted Mexican Director Roberto Rodriguez and the R rating came from violent gun fighting scenes that were not prominent in the scenes Plaintiff Pakter selected for the 25 minute film clip he showed to the class) despite the fact that Defendant DOE permitted the showing of films such as "Schindler's List" and "Saving Pvt. Ryan" which were similarly R-rated for their graphic violence; and*

- *Plaintiff Pakter was accused of having brought two plants to the school without the Principal's prior authorization (Note: The plants were brought in to make the school a more enjoyable place for the children to learn and the plants are still there).*

117) 3020a charges as issued were retaliatory, false and defamatory.

118) The 3020a charges were issued as part of the ongoing discrimination, harassment and retaliation against Plaintiff.

119) Defendants targeted and harassed Plaintiff Pakter because of his age.

120) Defendants targeted and harassed Plaintiff Pakter because he "blew the whistle" on what he observed as discrimination against minority students.

### Additional Facts Related to Discrimination, Retaliation & Harassment

121) Defendants targeted and harassed Plaintiff Pakter for treatment different from other similarly situated younger teachers.

122) Defendants targeted and harassed Plaintiff Pakter because of his age.

123) Defendants targeted and harassed Plaintiff Pakter because he "blew the whistle" on what he observed as discrimination against minority students.

124) Defendants targeted and harassed Plaintiff Pakter because he "blew the whistle" on what he observed as misuse and/or misappropriation of federal funds.

125) Defendants targeted and harassed Plaintiff Pakter because he spoke out on matters of public interest related to important issues within the NYC Public School system, including but not limited to discrimination against minority students, misuse/misdirection of public funds, the improper use of "Rubber Rooms" to "discipline" teachers, as well as deprivation of students and teacher rights.

126) Defendants targeted and harassed Plaintiff Pakter because he spoke out on matters related to compliance with curriculum requirements (failure to offer music instruction required for graduation) and curriculum traditions (related to reduction in foreign language offerings).

127) Defendants targeted and harassed Plaintiff Pakter because he refused to turn over to them the videotape evidence he had that supported his allegations.

128) Defendants targeted and harassed Plaintiff Pakter because of the results he was achieving with minority students, through his innovative programs that challenged students to excel, earn good grades in exchange for rewards that came out of Plaintiff Pakter's own pocket.

129) Defendants targeted and harassed Plaintiff Pakter because he tried to make the school a more enjoyable pleasant work environment for administrators, teachers and students.

130) Defendants targeted and harassed Plaintiff Pakter because he was experienced, and thus his long tenure, earned the maximum benefits and salary.

131) Defendants targeted and harassed Plaintiff Pakter because he spoke out against and refused to submit to a system that he believed was failing minority and other students.

132) Defendants targeted and harassed Plaintiff Pakter because, among other things, they viewed him to be a threat to (i) their ability to implement and/or continue policies that discriminated against minority students, (ii) their waste or misuse of monies in federally funded programs, (iii) their changes to available curricula to the disenfranchisement of minority students, (iv) their policies of cronyism, favoritism and nepotism, (v) their policies, use of and

abuses heaped upon teachers in the Rubber Rooms, (vi) their use of forced 3020a disciplinary hearings and forced medical / psychiatric examinations in violation of his and other teachers' rights, (vii) their policies of use of excessive economic pressures by improperly withholding Plaintiff's salary and pay checks and (viii) their policies that he considered to be destructive to the quality of education in NYC.

133)    Defendants targeted and harassed Plaintiff Pakter by intercepting salary checks that were issued to him and were forwarded to the school but which were withheld from and not mailed to him.    And, when Plaintiff Pakter learned of the interception of his checks, he was informed that if he agreed to retire and executed his retirement papers, that all the withheld checks would be released to him.

134)    When Plaintiff Pakter refused to retire, Defendants launched a new round of harassment, discrimination and retaliation against him – this one in the form of another set of disciplinary charges that remain pending.

135)    Defendants engaged in a continuous, systematic and ongoing course of conduct through which Plaintiff Pakter was subjected to harassment, intimidation, threats, retaliation, removal from schools, reassignment from school to school, confinement in Rubber Rooms, papering of his employment file with false but punitive letters, filing of frivolous charges that subjected him to 3020-a disciplinary hearings, filing of false reports that subjected him to demeaning medical / psychiatric examinations, withholding of pay, ridicule and constant false accusations by supervisors comprising a hostile work environment and were not discrete acts.

