UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------- X       (ECF CASE)
DAVID PAKTER,                                                              :
                                       Plaintiff,   :   08-cv-7673 (DAB)(KNF)
- against -                                                                :
                                                         :
NEW YORK CITY DEPARTMENT OF EDUCATION    :
      f/k/a BOARD OF EDUCATION OF THE CITY       :
      SCHOOL DISTRICT OF THE CITY OF NEW YORK;    :
      et al                                                         :
                                     Defendants.   :
------------------------------------------------------------------------------- X

**DECLARATION OF DAVID PAKTER IN SUPPORT OF CROSS MOTION AND IN OPPOSITION TO CERTAIN DEFENDANTS' JULY 1, 2009 MOTION TO DISMISS**

David Pakter hereby declares and says:

**INTRODUCTION**

1.     I am the plaintiff in this matter and I make this Declaration in Support of my Cross Motion and in Opposition to Certain Defendants' July 1, 2009 Motion to Dismiss.

2.     I believe the uncontested and irrefutable issues and facts in this case are that Defendants engaged in an ongoing, pervasive and outrageous pattern of harassment, retaliation and violation of my rights.   And, for purposes of this Declaration, certain of the Defendants conduct was, in part, the result of direct Orders to the individual Defendants, specifically Defendants Nieto, Raschilla and Penzell:

a.     **who were *"told"* to make allegations and *"write memos"* against and/or to be placed in Plaintiff Pakter's file that they *"knew were not true"*; and**

b.     **who were acting *"on Orders from Region 9 (their superiors)* [1] *to 'get something' on (Plaintiff) Pakter"*** (from April 2009 Appendix pp. 260 – 312).

---

[1] This admission by Defendant Assistant Principal Giovanni Raschilla relates directly to Defendant Principal Hilda Nieto and Defendant Superintendent (of Region 9) Alexis Penzell.  And to help promote judicial economy and to expedite this litigation, my counsel

3.      The above facts are not speculation.  They are spontaneous unrefuted (and indeed incontrovertible) statements that were made by Defendant Raschilla to independent journalist Jim Callaghan in an article that was published on March 15, 2007.   *See copy of article attached in April Appendix pp. 14 to 22, with Raschilla statements at p 15.*   My lawyer also informs me that Defendant Raschilla's statements are statements against interest that can form the basis for summary relief against him and certain other defendants, including the NYC Defendants, which moved to dismiss my Second Amended Complaint.

### THE NYC DEFENDANTS' MOTION TO DISMISS

4.      I have read the "Motion to Dismiss" and the accompanying "Declaration" by the attorney for the NYC Defendants and from what I can gather the following issues exist.

    a.   There are no individual Response by the Defendants whom I sued individually as well, for their ultra vires acts, and therefore I pray the Court permit me to proceed with the entry of Default against them;

    b.   The Motion that was filed is styled as a Motion to Dismiss for Defendants New York City Defendants, the Board of Education and Chancellor Klein only. Although there is a footnote at page 1 of the Brief, that suggests the Motion is made on behalf of all Defendants, that is not what the Motion itself says and there is no entry of Appearance on Behalf of the Individually named Defendants (who were sued in the representative and individual capacity).   Nor is there any confirmation that counsel for the NYC Defendants has authority to represent the

---

will be filing a Motion in Limine and/or for Partial Summary Judgment based on this Admission against Interest and to take the necessary discovery to see which of the Defendants were

individually named defendants or is defending them for the individual damages for which they are sued;

c. The Motion is not supported by any affidavit from a person with personal knowledge of the facts and to the extent counsel for the NYC Defendants does purport to offer evidence or facts, as explained below, I believe that the papers can and should be stricken pursuant to FRCP 12 (f) because counsel has offered an insufficient defense and because Defendants' counsel has intentionally misrepresented certain facts and evidence that he knows to be true in an effort to deceive the Court into believing things that are false, and through which I submit he makes redundant, immaterial, impertinent or scandalous;

d. The July 1, 2009 Motion as submitted by Defendants' counsel  contains statements of fact that appear to rise to the level of an "intent to deceive" the Court, which the 2nd Circuit has – as recently as July 14, 2009 stated creates an independent cause of action for actual and treble damages;

e. The arguments related to the alleged "failure" to comply with or satisfy the Notice of claims requirements are patently frivolous on their face because of the facts that there have been no less than four separate Notices to Defendants related to, giving them notice of and an opportunity to investigate my claims, including:

   i. Feb 2007 Omnibus Notice of Claim allegations that existed then and continue to now;

   ii. October 2007 - 2nd Notice of Claim adding the new claim of unfounded unlawful and unconstitutional violation of my rights based upon the above article that was published in a Union newspaper and in which Defendant

Raschilla admitted the Defendants conspiracy and harassment, retaliation, violation of rights and other wrongful conduct against me;

iii.   an Aug. 2008 complaint to the NYSDHR that was fully responded to at considerable length by one of Defendants other myriad of counsel;

iv.   and July 13, 2009 Notice (to update my claims) filed and served.