136)    As a result of Defendants' conduct, Plaintiff Pakter has had constant fear of losing his livelihood, license, medical benefits, his life insurance, considerable portions of his pension accumulation, and his ability to practice his chosen profession.

137) The actions of defendants as aforesaid have been and are continuous in nature, constituting a continuing and ongoing wrong.

138) The acts of each of the individually named Defendants include acts performed as part of their duties as employees or agents for Defendant DOE, as well as *ultra vires* acts that have been performed with malicious intent and/or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

139) Aforesaid actions of defendants, i.e., harassment, creation of a hostile and intimidating work environment, subjecting Plaintiff Pakter to unfair and abusive medical evaluation tactics and removal from the payroll for over one year for wrongfully alleging mental illness, initiation of disciplinary charges in which Plaintiff Pakter's termination was sought, and is again being sought and humiliating treatment in connection with those disciplinary charges, were taken in order to force him to separate from employment and/or retire earlier than he would otherwise wish to, and because of the Plaintiff Pakter's age, and because he opposed Defendants' illegal acts of age and racial discrimination, and upon information and belief, such actions were not taken against younger teachers.

140) Plaintiff Pakter's age and his opposition to Defendants' acts of race discrimination in educational federally funded programs and age discrimination were motivating factors in Defendants' treatment of Plaintiff Pakter and Defendants' use of medical and disciplinary processes, all of which were pretexts for the ongoing discrimination, harassment and retaliation.

141) Plaintiff is and has been officially assigned to HSA&D as a teacher of commercial art since 1979, however as a result of the aforesaid wrongful acts of discrimination, harassment and retaliation and other wrongful acts, Plaintiff has been illegally and/or unlawfully sent for discipline to the Rubber Room and has not been returned to his duties at HSS&D.

142) Defendants' acts of discrimination, harassment, retaliation and the other wrongful acts described above were willful and intentional.

143) Because of Defendants' unlawful actions, Plaintiff Pakter has suffered lost wages plus interest, per session work in the 2003/2004, 2004/2005, 2005/2006, 2006/2007, and 2007/2008 school years, and has been harmed physically and emotionally.

### COUNT I – Violation of Plaintiff Pakter's 1st Amendment Rights

144) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 to 143 of this complaint with the same force and effect as though fully set forth herein.

145) Plaintiff Pakter spoke out on issues of public interest including but not limited to (i) what he believed to be racial discrimination of his minority students in the NYC public school system, (ii) improper and discriminatory changes in course offerings in the NYC public school system, (iii) alleged waste, misuse and/or diversion of monies dedicated to federally funded education programs in the NYC public school system, (iv) discriminatory policies and occurrences in the NYC public school system, (v) targeting, harassment and retaliation of whistle blowers in the NYC public school system, (vi) disenfranchisement of minority students in the NYC public school system, (vii) policies of cronyism, favoritism and nepotism in the NYC public school system, (viii) policies, use of and abuses heaped upon teachers in the Rubber Rooms in the NYC public school system, (ix) use of forced 3020-a disciplinary hearings and forced medical / psychiatric examinations in violation of teachers' rights in the NYC public school system, (x) policies of use of excessive economic pressures by improperly withholding salary and pay checks of targeted teachers in the NYC public school system and (xi) other policies destructive to the quality of education in NYC.

146) Plaintiff Pakter right to speak out on the above issues of general public concern was protected under the 1st Amendment.

147)     Defendants were not permitted to interfere with, retaliate against, punish, threaten or attempt to silence Plaintiff Pakter for the exercise of his protected rights to speak out on the above issues of general public interest.

148)     Defendants interference with, retaliation against, punishment of, threats against or attempt to silence Plaintiff Pakter for the exercise of his protect rights to speak out on the above issues of general public interest was unlawful and in violation of his guaranteed rights under the 1st Amendment and the NYS Constitution as a public employee.

149)     As a direct and proximate result of Defendants' interference with, retaliation against, punishment of, threats against or attempt to silence Plaintiff Pakter for the exercise of his protected rights to speak out on the above issues of general public interest, Plaintiff Pakter was caused to suffer monetary and other damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

### COUNT II – Violation of Due Process Rights, Civil Rights & Equal Protection

150)     Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 to 143 of this complaint with the same force and effect as though fully set forth herein.