Note:  It is disingenuous for the NYC Defendants through their counsel today (Mr. Martinez) to suggest that I did not file the required Notices or that they were not given notice of my claims now when they know that I previously filed timely Notices of Claim and they themselves (through different counsel – Mr. Petrak) urged the dismissal of the Notices of Claims so that the issues between the Defendants and me could be addressed in the Federal Court and in particular in this proceeding.  My attorney also informs me that there is a principal known as judicial estoppel that can be applied to stop this nonsense by the NYC Defendants who today have one counsel saying one thing, when another of their counsel urged just the opposite and in fact urged that the issues of retaliation, harassment, violation of my rights and all issues between the NYC Defendants and me be heard and resolved in this Court.

5.   As I see the instant Motion, it falls into only two categories, to wit: a frivolous attempt to suggest that I have somehow missed the applicable statute of limitations and that I failed to provide the NYC Defendants with the required Notice of my claims.

6.     As explained below these allegations are patently false and should be seen for what they are – an attempt to cause further delay to my ability to finally have my claims heard on the merits by a neutral Federal Judge and to also have the damages I suffered assessed by a jury of my peers.

7.     And as noted below, and as the evidence (and statements against interest) show, the NYC Defendants conduct started in 2003 and has continued uninterrupted - and in fact increased in intensity and outrageousness – to the present.

8.     I am presently fighting spurious charges that (if they were not being used to destroy my life would be laughable), among other things, include allegations made against me after only 18 days in a school, included a charge that I should be terminated and that I am an unsatisfactory teacher because I (i) had the temerity to bring "two plants" to the school to help make the environment more pleasant for administrators, teachers and students and (ii) that I instituted an incentive program to get and encourage students to excel in their overall academic achievements and that any student who achieved and maintained an "A" average would be given (by me out of my own pocket" a watch of his/her own choosing.

9.     I submit that - at least at this stage - those are the issues in this case and that relate to the NYC Defendants' Motion and they are addressed below.

## THE CONTINUING TORT AGAINST ME FROM 2003 TO PRESENT

### From 1992 to 2003

10.     From 1992 to 2003, I received accolades from the NYC Defendants, my fellow teachers and my students.   *See April 2009 Appendix pp 153 - 196.*

11.     I dedicated my life and career to give my students and minorities in the NYC public school system equal educational opportunities and I was praised for it – until 2003.

12.     In addition to the praise from Principals, Ass't Principals, colleagues, parents and students, I was honored as one of NYC's Teachers of the Year in 1999.

13.     However, everything changed in 2003 and from that point forward, I was targeted for and the victim of an ongoing pattern of harassment and retaliation and subjected to hostile work environment, intimidation, assignment to Rubber Rooms, improper medical examinations, repeated disciplinary charges, all of which were designed and intended to cause me to be removed from my profession, my life's work, my career, to suffer humiliation, to have my salary checks withheld, forced to spend tens of thousands to defend myself against frivolous and fabricated charges and all of which was because as Defendant Raschilla admitted in 2007 **"there were Orders to get Pakter"**.

14.     Defendants treated me as if I was a threat to their positions and "fiefdoms" within the NYC public school system.

15.     I was punished because I spoke out against Defendants pattern of intentional discrimination against minority students (of color) that I discovered within the NYC public school system (at least at his High School of Art & Design ("HS A&D").

16.     I was punished when I discovered, reported and spoke   out against the potentially criminal and/or negligent misdirection / misuse of dedicated educational funds for minority student programming at HS A&D.

17.     I was punished because I discovered and threatened to expose other discriminatory policies (against students and teachers) in the NYC public school.

18.     I was punished because I refused to be silenced and exercised my 1st Amendment rights to speak out against the policies I discovered and believed were discriminatory and in violation of students rights and my own rights, all of which threatened the NYC Defendants' future and job security.