151)     152)As noted in paragraphs 133 to 142, Defendants targeted and harassed Plaintiff Pakter (i) for treatment different from other similarly situated teachers, (ii) because of his age, (iii) because he "blew the whistle" on what he observed as discrimination against minority students, (iv) because he "blew the whistle" on what he observed as misuse and/or

misappropriation of federal funds, (v) because he refused to turn over to them the videotape evidence he had that supported his allegations, (vi) because of the results he was achieving with minority students, via his innovative programs that challenged students to excel and get good grades in exchange for which rewards that came out of Plaintiff Pakter's own pocket, (vii) because he tried to make the school a more enjoyable and pleasant work place and environment for administrators, teachers, students, (viii) because of his experience, standing, earned benefits and salary and (ix) because he did speak out against and refused to submit to a system that he believed was failing minority and other students.

152) Defendants also intercepted Plaintiff Pakter's salary checks that were issued to him and were forwarded to the school but which were withheld from and not mailed to him.

153) Defendants subjected Plaintiff to unnecessary and improper medical / psychiatric examinations and disciplinary proceedings that were based on false charges, conducted in violation of his constitutional and contractual rights and which were designed to force Plaintiff to retire or be fired.

154) Defendants caused Plaintiff to be deprived of his per session and summer employment benefits.

155) Defendants' conduct was designed and intended to interfere with Plaintiff Pakter's liberties, due process, civil rights and property rights.

156) Defendants aforesaid conduct and actions are and were unlawful and in violation of his guaranteed rights under the 14th Amendment and 42 USC § 1983, as well as the rights as guaranteed to Plaintiff pursuant to the NYS Constitution.

157) As a direct and proximate result of Defendants' interference Plaintiff Pakter's liberties, due process, civil rights and property rights, Plaintiff Pakter was caused to suffer monetary and other damages including but not limited to (i) lost wages for per session work plus

interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

## COUNT III – Violation of ADEA - 29 U.S.C. § 621 et seq.

158)     Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 to 143 of this complaint with the same force and effect as though fully set forth herein.

159)     Plaintiff is protected by the provisions of the ADEA.

160)     The aforesaid actions of defendants in harassing Plaintiff, creating a hostile work environment, subjecting Plaintiff to unfair and abusive medical evaluation tactics, initiating disciplinary charges seeking Plaintiff's termination on fabricated, erratically enforced, protected allegations were all undertaken to attempt to force Plaintiff to retire earlier than he would otherwise wish to, and were undertaken because of the Plaintiff's age and/or because he opposed defendants' illegal acts of age discrimination, all in violation of the ADEA.

161)     Plaintiff's illegally withheld paychecks were promised to be turned over to him on the condition that he retired sooner than he otherwise would plan to retire.

162)     Defendants age related discrimination, harassment and retaliation included (i) Defendants continually reminding Plaintiff that he had reached full retirement age (pension not reduced), and that he had accrued sufficient pension credits to retire at, or close to, full salary and (ii) Defendants "branding" Plaintiff mentally unfit for duty as a proxy for age discrimination based on tests of cognitive function in an effort to imply that he may have age-related dementia.

163)     All of defendants' acts of discrimination and retaliation in violation of the ADEA, were willful and intentional.

164) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries

## COUNT IV – Violation of Civil Rights Act of 1964 - 42 U.S.C. §2000

165) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 to 143 of this complaint with the same force and effect as though fully set forth herein

166) Defendants' aforesaid acts constitute an unlawful discriminatory and retaliatory practices within the meaning of and as proscribed by 42 U.S.C. § 2000-e.

167) Defendants' aforesaid acts were egregious, willful, and mendacious.

168) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries

## COUNT V – Private Right of Action Under False Claims Act (FCA) 31 U.S.C. § 3730 (h)

169) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 to 143 of this complaint with the same force and effect as though fully set forth herein.

170) Section (h) of the False Claims Act states as follows:

*Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section [31 U.S.C § 3730], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.*

171)    Defendant DOE repeatedly and falsely certified that all its programs were in compliance with Title VI of the civil rights act of 1964 (42 USC § 2000-d) and Title I of the Elementary and Secondary Schools Act of 1965 (20 U.S.C. §6301), that at least some part of the $78,000.00 allocated to the non-existent music program at A&D were derived from federal funds.