19.     My students loved me, they were inspired and they excelled in their studies.

20.     The administration and the NYC Defendants hated me.

21.     And for that I was target, harassed and retaliated against.

### 2003, 2004 & 2005 – The Continuing Tort
### Targeting, Harassment, Retaliation, Discrimination and Ongoing Campaign Against Me!

22.     In May 2003, I prepared a Confidential Report to Defendant/Principal Appell entitled

        "Report and Information to Assist in Mission to Make The High School of Art and

        Design – The High School of First Choice for Every Junior High School Parent of New

        York's Best and Brightest Students "A Report Card Reflecting Progress and Areas in

        Need of Improvement")

23.     In this candid Report, I described areas for which improvement can and should be made

        but which also proved to be embarrassing or threatening to Defendant Appell and others

        at HS A&D (in particular Section 3 – Entitled Academic Programs and Course

        Offerings).  It was then that the harassment, discrimination and retaliation started.

24.     First I was attacked because out of my own pocket, I subsidized books for my students so

        they could learn French in my class and because I was trying to help them supplement the

        education offerings.

25.     I did this because I had discovered that there was a policy of discrimination against

        minority students and I tried to combat that.

26.     On Sept. 26, 2003, at the direction of Defendants Appellant Lachky, Defendant Mason

        sent me a letter accusing me of "fund-raising" in violation of Chancellor's Regulations

        (when they knew there was no such regulation exists pertaining to enrichment books).

                Note:  What I had done was simply buy the French books myself, express shipped

                them to the school and the students who wished to contribute reimbursed me for a

                part of the costs did so.  And for that I was accused of "fund-raising".

27. On Sept. 29, 2003, I was accused by Defendant (Ass't Principal) Mason (with knowledge of Defendants Appell & Lachky) of surreptitiously recording an in-school Conference at which I was forced to defend myself against the false charges of "fund-raising".

> Note: I had a right to record the meeting and the recording device was in plain sight and Defendants were informed – prior to the Conference – of my intention to record the meeting. There were no Chancellor's Regulations objections. Only after the meeting did they charge / accuse me with the surreptitious recording.

28. On Oct. 1, 2003, Ass't Principal Burack joined the attack against me demands a meeting for Oct. 2nd.

29. On Oct. 2, 2003, Defendant (Ass't Principal) Deninno joined the attack against me and demanded meeting on Oct. 3rd to discuss "curriculum issues".

30. On Oct. 2, 2003, I wrote a letter to Defendant Klein "blowing the whistle" on discriminatory policies at HS A&D.

31. On Oct. 8, 2003, Defendant (Ass't Principal) Deninno joined the harassment and demanded a meeting on Oct. 3rd. This time, I was accused of improperly offering my students French language for 10 minutes in my efforts to assist students to avoid adverse impact in their college options.

32. On Oct. 9, 2003, Defendant (Ass't Principal) Burack put a letter in my file falsely reporting meeting and alleged complaints received from students' about my class. There were negative references to my insistence on recording the meetings and accusations that I was insubordinate because I refused to turn off tape recorder, allegedly refused to follow directives, allegedly refused to follow supervisory directives and I was threatened with disciplinary action.

Note:  All this because I was trying to helping minority students learn French to help them with their overall education and their college options – and all after the students completed and satisfied all aspects of the mandatory curriculum – because the NYC Defendants deprived them of their educational rights.

33.   On Oct. 10, 2003, Defendant (Ass't Principal) Mason (with knowledge of Defendants Appell & Lachky) changed the charges from "fund-raising" to improper and unauthorized "sale of materials to students".   Note:  Again this is because I was helping his students with learning French, a subject, along with music and many other subjects, Principal Appell had determined the school's predominantly minority student population would be barred/prevented from studying.

34.   On Oct. 22, 2003, Defendant (Ass't Principal) Mason (with knowledge of Defendants Appell & Lachky) continued the charges that I was engaged in "sale of materials to students".   Note:  Again it was because I was helping students with learning French.

35.   On Oct. 22, 2003, Defendant (Ass't Principal) Mason put a letter in my file falsely reporting the events of an alleged Oct. 10th meeting and accusing me of misconduct for (i) "carrying video camera mounted on tri-pod" to record meeting in which I was being accused of insubordination, (ii) refusal to turn off the recorder, (iii) refusal to follow directives, (iv) refusal to follow supervisory directives and (iv) again threatening disciplinary action – AND an Unsatisfactory rating.