172)    When Plaintiff called this false certification of programs and misuse of funds and resources (diverting them from low income minority children to privileged non-minority children in an abutting elementary school) to the attention of the Defendants and supervising authorities, he was retaliated against.

173)    As part of the retaliation, Plaintiff was stripped of his per session fees, lost over an entire year's pay when it was claimed that he was mentally unfit to teach, forced to incur tens of thousands of dollars in attorney's fees to try to defend himself and his career was damaged.

174)    Defendants aforesaid acts of retaliation against Plaintiff are prohibited under the FCA and for which Plaintiff is entitled to double damages and special damages.

175)    Plaintiff's was forced to suffer personal and professional hardships.

176)    Defendants' conduct is part of an ongoing and continuing wrong that is constant unrelenting and continues to the present.

177) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

### COUNT VI - Violation of N.Y. State Human Rights Law Exec. L. § 290 *et seq*

178) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 to 143 of the complaint with the same force and effect as though fully set forth herein.

179) State Human Rights Law E.L.§296 (1) prohibits the discrimination in employment based on age. Plaintiff is 64 years old and his treatment was not visited on younger employees.

180) State Human Rights Law E.L. § 296 (7) prohibits the retaliation against any employee who has opposed illegal discriminatory acts under the Human Rights Law.

181) Defendants retaliated against Plaintiff for his having opposed racial discrimination in educational programs.

182) Defendants' retaliation against Plaintiff for his opposition for racial discrimination in educational programs is part of and has been a continuing wrong from 2003 and continues to the present.

183) Defendants themselves engaged in the aforesaid retaliation and directed and/or aided and abetted others in the aforesaid retaliation in violation of Human Rights Law §296(6). In these unlawful and *ultra vires* acts they are individually liable

184) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

## COUNT VII - Violation of New York Education Law § 3028-d

185) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 through 143 of the complaint with the same force and effect as though fully set forth herein.

186) Defendants are prohibited from retaliating against employees who report noncompliance with proper fiscal management.

187) Plaintiff reported misallocation of school resources resulting in race discrimination in educational programs, first within his school, then to the SCI, and also to the Chancellor of his school system.

188) Plaintiff Pakter spoke out on issues of public interest including but not limited to (i) what he believed to be racial discrimination of his minority students in the NYC public school system, (ii) improper and discriminatory changes in course offerings in the NYC public school system, (iii) alleged waste, misuse and/or diversion of monies dedicated to federally funded education programs in the NYC public school system, (iv) discriminatory policies and occurrences in the NYC public school system, (v) targeting, harassment and retaliation of whistle blowers in the NYC public school system, (vi) disenfranchisement of minority students in the NYC public school system, (vii) policies

of cronyism, favoritism and nepotism in the NYC public school system, (viii) policies, use of and abuses heaped upon teachers in the Rubber Rooms in the NYC public school system, (ix) use of forced 3020a disciplinary hearings and forced medical / psychiatric examinations in violation of teachers' rights in the NYC public school system, (x) policies of use of excessive economic pressures by improperly withholding salary and pay checks of targeted teachers in the NYC public school system and (xi) other policies destructive to the quality of education in NYC.

189) As a result of Plaintiffs speaking out on matters of public importance, and refusal to be silenced on these issues, Plaintiff was subjected to false "charges of misconduct", was subjected to embarrassing medical / psychiatric examinations through which he was falsely charged with being unfit for duty, forced into improperly convened 3020(a) proceedings and was removed from the payroll without due process.

190) Defendants' aforesaid acts were retaliatory in nature and violated NYS Educ. Law § 3028(d).

191) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

### COUNT VIII – Violation of N.Y. City Human Rights Law

192) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 through 143 of the complaint with the same force and effect as though fully set forth herein.

193) Defendants' aforesaid acts of discrimination and retaliation are prohibited by Section 8-101 et. seq. of the New York City Administrative Code.

194) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

195) Due to defendants' *ultra vires* acts, Plaintiff Pakter holds them individually liable and claims treble punitive damages against each personally.

**COUNT IX - Violations of New York State Constitution Article I. Sections 8. and 11**

196) Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 through 143 of the complaint with the same force and effect as though fully set forth herein.

197) Plaintiffs is entitled to the protections of Section 8 of Article I of the New York state Constitution (which guarantees due process, equal protection and civil rights) and Section 11 of Article I. of the New York state Constitution (which guarantees freedom of speech).