36.   On Oct. 24, 2003, I received a response (from Chad Vignola) to my  Oct. 3, 2003 whistle-blower letter to Defendant Klein.   Note:  Shortly after Mr. Vignola's letter he became embroiled in a scandal involving alleged misconduct and he resigned.

37.    From October 2003 to the end of the school year 2004, Defendants continued their harassment and retaliation so that they could give me negative Annual Professional Performance Reviews.

38.    And, for the school year '03 – '04, based on 1 year of false accusations against me, Defendants Appell, Mason, Deninno and Lachky settled on charges that I allegedly was deficient in my "attendance & punctuality" and I was rated Unsatisfactory.

>    Note:  These charges were evidence of further targeting, were based on the creation of falsified documents, created after the fact, and for the express purpose of making the unfounded charges.   Defendants purportedly create a special "Punctuality" file for me (no other teacher has such a file) and this file is fabricated and the dates and times are falsified as part of the continued targeting and harassment against me

### 2004 / 2005 - The Harassment, Retaliation & "Continuing Tort" Continues

39.    To prove the veracity of my prior whistle-blowing allegations of discrimination against minority students (of color) and allegations of misappropriation / misuse of educational funds, I made a Video Tape that proved all the things I was saying.   NOTE:  Almost immediately after this, Defendants increased their targeting and harassment against me.

40.    On Sept. 23, 2004, in a letter from Defendant Appell, I was summoned to a meeting to discuss "videotaping and subsequent actions" and at that meeting I as threatened disciplinary action, if I did not give Defendant Appell the tape and destroy all copies.  I refused.

41.    On Sept. 24, 2004, I receives notice that a "serious allegation" had been  made against me and that pending the outcome of the investigation I was being reassigned" to a Teacher Reassignment Center or "Rubber Room."   Note: The serious allegation related to the

Video tape that proved the discrimination against minority students that I made and which I refused to give up and refused to destroy.  The tape was evidence of the discrimination against students and the misappropriation [misuse of education funds] and ongoing targeting/harassment.  The Video tape is / was damning evidence against Defendants' conduct and its very existence is one of the reasons why I was threatened. [2]

42.   In 2004, I was outspoken in my objections to the fact that HS A& D classes and facilities were being diverted to children from an abutting school.  The existence of the Videotape threatened to expose the discrimination and apparent diversion and/or misappropriation of dedicated funds and facilities away from African American and Latino students to the benefit of a predominantly White Student body at the abutting school.   And, for that I was the target of further harassment.

43.   For the remainder of 2004 – 2005, I was confined in a Rubber Room and receives continued threats and extortion offers to the effect of "Give up the tape", "retire and we will leave you alone" and if you don't we will drag you through disciplinary proceedings and destroy you !

**2005 - The Targeting, Harassment, Retaliation and Discrimination Continues.**

---

[2] The videotape specifically depicted a class (from the abutting elementary school PS 59) that was predominantly white elementary school children receiving an instrumental music class at HS A & D.  The class was taught by a teacher of the abutting school who gave permission for the taping.  The teacher, Ms. Kim, was one of the authors of "Blueprint for the Arts" a citywide initiative to guarantee that every child in the NYC public school system from Kindergarten to 12th grade would receive classes in (i) music, (ii) the visual arts, (iii) drama and (iv) dance.  The Videotape was / is important because it corroborated my whistle-blowing by documenting violations of students' rights and denial of equal instructional service to minority students at HS A & D.  The reason I made the videotape was to secure evidence and to seek relief for HS A & D minority students, who were being denied their rights to these classes and education opportunities and who were stripped of their 2 (two) music teachers and curriculum.

**The 2005 Disciplinary Proceedings Based on Trumped Up Charges.**
**Due Process, Civil and Contractual Rights Violated During the Disciplinary Proceeding.**

44.    In April 2005, as part of the retaliation and harassment, I was charged with

"Unprofessional Conduct" and subjected to 3020a Disciplinary Hearings calling for my

termination.

45.    I was going to be disciplined because I helped students learn French, because I was

allegedly "not punctual" and because I refused to turn over the video tape.

46.    Defendants continued their threats and harassment.

47.    I was told "retire, shut up OR you will be terminated".

Note:  The 2005 Disciplinary Hearings were conducted in violation of NYS Educ.