198) Defendants aforesaid acts interfered with and/or deprived Plaintiff of his New York State Constitutional rights and guarantees by seeking to punish Plaintiff for exercising his right to free speech, and by denying him equal protection of state laws and due process.

199) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his

rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

### COUNT X - Slander Per Se, Defamation, Intentional Infliction of Emotional Distress

200)   Plaintiff repeats and realleges each and every allegation contained in paragraphs 18 through 143 of the complaint with the same force and effect as though fully set forth herein.

201)   Defendants made false, malicious and/or reckless allegations about Plaintiff including, among other things (i) that he was mentally unfit to continue his role as educator, (ii) that he was incompetent, (iii) that he was insubordinate, (iv) that he used pornographic materials, (v) that he showed students films improper for their age, (vi) that he was habitually tardy, (vii) that he was trying to bribe students and (viii) that he was a danger to the students and the school environs.

202)   Defendants caused their false, malicious and reckless allegations to be published to other teachers, students, within the system and within the community.

203)   Defendants' publication of the aforesaid false, malicious and reckless allegations were made in bad faith in order to take him off the payroll, suspend his benefits, prevent him from him from entering their premises, to cause him to be embarrassed and to be forced into retirement or discipline and for other improper reasons.

204)   Defendants' publications constitute slander, slander per se, defamation and defamation per se.

205)   As a direct and proximate result of Defendants aforesaid publications, Plaintiff has been subjected to embarrassment, humiliation, ridicule, scorn and contempt.

206)   As a direct and proximate result of Defendants' aforesaid acts, Plaintiff has suffered damages including but not limited to (i) lost wages for per session work plus interest

and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) ridicule, humiliation and embarrassment; (vii) damage to professional reputation, development, credentials and skills and (viii) other actual and emotional injuries.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief, after a jury trial, and against the Defendants, jointly, severally and/or in the alternative, and:

a. Adjudge and decree that defendants have willfully violated Plaintiffs 1st & 14th Amendment rights; violated Plaintiffs rights pursuant to 42 USC § 1983; violated ADEA 29 U.S.C. §§ 621 et seq.; violated the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964; violated NYS Human Rights Law (E.L.§ 290 et seq); violated Sections 8 & 11 of the NYS Constitution; violated NYS State Education Law §3028-d, violated NYC City Human Rights Law 8-101 *et seq.* of the New York City Administrative Code; and committed other common law torts including slander, defamation and ongoing intentional infliction of emotional distress;

b. Award Plaintiff appropriate back pay and pension adjustment, in an amount to be determined by the jury, as well as liquidated damages and pre-judgment interest in amounts to be proved at trial, arising from the denial of per session work; restoration of pay lost because of quasi-constructive termination, restoration of the wrongful conviction and fine of $15,000.00 with interest from 2005;

c. Award Plaintiff twice back pay, in an amount to be determined by the jury, (once has been repaid to date) for the year denied salary and the per session losses pursuant to the retaliation provisions of the False Claims Act and additional special damages;

d. Award compensatory damages in an amount to be determined by a jury, for damages including but not limited to (i) lost wages for per session work plus interest and consequential reduction of pension benefits, (ii) lost half his salary during 2007-2008, (iii) damages due to the conditions in the Rubber Room to which he was assigned in violation of his rights, (iv) constructive and/or de facto termination; (v) diminution of duties and benefits; (vi) damage to professional reputation, development, credentials and skills;

e. Award compensatory damages in an amount to be determined by the jury for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' aforesaid wrongful acts;

f. Award treble, special, exemplary and/or punitive damages, as may be allowed and in an amount to be determined by the jury, based on defendants aforesaid *ultra vires* wrongful acts for which they are to be held individually responsible;

g. Award Plaintiff the costs of this action, together with reasonable attorney's fees, as provided by the ADEA, 29 U.S.C. § 626(b) and by incorporation, 29 U.S.C. §616(b), and as provided by 42 U.S.C. §1988 and as provided by 31 U.S.C. § 3730 (h);

h. Award of damages, against each of the defendants individually for their *ultra vires*, mendacious, and willful acts; and

i. Grant Plaintiff such additional equitable and legal relief as the Court deems just and proper in the circumstances.

Dated: June 1, 2009     JOY HOCHSTADT, P.C.
New York, NY            300 Central Park West
                        New York, New York 10024
                        Attorney for Plaintiff


                        By: /s/_____
                            Joy Hochstadt (JH 0935)