Law Sec. 3020a, in violation of my contractual rights, and in violation of my

constitutional and due process rights, by a hearing officer who convened the

hearings without proper authority – in violation of the arbitration clauses of both

the contract and the statute under which they are governed  – and in which

fabricated and false evidence was improperly admitted.

48.    During the 3020a hearings, I was again told – "give up the tape, agree to shut up, agree to

retire OR we will subject you to harsh fines and discipline."

49.    The sworn testimony in the 3020a hearing shows that I was a victim of being targeted by

school administration, who treated me in a manner that was disparate to the treatment

other teachers received.

50.    Half way through Disciplinary Hearing in 2005, the Hearing Officer told my Defense

Counsel that the "highly questionable" charges of "alleged" tardiness and punctuality

would be thrown out but that he – the Hearing Officer – was angered that I would not

agree to submit to psychological counseling before doctors of Defendants choosing as a

condition of to reinstatement to my job and salary.

51.     I refused and the "alleged punctuality" and tardiness charges were kept in and are the basis for excessive penalty.

52.     I was fined more than $15,000 and sent back to a Rubber Room. It should be noted that the actual evidence showed that the original determination that I was "unfit for duty" was an intentional distortion and fabrication of fact and the Defendant Jacobson was forced by the Medical Arbitrator to concede that I was falsely and maliciously accused of being allegedly "unfit for duty" when there was no basis in fact or medicine for such an allegation or finding.

53.     I was forced to submit to 3020a Disciplinary Hearings to defend myself against charges that I was an "unsatisfactory teacher" while at the same time I was being illegally deprived of my salary and at a time when Defendants "physicians" declared me emotionally unstable and psychologically "unfit for duty".

54.     2005 – 2006  Defendant Stuart told me that Defendants were withholding my paychecks pending my agreement to leave the DOE.

### 2005 – 2006 – Unlawful Use of Medical Examinations as part of Ongoing Targeting, Harassment, Retaliation and Discrimination and Campaign to Get Rid of Me!

55.     Defendants' changed their approach to now take the following tack:

   *"If we cannot get rid of Pakter through the Disciplinary Proceedings – we will declare him mentally unfit for duty"*

56.     So as the Disciplinary Hearings dragged on and as I fought to try to protect my rights, Defendants launched the additional attack against me.

57.     Defendants first accused me of being "medically unfit to teach" and forced me to submit to psychiatric and psychological examinations.

58.     Defendants next illegally withhold my pay while their hand-picked medical "charlatans" pronounced me "unfit for duty".   See Misc. 2005 Letters involving Lachky, Penzell,

Medical Bureau, Human Resources, Schuster, Jacobson, MMPI Test, NYSUT, Goldwaser - Forensic Psychiatric Examination Report.

59.   In a May 2005 Letter, Defendant (Interim Acting Principal) Lachky demanded that I submit to a medical exam, claiming that I was "unfit for duty" and accusing me of (i) Videotaping without consent; (ii) Refusal to turn over tape; (iii) Threatening careers of Principal and Assistant Principals and (iv) Accessing / maintaining Pornographic materials on "his" computer.

60.   Defendant Lachky wrote Defendant Penzell making the false claim that *"Some time after his (my) removal files of pornographic materials were found on a computer that was under the sole custodial usage of Mr. Pakter and which was being used by his classes"*.

Note: The alleged pornographic materials were "found"/  "discovered" on an old classroom Student use computer 6 months after I had been removed from the school and confined in the Rubber Room and the charges were bogus and were thrown out.

61.   Yet, this was enough to force me into Medical Evaluations that dragged out for months, which exams were conducted or demanded by Defendants Eliane Meyer, Audrey Jacobson and others.

62.   In July 2005, I was forced and subjected to improper testing by Defendant Jacobson.

63.   From July – Aug. 2005, I was subjected to improper examinations by Defendant Garner on express Orders/Instructions from Defendant Jacobson. Garner then instructed Defendant Meyer to inform me that  Defendant Schuster to subject me to several hours of testing.  In reality Schuster subjected me to an almost endless battery of Psychological tests over two full days,  immediately after Jacobson improperly  provided Schuster in

advance with a long and detailed "laundry list" of symptoms Schuster is "expected" to "find/discover".

64.   On Aug. 16, 2005, Defendant Jacobson improperly determined that I was "unfit" for duty" allegedly based on Defendants Schuster & Garner's reports.

65.   The MMPI-2 results and other evidence that was favorable to me was suppressed and/or concealed, in particular test results that stated:   *"(My) MMPI-2 clinical and content scales are within normal limits.  No clinical symptoms were reported".*

66.   In Oct. 2005,  an expert and world renowned Forensic Psychiatrist that I retained from NYU - Professor Dr. Alberto Goldwaser, M.D., D.F.A.P.A. – proved without a doubt that Defendants' conduct against me and in declaring me "unfit" was improper and unlawful and in violation of my civil, due process and contract rights.

67.   Yet, Defendants refused to immediately act upon this evidence.

68.   It  took from May 2005 to June 2006 for me to finally clear myself of the false charges made against me by these Defendants.

69.   And even, though I was cleared, Defendants STILL withheld my pay until June 2006.

70.   Dr. Charles Schwartz of Montefiore Hospital, who was chosen by Defendants themselves to be an "Independent" Psychological Arbitrator for Final Binding Medical Arbitrator confirmed that there was NOTHING WRONG with me and that the prior declaration that I was "unfit" was improper and against medical findings and unsupported by any scientific evidence.

71.   I was declared "FIT FOR DUTY" and the prior findings were declared erroneous.

72.   Yet, Defendants persisted – and even Defendants counsel Martinez continues to attempt to dredge up information (such as an allegation that I was unfit for duty and an allegation that I used pornographic materials at school) that he knows are false, that he knows are

improper and which he raises for what I submit are the sole and improper purposes of

attempting to besmirch my name and reputation through scandalous and salacious

materials that are irrelevant, immaterial and false.


**2006 and 2007 present -  Continuing Tort**
**Targeting, Harassment, Retaliation and Discrimination and Campaign to Get Rid of Me!**

73.    In 2007, I was transferred, without my permission, to High School for Fashion Industries

in Manhattan.

74.    Even though I objected to the transfer, I continued to try to inspire and motivate students

and make environment more enjoyable place of learning for everyone.

75.    I was at the High School for Fashion Industries for 18 days before I was informed that I

was AGAIN being brought up on disciplinary charges.

76.    The sum and substance of what the NYC Defendants kept telling me is/was that I had a

choice, to wit:  shut up, retire or we will terminate you and/or impose harsh discipline.

77.    I refused to shut up and I refused to retire.

78.    In October 2007, I received disciplinary charges for alleged unsatisfactory behavior that

allegedly merited my termination.  The charges were that I:

    a.    Talked about my and my family's watch business (I did but I was using it as

incentive to get the students to increase their overall GPA and if they did, they

would earn the watch of their choosing);

    b.    Providing watch website address (I did but again it was part of the incentive to get

the students to increase their overall GPA and if they did they would earn the

watch of their choosing);

c. Showing students book, brochure and catalog of watches (I did but again it was part of the incentive to get the students to increase their overall GPA and if they did they would earn the watch of their choosing);

d. Saying words to the effect that I would give a watch to any student who achieved an overall grade point average of 90% or better ((I did but again it was part of the incentive to get the students to increase their overall GPA and if they did they would earn the watch of their choosing);

e. Showing two watches to students;

f. Talking about my personal life;

g. Saying words to the effect that I was fired from High of Art and Design for being a Whistle-blower;

h. Showing the class a 25 minute film clip of an Internationally acclaimed film in which the violent scenes which earned the film an "R" rating were not part of the film clip;

i. Bringing "trees" (tall potted plants) to school;

j. Causing widespread negative publicity and notoriety to High School of Fashion Industries and New York City Public School System;  and

k. Being late to the Rubber Room (to which I was improperly assigned out of my Region- a small Rubber Room that lacked any windows or available drinking water or adequate air circulation and was otherwise unsafe, dangerous and a hostile work environment).

79. Again in 2007, Defendants continued their harassment and retaliation against me and sought my termination and retirement.

80.   As part of the ongoing plan of extortion, harassment, discrimination and retaliation, Defendants continued to tell me, in sum and substance that:

*"If you shut up, If you agree to turn over and destroy the tapes, If you stop talking about the problems at High School of Art & Design, IF you stop raising issues about alleged misappropriation / misuse of educational funds, If you stop talking about discrimination of minority students and teachers at certain schools and similar policies within the NYC Public School System, we will let you retire without a 'blemish' on your record and with your license.  BUT - If do NOT, we will terminate you and you will never work as a teacher again"!*

81.   The threats to stop me from publicizing the issues raised by and shown in the tape continued.

82.   And again, in sum and substance, I was given the option of shutting up, agreeing to retire, and in exchange the disciplinary charges would be dropped, the harassment would end and I would be allowed to leave with my name and reputation in tact.

83.   But if I continued to speak out about the discriminatory policies, the misuse of funds, the deprivation of mandated curricula for minority students and if I continued to stand up for what that which I knew and believed to be the students' and my rights, I would be subjected to harsh further retaliation, fines and discipline.

84.   I refused.

### 2007/8 to present -  Continuing Tort
### Targeting, Harassment, Retaliation and Discrimination and Campaign to Get Rid of Me!

85.   I was next harassed and retaliated when I gave an interview in my Union's newspaper.  It was this interview in which Defendant Raschilla made his Admissions against Interest and it was this interview that caused enormous public attention (negative public attention)

to be focused on Defendants' policies and conduct with me as the "poster child" of whistle-blower retaliation.

86.    Because of the interview I gave, disciplinary charges were filed against me, notwithstanding my 1st Amendment rights to speak out on these matters of great public interest.

87.    The disciplinary charges based on my 2007 Interview were dropped in June 2008 – after objections by the Union President.

88.    In 2007 and 2008 I filed multiple Notices of Claim.

89.    In 2007 and 2008, my Notices of Claim addressed the issues of age discrimination (and their repeated efforts to get me to retire and offers to permit me to retire in lieu of going through 3020a hearings and the risk of more potentially damaging discoveries), ADA violations, civil and due process rights violations, unlawful retaliation for exercising my 1st Amendment and other rights (including the rights to file complaints) and the other wrongs they committed against me.

90.    In 2008, my NYS DHR and EEOC complaints were dismissed (at my and Defendants request) so that the case could proceed in Federal Court and I was given a Right to Sue Letter.

91.    At the present time, I am in the midst of a disciplinary hearing that includes the ridiculous charges, including the charge that I am an unsatisfactory teacher "because I sought to give incentive rewards to students who achieved A averages and because I brought plants to make the school look nicer".

    a.    What is really going on is that I have been singled out, retaliated against, harassed and discriminated against  – exactly as Defendant Raschilla admitted in the March 2007 Interview – through an ongoing campaign and continuing tort that included

the **"making of false allegations"** the filing of ***"memos"*** **against me and/or**

**memos to be placed in my file . . . that (Defendants)** ***"knew were not true"***; and

b.  ALL of this was ***"on Orders from Region 9 (their superiors) to 'get something'***

***on (me)"***.

## <u>CONCLUSION</u>

92.   So why did Defendants do the things of which I accuse them and which are documented

in and by the irrefutable evidence that is alleged in my complaint or the documents

already presented to the Court or in Defendants own records?

93.   I spoke out on important issues related to minority students' education.

94.   I protested school policies and conduct of school officials who discriminated against

minority students and who diverted funds

95.   I sought to motivate students to achieve superior grades.

96.   I demanded my contract and due process rights.

97.   I was a tenured teacher over 60 years of age and when my rights were infringed upon I

objected.

98.   I refused to give up the evidence that confirmed Defendants violations of minority

students' rights, deprivation of equal educational opportunities and misuse of funds.

99.   I demanded my day in Court.

100.   And for all this, for the last 6 years I have been (i) targeted, (ii) harassed, (iii)

discriminated against, (iv) victimized, (v) ridiculed, (vi) stripped of my pay, (vii) forced

to undergo humiliating medical examinations, (viii) forced to endure hostile work

environment, (ix) forced to expend tens of thousands of dollars to defend myself of

frivolous and false charges, (x) forced to endure emotional distress, (xi) have my name

smeared with such unlawful and knowingly false allegations that have been spread across

the internet accusing me of having allegedly downloading pornography on a school computer (which they mysteriously found on a computer 5 months after I was already out of the school), (xii) confined to Rubber Rooms without due process for years on end, and (xiii) have my career, good name and professional career have been destroyed.

101.   Defendants' suggestion that these were singular events is as laughable as it is pathetic.

102.   And, I pray the Court see through this charade and allow me to move expeditiously to a trial on the merits.

103.   The foregoing statements made by me are true the best of my knowledge, information and belief and based on my knowledge of the files and evidence in this case.


Dated:  New York, NY                                  _____
        _____                                David Pakter